UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:12-cv-557

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **COMPLAINT FOR DECLARATORY** |
| v. ) | **AND INJUNCTIVE RELIEF** |
| ) | |
| STATE OF NORTH CAROLINA, ) | |
| ) | |
| Defendant. ) | |

## INTRODUCTION

1. Title II of the Americans with Disabilities Act ("ADA") prohibits the unjustified isolation of persons with disabilities, *see* 42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), and requires states and other public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") similarly prohibits recipients of federal financial assistance from discriminating against individuals with disabilities, and requires that they provide services and supports in the most integrated setting appropriate to the needs of individuals with disabilities. 29 U.S.C. § 794, 45 C.F.R. § 84.4.

2. In North Carolina, thousands of people with mental illness ("the Residents") are unnecessarily in institutional settings called adult care homes, even though they could be more appropriately served in community-based settings.

3. More integrated and appropriate alternatives for persons with mental illness exist within North Carolina's mental health service system. These alternatives include supported housing—

integrated, community-based housing that provides tenants with all the rights of tenancy—and an array of mental health services to support people with mental illness living in the community. If administered appropriately, these community-based services are well able to meet the needs of people with mental illness.

## JURISDICTION

4. This Court has jurisdiction of this action under title II of the ADA, 42 U.S.C. § 12133, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, and 28 U.S.C. §§ 1331 and 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391, given that a substantial part of the acts and omissions giving rise to this action occurred in the Eastern District of North Carolina. 28 U.S.C. § 1391(b).

## PARTIES

6. Plaintiff is the United States of America.

7. Defendant State of North Carolina is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and is, therefore, subject to title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its implementing regulations, 28 C.F.R. Part 35.

8. At all times relevant to this action, the State of North Carolina has been a "recipient" of "federal financial assistance," including Medicaid funds, and is, therefore, subject to the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 34 C.F.R. Part 104.

## STATUTORY AND REGULATORY BACKGROUND

9. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). It found that "historically, society has tended to isolate and segregate individuals

2

with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

10. For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

11. Congress directed the Attorney General to issue regulations implementing title II of the ADA. 42 U.S.C. § 12134. The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]" 28 C.F.R. § 35.130(d), App. B at 673 (2011).

12. Regulations implementing title II of the ADA further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3); *accord* 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

13. Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a): "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the

3

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity…."

14. The Rehabilitation Act's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); *see also* 45 C.F.R. § 84.4.

15. In *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities. Under *Olmstead*, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id*. at 607.

## FACTUAL ALLEGATIONS

**A. North Carolina's Mental Health Service System**

16. North Carolina has a mental health service system through which it delivers services to persons with mental illness. State law requires North Carolina "to provide mental health . . . services through a delivery system designed to meet the needs of clients in the least restrictive, therapeutically most appropriate setting available" and "to provide community-based services when such services are appropriate, unopposed by the affected individuals, and can be reasonably accommodated within available resources and taking into account the needs of other persons for mental health, developmental disabilities, and substance abuse services." N.C. Gen. Stat. § 122C-2 (2010).

17. The North Carolina Department of Health and Human Services ("DHHS") is the State agency responsible for developing and implementing the State plan for the delivery of mental

health services, including setting strategic goals and determining how state, local, and federal resources will be deployed. N.C. Gen. Stat. §§ 122C-102, -112.1(b)(4) (2010).

18. Within DHHS, the Division of Mental Health, Developmental Disabilities and Substance Abuse Services ("DMH") manages the mental health service system, and, in doing so, enforces policies and regulations, allocates public funds, and manages the community mental health system. The Division of Medical Assistance ("DMA") within DHHS manages the State's Medicaid program, which includes coverage of mental health, developmental disabilities, substance abuse, and other services to Medicaid-eligible individuals in adult care homes and other settings.

19. In carrying out these roles and responsibilities, the State determines what mental health services to provide, who will provide them, in what settings to provide them, and how to allocate funds among various services and settings. *See id.* §§ 122C-102, -112.1(b)(4).

20. Among the State's mental health programs and services are community support and residential care services. Community support services include case management services, psychosocial rehabilitation services, Assertive Community Treatment ("ACT") teams, Community Support Teams, peer support services, supported employment, and a range of crisis services.

21. Residential services include supported housing, group homes, and residential treatment services. North Carolina also delivers publicly subsidized inpatient psychiatric services through its State-operated psychiatric hospitals.

22. Thousands of individuals with mental illness also receive services in adult care homes—facilities licensed by DHHS to provide room and board, housekeeping, and personal care services for two or more unrelated adults—even though these facilities are not designed to

5

provide for the mental health needs of their residents, and are prohibited by State law from admitting individuals for the purpose of mental health treatment. *See* N.C. Gen. Stat. §§ 131D-2.1, -2.4; 10A N.C. Admin. Code § 13F.0701; *see also* STUDY OF ISSUES RELATED TO PERSONS WITH MENTAL ILLNESS IN LONG-TERM CARE FACILITIES, at 4 (Dec. 1, 2005).

23.     By virtue of the manner in which North Carolina has administered its service system, adult care homes have become a major part of the State's mental health service system. *See* SHORT- AND LONG-TERM SOLUTIONS FOR CO-LOCATION IN ADULT AND FAMILY CARE HOMES: A REPORT OF THE NCIOM TASK FORCE ON THE CO-LOCATION OF DIFFERENT POPULATIONS IN ADULT CARE HOMES, North Carolina Institute of Medicine, at 11 (January 2011).

24.     North Carolina subsidizes a portion of the cost of providing care to most residents of adult care homes.

25.     North Carolina also licenses, inspects, monitors, and regulates adult care homes, and has the power to determine their capacity. N.C. Gen. Stat. § 131D-2.4; *see* N.C. Gen. Stat. § 131E-178(a). New adult care home beds cannot be developed without a certification from the State that a need for those beds exists. N.C. Gen. Stat. § 131E-178(a); *see* N.C. Gen. Stat. § 131E-176 (including adult care homes in definition of health service facility and health service facility bed).

26.     Additionally, the State uses adult care homes as places to discharge persons leaving its psychiatric hospitals. From 2001 to 2010, the State discharged 7,595 individuals with mental illness from psychiatric hospitals directly to adult care homes and family care homes. ADULT CARE HOME REPORT: HOSPITAL DISCHARGES 2000-2010, DHHS Div. of State Operated Healthcare Facilities, at 1-2.

27. Similarly, Residents have reported that employees within the State's Division of Social Services have also placed persons with mental illness in adult care homes.

28. As the State has acknowledged, "many with mental illnesses continue to live in long term care settings because there are not yet more appropriate alternatives available to them in their communities." STUDY OF ISSUES RELATED TO PERSONS WITH MENTAL ILLNESS IN LONG-TERM CARE FACILITIES, Dep't of Health and Human Servs., at 4 (December 1, 2005).

29. A State-funded report has similarly acknowledged an "institutional bias" in North Carolina: "People who enter an ACH or other type of facility can obtain certain financial assistance, services, and supports that are not equally available to people with similar levels of disability and financial need who choose to remain in their own homes." SHORT- AND LONG-TERM SOLUTIONS FOR CO-LOCATION, at 32.

30. As a result of the State's planning, structuring, administration, and funding of its system of care, people with mental illness receive services unnecessarily in adult care homes or are at risk of unnecessary institutionalization.

**B. Adult Care Homes**

31. Adult care homes are institutional settings that do not enable Residents to interact with nondisabled persons to the fullest extent possible. Many adult care homes house a large number of people, a significant percentage of whom have diagnoses of mental illness. Residents live in close quarters primarily with other persons with disabilities, and most aspects of their daily lives are regimented and limited by rules and practices of adult care homes.

32. Many Residents are seen on-site by doctors and mental health and health care providers. In some adult care homes, staff dispense medications by cart; in others, Residents are required to queue at a medication station.

33. Paging systems are used on a regular basis at many facilities, and administrative offices in some adult care homes display video screens on which the movements and activities of Residents can be monitored.

34. Adult care homes have highly regimented meal and medication times, and Residents of adult care homes are typically assigned to small, shared bedrooms with other people.

35. Several adult care homes house Residents behind locked, alarmed doors, restricting their ability to come and go freely. Many facilities have curfews, and require guests to sign in and out. *See also* 10A N.C. Admin. Code § 13F.0906(f)(2) (permitting restrictions on visitation by friends and family); 10A N.C. Admin. Code § 13F.0906(f)(3) (requiring facilities to maintain a sign out register).

36. Physically, many adult care homes are isolated from the general community—they are often located in remote areas outside of walking distance to stores and town centers. Although some facilities take Residents on organized trips to shopping centers or stores, Residents typically travel together as a group in a facility's bus or van.

37. In a recent report regarding the co-location of different populations in adult care homes, a task force comprised of State officials and employees, as well as various stakeholders, recognized that adult care homes "are not optimal for community integration," and that "[r]esidents of adult care homes may be cut off from active participation in the local community because of the lack of transportation and the structured format (i.e., the schedule of meals and personal care) of many residential care homes." *See* SHORT- AND LONG-TERM SOLUTIONS FOR CO-LOCATION, at 34.

38. A 2005 report issued by DHHS similarly acknowledged that "many with mental illnesses continue to live in long term care settings because there are not yet more appropriate alternatives

available to them in their communities" and that adult care homes are not designed to allow persons with mental illnesses "to achieve a greater measure of independence." *See* STUDY OF ISSUES RELATED TO PERSONS WITH MENTAL ILLNESS IN LONG-TERM CARE FACILITIES, Dep't of Health and Human Servs., at 4 (December 1, 2005).

### C. Individuals with Mental Illness Residing in Adult Care Homes Are Qualified to Receive Services in More Integrated Settings

39. Upon information and belief, the vast majority of persons with mental illness in adult care homes and those at risk of entry to adult care homes can be served in more integrated settings.

40. The placement of persons with mental illness in adult care homes is not based on a determination that such placement is clinically necessary. Instead, people with mental illness tend to end up in adult care homes simply because there are no available community-based alternatives. As the State has acknowledged, adult care homes are not the most appropriate settings for persons with mental illness, because, among other things, they are not designed to provide any recovery-oriented or rehabilitative services, or to afford people with mental illness opportunities for achieving greater independence and community integration. *See, e.g.,* STUDY OF ISSUES RELATED TO PERSONS WITH MENTAL ILLNESS IN LONG-TERM CARE FACILITIES, Dep't of Health and Human Servs., at 4 (December 1, 2005).

41. People with mental illness in adult care homes are not materially different from people with mental illness who receive services in the community. They have similar diagnoses and symptoms of people who live successfully in more independent settings, with the supports and services that exist in the State's community mental health system.

42. Supported housing is a community-based program that is able to meet the needs of persons with mental illness.

43. The State has acknowledged that supportive housing is an effective service setting for persons with serious mental illness and achieves positive outcomes in terms of housing and health stability and improvement in quality of life for persons with mental illness. *See, e.g.,* SUPPORTIVE HOUSING AS AN ALTERNATIVE TO PSYCHIATRIC HOSPITALIZATION, Dep't of Health and Human Servs., at 1-2 (March 15, 2011).

44. With reasonable modifications, the types of services and supports that exist in North Carolina's community mental health service system are able to meet the needs of people with mental illness confined to adult care homes.

45. People with mental illness in adult care homes would not oppose moving to integrated settings if they had a fully-informed choice and a realistic opportunity to do so. Numerous Residents have expressed their desire to leave their adult care homes and become members of their communities once again.

**D. Providing Services in Integrated Settings Can Be Reasonably Accommodated**

46. Providing services to Residents and persons with mental illness at risk of entry to adult care homes in community settings can be reasonably accommodated.

47. The types of services needed to support people with mental illness in community-based settings already exist in North Carolina's community mental health service system, including ACT Teams, Community Support Teams, case management services, peer support services, supported employment services, psychosocial rehabilitation services, and crisis services. They have been administered, however, in a manner inadequate to serve Residents in community-based settings.

48. Supported housing also exists in the State's mental health system, but on a scale that is inadequate to meet the needs of persons who are unnecessarily institutionalized in adult care

homes.  *See* SERVING PERSONS WITH DISABILITIES IN APPROPRIATE SETTINGS: THE NORTH CAROLINA PLAN, Dep't of Health and Human Servs., at 29, 32-33 (April 2003).  *See generally* SUPPORTIVE HOUSING AS AN ALTERNATIVE TO PSYCHIATRIC HOSPITALIZATION, Dep't of Health and Human Servs., at 1 (March 15, 2011).  The State could redirect funds it currently spends on services for Residents of adult care homes and use them to support Residents in community-based settings.

### E.  The United States' Investigation

49.     On July 28, 2011, after an eight month investigation into the State's mental health service system, the United States Department of Justice (the "Department") sent a formal Letter of Findings (the "Letter") to the Attorney General of North Carolina.  The Letter reported in detail the findings of the Department's investigation, provided the State notice of its failure to comply with the ADA, and outlined the steps necessary for the State to meet its obligations under the ADA.

50.     The Letter reported the Department's findings that "the State fails to provide services to individuals with mental illness in the most integrated setting appropriate to their needs in violation of the ADA" and that "[t]he State plans, structures, and administers its mental health service system to deliver services to thousands of persons with mental illness in large, segregated adult care homes, and to allocate funding to serve individuals in adult care homes rather than in integrated settings."

51.     The Letter identified numerous remedial measures the State could take to comply with the ADA, and further advised the State that, in the event that a resolution could not be reached voluntarily, the Attorney General may initiate a lawsuit.  Over the past year, the Department met with State officials and exchanged written proposals in an attempt to reach a resolution to the deficiencies identified in the Letter.  The parties ultimately reached a settlement agreement.

52. All conditions precedent to the filing of this Complaint have occurred or been performed.

## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

53. The allegations of Paragraphs 1 through 52 of the Complaint are hereby realleged and incorporated by reference.

54. Defendant is a public entity subject to title II of the ADA. 42 U.S.C. § 12131(1).

55. Defendant violates the ADA by administering its mental health service system in a manner that denies Residents and persons with mental illness at risk of entry into adult care homes the opportunity to receive services in the most integrated setting appropriate to their needs.

56. The Residents and persons with mental illness at risk of entry into adult care homes are persons with disabilities covered by title II of the ADA, and they are qualified to receive services in a more integrated setting. 42 U.S.C. §§ 12102, 12131(2).

57. Providing services to Residents and persons with mental illness at risk of entry into adult care homes in more integrated settings can be accomplished with reasonable modifications to the Defendants' programs and services.

58. Defendant's actions constitute discrimination in violation of title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Part 35.

## COUNT II

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

59. The allegations of Paragraphs 1 through 58 of the Complaint are hereby re-alleged and incorporated by reference.

60. The State of North Carolina, which is a recipient of federal financial assistance, discriminates against "qualified individual[s] with a disability" within the meaning of Section

504 of the Rehabilitation Act by administering programs and services for individuals with mental illness in a manner that denies individuals the opportunity to receive services in the most integrated setting appropriate to their needs. 29 U.S.C. § 794; 45 C.F.R. § 84.4.

61.     The Residents and persons with mental illness at risk of entry into adult care homes are persons with disabilities covered by Section 504 of the Rehabilitation Act, and they are qualified to receive services in a more integrated setting.

62.     Providing services to Residents and persons with mental illness at risk of entry into adult care homes in more integrated settings can be accomplished with reasonable modifications to the Defendants' programs and services.

63.     Defendant's actions constitute discrimination in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 45 C.F.R. § 84.4.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

    A.      Grant judgment in favor of the United States on its Complaint and declare that Defendant has violated title II of the ADA, 42 U.S.C. § 12131 *et seq.* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

    B.      Enjoin Defendant from:

        1.      failing to provide appropriate, integrated community services and supports to Residents and individuals with mental illness at risk of unnecessary segregation in adult care homes;

        2.      discriminating against Residents and individuals with mental illness at risk of unnecessary segregation in adult care homes by failing to provide services and supports in the most integrated setting appropriate to their needs;

C. Issue a declaratory judgment declaring that Defendant has violated title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to services, programs, and supports for Residents and individuals with mental illness at risk of unnecessary segregation in adult care homes to enable them to receive services in the most integrated setting appropriate to their needs; and

D. Order such other appropriate relief as the interests of justice may require.

This 23rd day of August, 2012.                    Respectfully submitted,


*/s/ Thomas G. Walker*                              */s/ Thomas E. Perez*
THOMAS G. WALKER                                    THOMAS E. PEREZ
United States Attorney                              Assistant Attorney General
Eastern District of North Carolina                  Civil Rights Division

                                                    EVE HILL
                                                    Senior Counselor to the Assistant Attorney General
                                                    Civil Rights Division

                                                    ALISON N. BARKOFF
                                                    Special Counsel for *Olmstead* Enforcement
                                                    Civil Rights Division

                                                    GREGORY B. FRIEL
                                                    Acting Section Chief
                                                    SHEILA M. FORAN
                                                    Special Legal Counsel
                                                    ANNE S. RAISH
                                                    Deputy Chief
                                                    Disability Rights Section
                                                    Civil Rights Division


*/s/ G. Norman Acker III*                           */s/ Joy Levin Welan*
G. NORMAN ACKER III                                 JOY LEVIN WELAN, D.C. Bar No. 978973
Assistant United States Attorney                    REGAN RUSH
310 New Bern Avenue                                 TRAVIS W. ENGLAND
Federal Building, Suite 800                         REGINA KLINE
Raleigh, NC 27601                                   Trial Attorneys
Telephone: (919) 856-4530                           Disability Rights Section
Facsimile: (919) 856-4821                           Civil Rights Division

14

Norman.Acker@usdoj.gov
N.C. Bar No. 12839

U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone: (202) 305-1894
Facsimile: (202) 307-1197
Joy.Welan@usdoj.gov

*Counsel for Plaintiff United States of America*