# Exhibit A

# SETTLEMENT AGREEMENT

## I.   GENERAL PROVISIONS

**A.**    This Agreement (the "Agreement") is entered into between the United States ("United States") and the State of North Carolina (the "State") (hereinafter collectively "the Parties").

**B.**    This Agreement resolves the investigation conducted by the United States concerning alleged violations by the State of title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12131, *et seq.*, as interpreted by the United States Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999), and Section 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 794(a). The Agreement addresses the corrective measures set forth by the United States in its letter to the State dated July 28, 2011 ("Findings Letter"). This Agreement does not serve as an admission by the State that corrective measures are necessary to meet the requirements of the ADA, the Rehab Act, or the *Olmstead* decision, or that the State is not currently complying with the ADA or the Rehab Act. The State specifically does not agree that any citizen or resident of the State is entitled to housing or a housing subsidy under the United States or North Carolina Constitutions, the ADA, the Rehab Act, the *Olmstead* decision, or any other federal or State law or regulation.

**C.**    This Agreement is intended to ensure the State will willingly meet the requirements of the ADA, the Rehab Act, and the *Olmstead* decision, which require that, to the extent that the State offers services to individuals with disabilities, such services shall be provided in the most integrated setting appropriate to meet their needs. Accordingly, through this Agreement, the Parties intend that the goals of community integration and self-determination will be achieved.

**D.**    Since the United States issued the Findings Letter, the State has cooperated fully with the United States in reviewing the findings and working with the United States to resolve the findings, even though the State disputes many of the findings and conclusions. The Parties agree that it is in their mutual interest to avoid litigation.

**E.**    Nothing in this Agreement shall be construed as an acknowledgment, an admission, or evidence of liability of the State under the ADA, the Rehab Act, the holding in *Olmstead*, the Constitution or any federal or State law, and this Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

**F.**    The signatures below of officials representing the United States and the State signify that these parties have given their final approval to this Agreement. Each

Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of his or her entity is duly authorized to enter into this Agreement and to bind that Party to the terms and conditions of this Agreement.

**G.** This Agreement is binding upon the Parties, by and through their officials, agents, employees, and successors for the term of this Agreement. If the State contracts with an outside provider for any of the services provided in this Agreement, the Agreement shall be binding on all contracted parties, including agents and assigns. The State shall ensure that all contracted parties and agents take all actions necessary for the State to comply with the provisions of this Agreement.

**H.** No person or entity is intended to be a third party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and, accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement in any civil, criminal, or administrative action. Neither third parties, nor the Court, shall have the ability to modify the terms set out in this Agreement without consent of the Parties, subject to the enforcement provisions set forth in Sections V(F) and (G), below.

**I.** This Agreement and any documents incorporated by reference constitute the entire integrated Agreement of the Parties. No prior contemporaneous communications, oral or written, or prior drafts shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding. Any amendment to this Agreement shall be in writing and signed by both Parties.

**J.** This Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same Agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart. All references to signature or execution of the Agreement shall be calculated from the date on which the last Party executed the Agreement.

**K.** The State, while empowered to enter into and implement this Agreement, does not have the legal authority to bind the North Carolina General Assembly, which has the authority under the North Carolina Constitution and laws to appropriate funds for, and amend laws pertaining to, the State's system of services for people with mental illness. The State agrees to seek funding necessary to implement and complete the terms of this Agreement. In the event the State fails to attain necessary appropriations to implement and complete the terms of this Agreement this year or in a future fiscal year, this Agreement shall become null and void and the United States has the right to revive any claims otherwise barred by operation of this Agreement. Any question of whether the amount of the appropriations is adequate to implement and complete the terms of the Settlement Agreement is solely for determination by the State, and the State's determination may not be challenged by the United States in any forum, unless the United States can show it was not made in good faith.

2

**L.**      During the pendency of this Agreement, the United States is barred from bringing an action against the State of North Carolina under the ADA or the Rehab Act for any claim or allegation set forth in the Findings Letter.

**M.**      The Parties represent and acknowledge that this Agreement is the result of extensive, thorough and good faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims or allegations set forth in the Findings Letter.

**N.**      The United States and the State will bear the cost of their own fees and expenses incurred in connection with this Agreement.

**O.**      This Agreement shall be interpreted in accordance with federal law and the laws of the State of North Carolina. The venue for all legal actions concerning this Agreement shall be in the United States District Court for the Eastern District of North Carolina, Western Division (the "Court").

## II.    DEFINITIONS

**A.**      "Housing Slot(s)" are defined as State or federal housing vouchers and/or rental subsidies for community-based supported housing. Each Housing Slot includes a package of tenancy support, transition support and rental support.

**B.**      The term "individual" shall mean the individual, or, in situations where a guardian of the person or general guardian has been appointed because the individual has been declared legally incompetent, the individual and his or her guardian. Guardians shall seek to preserve for the individual who has been declared legally incompetent the opportunity to exercise those rights that are within his or her comprehension and judgment, allowing for the possibility of error to the same degree as is allowed to persons who have not been declared legally incompetent, in accordance with N.C. Gen. Stat. § 35A-1201(a)(5). Guardians shall permit individuals who have been declared legally incompetent to participate as fully as possible in treatment discussions and discharge planning, to the maximum extent of the individual's capabilities, in accordance with N.C. Gen. Stat. § 35A-1201(a)(5). Any decisions made by the guardian about where the individual will live should reflect the individual's preferences, to the extent possible, in accordance with guidance issued by the Division of Aging and Adult Services. The State shall conduct in-reach and education with county Departments of Social Services and Clerks of Court to ensure that guardians of individuals with Serious Mental Illness and Serious and Persistent Mental Illness, as defined below, who have been declared legally incompetent understand these requirements.

C.     An individual with "Serious Mental Illness" ("SMI") is defined, consistent with North Carolina's Local Management Entity ("LME") Operations Manual, as an individual who is 18 years of age or older with a mental illness or disorder (but not a primary diagnosis of Alzheimer's disease or dementia) that is described in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, that impairs or impedes functioning in one or more major areas of living and is unlikely to improve without treatment, services and/or supports.

D.     An individual with "Serious and Persistent Mental Illness" ("SPMI") is defined, consistent with North Carolina's LME Operations Manual, as a person who is 18 years of age or older:

1.     with a mental illness or disorder (but not a primary diagnosis of Alzheimer's disease or dementia or acquired brain injury) so severe and chronic that it prevents or erodes development of functional capacities in primary aspects of daily life such as personal hygiene and self care, decision-making, interpersonal relationships, social transactions, learning and recreational activities; or

2.     who is receiving Supplemental Security Income ("SSI") or Social Security Disability Income ("SSDI") due to mental illness.

E.     SPMI and SMI specifically include individuals who otherwise satisfy the relevant criteria and who have a co-occurring condition, such as a substance abuse disorder, developmental disability, acquired brain injury or other condition.

F.     "Tenancy Rights" are defined as rights created by a landlord/tenant relationship, whether through a direct lease or a sublease.

## III.    SUBSTANTIVE PROVISIONS

A.     The State agrees to develop and implement effective measures to prevent inappropriate institutionalization and to provide adequate and appropriate public services and supports identified through person centered planning in the most integrated setting appropriate to meet the needs of individuals with SMI, who are in or at risk of entry to an adult care home, pursuant to the details and timelines set forth below.

B.     **COMMUNITY-BASED SUPPORTED HOUSING SLOTS**

1.     The State will develop and implement measures to provide individuals outlined in Section III(B)(2)(a)-(e) access to community-based supported housing. Nothing in this Agreement will require the State to forgo federal funding or federal program participation, for housing that meets all the criteria in Section III(B)(7), to provide community placements for individuals pursuant to this Agreement.

4

2.  Priority for the receipt of Housing Slots will be given to the following individuals:

    a.  Individuals with SMI who reside in an adult care home determined by the State to be an Institution for Mental Disease ("IMD");

    b.  Individuals with SPMI who are residing in adult care homes licensed for at least 50 beds and in which 25% or more of the resident population has a mental illness;

    c.  Individuals with SPMI who are residing in adult care homes licensed for between 20 and 49 beds and in which 40% or more of the resident population has a mental illness;

    d.  Individuals with SPMI who are or will be discharged from a State psychiatric hospital and who are homeless or have unstable housing; and

    e.  Individuals diverted from entry into adult care homes pursuant to the pre-admission screening and diversion provisions of Section III(F) of this Agreement.

3.  The State will provide access to 3,000 Housing Slots in accordance with the following schedule:

    a.  By July 1, 2013 the State will provide Housing Slots to at least 100 and up to 300 individuals.

    b.  By July 1, 2014 the State will provide Housing Slots to at least 150 additional individuals.

    c.  By July 1, 2015 the State will provide Housing Slots to at least 708 individuals.

    d.  By July 1, 2016 the State will provide Housing Slots to at least 1,166 individuals.

    e.  By July 1, 2017 the State will provide Housing Slots to at least 1,624 individuals.

    f.  By July 1, 2018 the State will provide Housing Slots to at least 2,082 individuals.

    g.  By July 1, 2019 the State will provide Housing Slots to at least 2,541 individuals.

    h.  By July 1, 2020 the State will provide Housing Slots to at least 3,000 individuals.

4.  The State shall develop rules to establish processes and procedures for

5

determining eligibility for the Housing Slots consistent with this Agreement. Until such time, Housing Slots will be allocated on a first come, first served basis based on geographic housing availability and individual preference in accordance with the priorities set forth in III(B)(2), above. Housing Slots will only be offered to individuals who are Medicaid eligible, Special Assistance eligible in an adult care home, would be Special Assistance eligible in an adult care home though no longer residing in an adult care home, or have a gross income equal to or less than 100% of the Federal Poverty Guidelines for a single individual. The State may elect to revise the criteria in this Paragraph subject to the approval of the Independent Reviewer.

5.  Over the course of this Agreement, two thousand of the above Housing Slots will be provided to individuals described in Section III(B)(2)(a), (b), and (c) of this Agreement, and one thousand of the Housing Slots will be provided to individuals described in Section III(B)(2)(d) and (e) of this Agreement. The State will determine each year the proportionate allocation of slots, giving priority to individuals described in Section III(B)(2)(a), (b), and (c).

6.  The State currently has ongoing programs for housing assistance that will continue in effect. The State may utilize those programs to fulfill its obligations under this Agreement to provide Housing Slots to individuals, so long as the Housing Slots provided using those ongoing programs meets all the criteria in III(B)(7)(a)-(g).

7.  Housing Slots will be provided for individuals to live in settings that meet the following criteria:

    a.  They are permanent housing with Tenancy Rights;

    b.  They include tenancy support services that enable residents to attain and maintain integrated, affordable housing. Tenancy support services offered to people living in supported housing are flexible and are available as needed and desired, but are not mandated as a condition of tenancy;

    c.  They enable individuals with disabilities to interact with individuals without disabilities to the fullest extent possible;

    d.  They do not limit individuals' ability to access community activities at times, frequencies and with persons of their choosing;

    e.  They are scattered site housing, where no more than 20% of the units in any development are occupied by individuals with a disability known to the State, except as set forth below:

        i.  Up to 250 Housing Slots may be in disability-neutral developments, that have up to 16 units, where more than 20%

of the units are occupied by individuals with a disability known to the State;

f. They afford individuals choice in their daily life activities, such as eating, bathing, sleeping, visiting and other typical daily activities;

g. The priority is for single-occupancy housing.

  i. If single-occupancy housing is not available when a person is ready to transition to community-based housing, he or she can choose to either live with a roommate, or wait for single-occupancy housing.  If an individual chooses to live with a roommate, after being fully informed about his or her options as described in Section III(B)(9) below, each roommate must have his or her own bedroom and the individual must have the opportunity to choose his or her roommate.  If an individual chooses to wait for single-occupancy housing or housing with a particular roommate, after being fully informed about his or her options as described in Section III(B)(9), he or she will receive the in-reach and discharge planning services described in Section III(E), and will remain eligible to receive a Housing Slot in single-occupancy housing or with a particular roommate once one is available.

  ii. Single-family housing is not preferred; however, Housing Slots may be in single-family houses, if the individual, after being fully informed about his or her options as described in Section III(B)(9), affirmatively seeks to rent a house or room in a house.  Additionally, such single family houses must meet all other criteria listed in Section III(B)(7).  Housing Slots may not be offered in a home in which the owner is the service provider unless the home has no more than two bedrooms, and the transition team has obtained assurances that the individual is offered choice of service provider and that his or her right to reside in the home is not contingent on the service provider the individual chooses.   The State will also make efforts to minimize use of homes in which the owner is  the service provider when located in an area where there are other available housing providers.  If an individual chooses to live in a single-family house because no other housing is available, that individual will receive the in-reach services described in Section III(E) and will remain eligible to receive a Housing Slot in single-occupancy housing once one is available.

8. Housing Slots made available under this Agreement cannot be used in adult care homes, family care homes, group homes, nursing facilities, boarding homes, assisted living residences, supervised living settings, or any setting required to be licensed.

9. Individuals will be free to choose other appropriate and available housing options, after being fully informed of all options available. Being fully informed means that an individual has been provided information about the option of transitioning to supported housing, its benefits, and the array of services and supports available as set out in this Agreement. However, housing that does not meet the criteria set forth in Section III(B)(7) will not be considered a Housing Slot for purposes of this Agreement. If an individual chooses a housing option that does not meet the criteria of Section III(B)(7) because a Housing Slot is not available, that individual will receive the in-reach services and discharge planning services described in Section III(E) and will remain eligible to receive a Housing Slot as soon as one is available.

## C. COMMUNITY-BASED MENTAL HEALTH SERVICES

1. The State shall provide access to the array and intensity of services and supports necessary to enable individuals with SMI in or at risk of entry in adult care homes to successfully transition to and live in community-based settings. The State shall provide each individual receiving a Housing Slot under this Agreement with access to services for which that individual is eligible that are covered under the North Carolina State Plan for Medical Assistance, the Centers for Medicare and Medicaid Services ("CMS") approved Medicaid 1915(b)/(c) waiver, or the State-funded service array.

2. The State shall also provide individuals with SMI in or at risk of entry to adult care homes who do not receive a Housing Slot under this Agreement with access to services for which that individual is eligible that are covered under the North Carolina State Plan for Medical Assistance, the CMS-approved Medicaid 1915(b)/(c) waiver, or the State funded service array. Services provided with State funds to non-Medicaid eligible individuals who do not receive a Housing Slot shall be subject to availability of funds and in accordance with State laws and regulations regarding access to those services.

3. The services and supports referenced in Sections III(C)(1) and (2), above, shall:

   a. be evidence-based, recovery-focused and community-based;

   b. be flexible and individualized to meet the needs of each individual;

   c. help individuals to increase their ability to recognize and deal with situations that may otherwise result in crises; and

   d. increase and strengthen individuals' networks of community and natural supports, as well as their use of these supports for crisis prevention and intervention.

4. The State will rely on the following community mental health services to

8

satisfy the requirements of this Agreement: Assertive Community Treatment ("ACT") teams, Community Support Teams ("CST"), case management services, peer support services, psychosocial rehabilitation services, and any other services as set forth in Sections III(C)(1) and (2) of this Agreement.

5. All ACT teams shall operate to fidelity to either, at the State's determination, the Dartmouth Assertive Community Treatment ("DACT") model or the Tool for Measurement of Assertive Community Treatment ("TMACT"). All providers of community mental health services shall adhere to requirements of the applicable service definition.

6. A person-centered service plan shall be developed for each individual, which will be implemented by a qualified professional who is clinically responsible for ensuring that all elements and components of the plan are arranged for the recipient in a coordinated manner. Individualized service plans will include psychiatric advance directives and/or crisis plans so that such measures can be incorporated into the response to any behavioral health crisis.

7. The State is in the process of implementing capitated prepaid inpatient health plans ("PIHPs") as defined in 42 C.F.R. Part 438 for Medicaid-reimbursable mental health, developmental disabilities and substance abuse services pursuant to a 1915(b)/(c) waiver under the Social Security Act. These plans are currently operated by LMEs. The State will monitor services and service gaps and, through contracts with PIHP and/or LMEs, will ensure that the number and quality of community mental health service providers is sufficient to allow for successful transition of individuals with SMI, who are in or at risk of entry to an adult care homes, to supported housing, and for their long-term stability and success as tenants in supported housing. The State will hold the PIHP and/or LMEs accountable for providing access to community-based mental health services in accordance with 42 C.F.R. Part 438, but the State remains ultimately responsible for fulfilling its obligations under the Agreement.

8. Each PIHP and/or LME will provide publicity, materials and training about the crisis hotline, services, and the availability of information for individuals with limited English proficiency, to every beneficiary consistent with federal requirements at 42 C.F.R. § 438.10 as well as to all behavioral health providers, including hospitals and community providers, police departments, homeless shelters, and department of corrections facilities. Peer supports, enhanced ACT, including employment support from employment specialists on ACT teams for individuals with SMI, Transition Year Stability Resources, Limited English Proficiency requirements, crisis hotlines and treatment planning will be implemented in coordination with the current PIHP implementation schedule. Finally, each PIHP and/or LME will comply with federal requirements related to accessibility of services provided under the Medicaid State Plan that they are contractually required to provide. The State will remain accountable for implementing and fulfilling the terms of this

9

Agreement.

9. Assertive Community Treatment Team Services: ACT teams will be expanded according to the below timelines, contingent upon timely CMS approval of a State Plan Amendment ("SPA") requiring all ACT teams to comply with a nationally recognized fidelity model (e.g., DACT or TMACT), if one is necessary. By July 1, 2013, all individuals receiving ACT services will receive services from employment specialists on their ACT teams. If it is necessary, the State will initiate the process of submitting a SPA within 45 days after the Agreement is signed.

   a. By July 1, 2013, all ACT teams in the State will operate in accordance with a nationally recognized fidelity model and the State will increase the number of individuals served by ACT teams to 33 teams serving 3,225 individuals at any one time.

   b. By July 1, 2014, the State will increase the number of individuals served by ACT teams to 34 teams serving 3,467 individuals at any one time, using the DACT or TMACT model.

   c. By July 1, 2015, the State will increase the number of individuals served by ACT teams to 37 teams serving 3,727 individuals at any one time, using the DACT or TMACT model.

   d. By July 1, 2016, the State will increase the number of individuals served by ACT teams to 40 teams serving 4,006 individuals at any one time, using the DACT or TMACT model.

   e. By July 1, 2017, the State will increase the number of individuals served by ACT teams to 43 teams serving 4,307 individuals at any one time, using the DACT or TMACT model.

   f. By July 1, 2018, the State will increase the number of individuals served by ACT teams to 46 teams serving 4,630 individuals at any one time, using the DACT or TMACT model.

   g. By July 1, 2019, the State will increase the number of individuals served by ACT teams to 50 teams serving 5,000 individuals at any one time, using the DACT or TMACT model.

10. Crisis Services

   a. The State shall require that each PIHP and/or LME develops a crisis service system that includes crisis services sufficient to offer timely and accessible services and supports to individuals with SMI experiencing a behavioral health crisis. The services will include mobile crisis teams, walk-in crisis clinics, community hospital beds, and 24-hour-per-day/7-

day-per-week crisis telephone lines.

b. The State will monitor crisis services and identify service gaps. The State will develop and implement effective measures to address any gaps or weaknesses identified.

c. Crisis services shall be provided in the least restrictive setting (including at the individual's residence whenever practicable), consistent with an already developed individual community-based crisis plan or in a manner that develops such a plan as a result of a crisis situation, and in a manner that prevents unnecessary hospitalization, incarceration or institutionalization.

## D. SUPPORTED EMPLOYMENT

1. The State will develop and implement measures to provide Supported Employment Services to individuals with SMI, who are in or at risk of entry to an adult care home, that meet their individualized needs. Supported Employment Services are defined as services that will assist individuals in preparing for, identifying, and maintaining integrated, paid, competitive employment. Services offered may include job coaching, transportation, assistive technology assistance, specialized job training, and individually-tailored supervision.

2. Supported Employment Services will be provided with fidelity to an evidence-based supported employment model for supporting people in their pursuit and maintenance of integrated, paid, competitive work opportunities. Supported Employment Services will be assessed by an established fidelity scale such as the scale included in the Substance Abuse and Mental Health Services Administration supported employment toolkit.

3. By July 1, 2013, the State will provide Supported Employment Services to a total of 100 individuals; by July 2, 2014, the State will provide Supported Employment Services to a total of 250 individuals; by July 1, 2015, the State will provide Supported Employment Services to a total of 708 individuals; by July 1, 2016, the State will provide Supported Employment Services to a total of 1,166 individuals; by July 1, 2017, the State will provide Supported Employment Services to a total of 1,624 individuals; by July 1, 2018, the State will provide Supported Employment Services to a total of 2,082 individuals; and by July 1, 2019, the State will provide Supported Employment Services to a total of 2,500 individuals.

## E. DISCHARGE AND TRANSITION PROCESS

1. The State will implement procedures for ensuring that individuals with SMI in, or later admitted to, an adult care home or State psychiatric hospital will be accurately and fully informed about all community-based options, including

11

the option of transitioning to supported housing, its benefits, the array of services and supports available to those in supported housing, and the rental subsidy and other assistance they will receive while in supported housing.

2. In-Reach: The State will provide or arrange for frequent education efforts targeted to individuals in adult care homes and State psychiatric hospitals. The State will initially target in-reach to adult care homes that are determined to be IMDs. The State may temporarily suspend in-reach efforts during any time period when the interest list for Housing Slots exceeds twice the number of Housing Slots required to be filled in the current and subsequent fiscal year. The in-reach will include providing information about the benefits of supported housing; facilitating visits in such settings; and offering opportunities to meet with other individuals with disabilities who are living, working and receiving services in integrated settings, with their families, and with community providers. The in-reach will be provided by individuals who are knowledgeable about community services and supports, including supported housing, and will not be provided by operators of adult care homes. The State will provide in-reach to adult care home residents on a regular basis, but not less than quarterly.

3. The State will provide each individual with SMI in, or later admitted to, an adult care home, or State psychiatric hospital operated by the Department of Health and Human Services, with effective discharge planning and a written discharge plan. The goal of discharge planning is to assist the individual in developing a plan to achieve outcomes that promote the individual's growth, well being and independence, based on the individual's strengths, needs, goals and preferences, in the most integrated setting appropriate in all domains of the individual's life (including community living, activities, employment, education, recreation, healthcare and relationships).

4. Discharge planning will be conducted by transition teams that include:

   a. persons knowledgeable about resources, supports, services and opportunities available in the community, including community mental health service providers;

   b. professionals with subject matter expertise about accessing needed community mental health care, and for those with complex health care needs, accessing additional needed community health care, therapeutic services and other necessary services and supports to ensure a safe and successful transition to community living;

   c. persons who have the linguistic and cultural competence to serve the individual;

   d. peer specialists when available; and

12

e. with the consent of the individual, persons whose involvement is relevant to identifying the strengths, needs, preferences, capabilities, and interests of the individual and to devising ways to meet them in an integrated community setting.

5. For individuals in State psychiatric facilities, the PIHP and/or LME transition coordinator will work in concert with the facility team. The PIHP and/or LME transition coordinator will serve as the lead contact with the individual leading up to transition from an adult care home or State psychiatric hospital, including during the transition team meetings and while administering the required transition process.

6. Each individual shall be given the opportunity to participate as fully as possible in his or her treatment and discharge planning.

7. Discharge planning:

   a. begins at admission;

   a. is based on the principle that with sufficient services and supports, people with SMI or SPMI can live in an integrated community setting;

   b. assists the individual in developing an effective written plan to enable the individual to live independently in an integrated community setting;

   c. is developed and implemented through a person-centered planning process in which the individual has a primary role and is based on the principle of self-determination.

8. The discharge planning process will result in a written discharge plan that:

   a. identifies the individual's strengths, preferences, needs, and desired outcomes;

   b. identifies the specific supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes, regardless of whether those services and supports are currently available;

   c. includes a list of specific providers that can provide the identified supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes;

   d. documents any barriers preventing the individual from transitioning to a more integrated setting and sets forth a plan for addressing those barriers;

      i. Such barriers shall not include the individual's disability or the severity of the disability.

13

ii.   For individuals with a history of re-admission or crises, the factors that led to re-admission or crises shall be identified and addressed.

e.   sets forth the date that transition can occur, as well as the timeframes for completion of all needed steps to effect the transition; and

f.   prompts the development and implementation of needed actions to occur before, during, and after the transition.

9.   The North Carolina Department of Health and Human Services ("DHHS") will create a transition team at the State level to assist local transition teams in addressing and overcoming identified barriers preventing individuals from transitioning to an integrated setting. The members of the DHHS transition team will include individuals with experience and expertise in how to successfully resolve problems that arise during discharge planning and implementation of discharge plans.

10.   The DHHS transition team will ensure that transition teams (both State hospital facility staff and leadership and PIHP and/or LME Transition Coordinators) are adequately trained.  It will oversee the transition teams to ensure that they effectively inform individuals of community opportunities. The training will include training on person-centered planning.  The DHHS transition team will assist local transition teams in addressing identified barriers to discharge for individuals whose teams recommend that an individual remain in a State hospital or adult care home, or recommend discharge to a less integrated setting (e.g., congregate care setting, family care home, group home, or nursing facility).  The DHHS transition team will also assist local transition teams in addressing identified barriers to discharge for individuals whose teams cannot agree on a plan, are having difficulty implementing a plan, or need assistance in developing a plan to meet an individual's needs.

11.   If the individual chooses to remain in an adult care home or State psychiatric hospital, the transition team shall identify barriers to placement in a more integrated setting, describe steps to address the barriers and attempt to address the barriers (including housing).  The State shall document the steps taken to ensure that the decision is an informed one and will regularly educate the individual about the various community options open to the individual, utilizing methods and timetables described in Section III(E)(2).

12.   The State will re-assess individuals with SPMI who remain in adult care homes or State psychiatric hospitals for discharge to an integrated community setting on a quarterly basis, or more frequently upon request; the State will update the written discharge plans as needed based on new information and/or developments.

13. Implementation of the In-Reach, Discharge and Transition Process

    a.  Within 90 days of signing this Agreement, the State will work with PIHP and/or LMEs to develop requirements and materials for in-reach and transition coordinators and teams.

    b.  Within 180 days after the Agreement is signed, PIHP and/or LMEs will begin to conduct ongoing in-reach to residents in adult care homes and State psychiatric hospitals, and residents will be assigned to a transition team, consistent with Section III(E)(2).

    c.  Transition and discharge planning for an individual will be completed within 90 days of assignment to a transition team. Discharge of an individual will occur within 90 days of assignment to a transition team provided that a Housing Slot, as described in Sections II(A) and III(B), is then available. If a Housing Slot is not available for an individual within 90 days of assignment to the transition team, the transition team will maintain contact and work with the individual on an ongoing basis until the individual transitions to community-based housing as described in Section III(B)(7).

    d.  The State will undertake the following procedures with respect to individuals with SMI in an adult care home that has received a notice that it is at risk of a determination that it is an IMD, in addition to any other applicable requirements under this Agreement:

        i.  Within one business day after any adult care home is notified by the State that it is at risk of being determined to be an IMD, the State will also notify the Independent Reviewer, Disability Rights North Carolina, and the applicable LME or PIHP and county Departments of Social Services of the at-risk determination.

        ii.  The LME and/or PIHP will connect individuals with SMI who wish to transition from the at-risk adult care home to another appropriate living situation. The LME and/or PIHP will also link individuals with SMI to appropriate mental health services. For individuals with SMI who are enrolled in a PIHP, the PIHP will implement care coordination activities to address the needs of individuals who wish to transition from the at-risk adult care home to another appropriate living situation.

        iii.  The State will use best efforts to track the location of individuals who move out of an adult care home on or after the date of the at-risk notice. If the adult care home initiates a discharge and the destination is unknown or inappropriate as set forth in N.C. Session Law 2011-272, a discharge team will be convened.

iv. Upon implementation of this Agreement, any individual identified by the efforts described in Section III(E)(13)(d)(iii) who has moved from an adult care home determined to be at risk of an IMD determination shall be offered in-reach, person-centered planning, discharge and transition planning, community-based services, and housing in accordance with this Agreement. Such individuals shall be considered part of the priority group established by Section III(B)(2)(a).

14. The State and/or the LME and/or the PIHP shall monitor adult care homes for compliance with the Adult Care Home Residents' Bill of Rights requirements contained in Chapter 131D of the North Carolina General Statutes and 42 C.F.R. § 438.100, including the right to be treated with respect, consideration, dignity, and full recognition of his or her individuality and right to privacy; to associate and communicate privately and without restriction with people and groups of his or her own choice; to be encouraged to exercise his or her rights as a resident and a citizen; to be permitted to make complaints and suggestions without fear of coercion or retaliation; to maximum flexibility to exercise choices; to receive information on available treatment options and alternatives; and to participate in decisions regarding his or her health care. In accordance with 42 C.F.R. § 438.100, the State will ensure that each individual is free to exercise his or her rights, and that the exercise of rights does not adversely affect the way the PIHP, LME, providers, or State agencies treat the enrollee.

## F. PRE-ADMISSION SCREENING AND DIVERSION

1. Beginning January 1, 2013, the State will refine and implement tools and training to ensure that when any individual is being considered for admission to an adult care home, the State shall arrange for a determination, by an independent screener, of whether the individual has SMI. The State shall connect any individual with SMI to the appropriate PIHP and/or LME for a prompt determination of eligibility for mental health services.

2. Once an individual is determined to be eligible for mental health services, the State and/or the PIHP and/or LME will work with the individual to develop and implement a community integration plan. The individual shall be given the opportunity to participate as fully as possible in this process. The development and implementation of the community integration plan shall be consistent with the discharge planning provisions in Section III(E) of this Agreement.

3. If the individual, after being fully informed of the available alternatives to entry into an adult care home, chooses to transition into an adult care home, the State will document the steps taken to show that the decision is an informed one. The State will set forth and implement individualized strategies

16

to address concerns and objections to placement in an integrated setting, and will monitor individuals choosing to reside in adult care homes and continue to provide in-reach and transition planning services.

**G.  QUALITY ASSURANCE & PERFORMANCE IMPROVEMENT**

1. The State will develop and implement a quality assurance and performance improvement monitoring system to ensure that community-based placements and services are developed in accordance with this Agreement, and that the individuals who receive services or Housing Slots pursuant to this Agreement are provided with the services and supports they need for their health, safety, and welfare.  The goal of the State's system will be that all mental health and other services and supports funded by the State are of good quality and are sufficient to help individuals achieve increased independence, gain greater integration into the community, obtain and maintain stable housing, avoid harms, and decrease the incidence of hospital contacts and institutionalization.

2. A Transition Oversight Committee will be created at DHHS to monitor monthly progress of implementation of this Agreement, and will be chaired by the DHHS Designee (Deputy Secretary). The Division of Medical Assistance, Division of Mental Health, Developmental Disabilities, and Substance Abuse Services, Division of State Operated Healthcare Facilities, State Hospital Team Lead, State Hospital Chief Executive Officers, Money Follows the Person Program, and PIHPs and/or LMEs will be responsible for reporting on the progress being made. PIHPs and/or LMEs will be responsible for reporting on discharge-related measures, including, but not limited to: housing vacancies; discharge planning and transition process; referral process and subsequent admissions; time between application for services to discharge destination; and actual admission date to community-based settings.

3. DHHS agrees to take the following steps related to Quality Assurance and Performance Improvement:

   a. Develop and phase in protocols, data collection instruments and database enhancements for on-going monitoring and evaluation;

   b. Develop and implement uniform application for institutional census tracking;

   c. Develop and implement standard report to monitor institutional patients length of stay, readmissions and community tenure;

   d. Develop and implement dashboard for daily decision support;

   e. Develop and implement centralized housing data system to inform discharge planning;

17

f. Develop and utilize template for published, annual progress reports;

g. Develop and utilize monitoring and evaluation protocols and data collection regarding personal outcomes measures, which include the following:

   i. number of incidents of harm

   ii. number of repeat admissions to State hospitals, adult care homes, or inpatient psychiatric facility

   iii. use of crisis beds and community hospital admissions

   iv. repeat emergency room visits

   v. time spent in congregate day programming

   vi. number of people employed, attending school, or engaged in community life; and

   vii. maintenance of a chosen living arrangement.

4. Quality Assurance System: The State will regularly collect, aggregate and analyze data related to in-reach and person-centered discharge and community placement efforts, including but not limited to information related to both successful and unsuccessful placements, as well as the problems or barriers to placing and/or keeping individuals in the most integrated setting. The State will review this information on a semi-annual basis and develop and implement measures to overcome the problems and barriers identified.

5. Quality of Life Surveys: The State will implement three quality of life surveys to be completed by individuals with SMI who are transitioning out of an adult care home or State psychiatric hospital. The surveys will be implemented (1) prior to transitioning out of the facility; (2) eleven months after transitioning out of the facility; and (3) twenty-four months after transitioning out of the facility. Participation in the survey is completely voluntary and does not impact the participant's ability to transition.

6. External Quality Review ("EQR") Program: As part of the quality assurance system, the State shall complete an annual PIHP and/or LME EQR process by which an EQR Organization, through a specific agreement with the State, will review PIHP and/or LME policies and processes for the State's mental health service system. EQR will include extensive review of PIHP and/or LME documentation and interviews with PIHP and/or LME staff. Interviews with stakeholders and confirmation of data will also be initiated. The reviews will focus on monitoring services, reviewing grievances and appeals received, reviewing medical charts as needed, and any individual provider follow up. EQR will provide monitoring information related to:

18

    a. Marketing

    b. Program integrity

    c. Information to beneficiaries

    d. Grievances

    e. Timely access to services

    f. Primary care provider/specialist capacity

    g. Coordination/continuity of care

    h. Coverage/authorization

    i. Provider selection

    j. Quality of care

7. Use of Data: Each year the State will aggregate and analyze the data collected by the State, PIHPs and/or LMEs, and the EQR Organization on the outcomes of this Agreement. If data collected shows that the Agreement's intended outcomes of increased integration, stable integrated housing, and decreased hospitalization and institutionalization are not occurring, the State will evaluate why the goals are not being met and assess whether action is needed to better meet these goals.

8. Reporting

    a. The State will publish, on the DHHS website, an annual report identifying the number of people served in each type of setting and service described in this Agreement.

    b. In the annual report, the State will detail the quality of services and supports provided by the State and its community providers using data collected through the quality assurance and performance improvement system, the contracting process, the EQRs, and the outcome data described above.

## IV.     INDEPENDENT REVIEWER

A.     The Parties have selected Marylou Sudders as an expert to monitor the State's implementation of this Agreement (the "Reviewer"). The Reviewer shall have full authority to independently assess, review, and report annually on the State's implementation of and compliance with the provisions of this Agreement. In the event that the Reviewer resigns or the Parties agree to replace the Reviewer, the

19

Parties shall meet and confer within 30 days of the notice of resignation or the Parties' agreement to select a replacement Reviewer. If they are unable to agree on a replacement Reviewer, the Parties shall each, within 21 days of the meet and confer, nominate two individuals with expertise in the provision of community-based services to persons with mental illness. The Court will select the replacement Reviewer from among those nominated by the Parties.

**B.** The annual budget for the Reviewer shall be $250,000.00. All reasonable fees, costs and expenses of the Reviewer, including the cost of any consultants or staff hired by the Reviewer, shall be borne by the State up to the amount of this annual budget. The Reviewer shall provide a monthly accounting justifying the fees, costs and expenses. In no event will the State reimburse the Reviewer for any fees, costs or expenses that exceed the amount of this annual budget. The State shall be the final arbiter of what costs and expenses are considered reasonable.

**C.** Within the budget described in Section IV(B), above, the Reviewer may hire staff and consultants, in consultation with and subject to reasonable objections by the State, to assist in his or her evaluations of the State's compliance with this Agreement. The Reviewer and any hired staff or consultants are neither agents nor business associates of the State, the United States, or the Court.

**D.** The Reviewer will confer regularly and informally with the Parties on matters related to implementation efforts and compliance.

**E.** The Reviewer, and any hired staff or consultants, may:

1. Have ex parte communications at any time with the Parties, including counsel for the Parties, and employees, agents, contractors and all others working for or on behalf of the State or the United States to implement the terms of this Agreement.

2. Request meetings with either or both Parties. The purpose of these meetings shall include, among other things, prioritizing areas for the Reviewer to review, scheduling visits, discussing areas of concern, and discussing areas in which technical assistance may be appropriate.

3. Speak with stakeholders with such stakeholders' consent, on a confidential basis or otherwise, at the Reviewer's discretion.

4. Speak with anyone else the Reviewer and any staff/consultants deem necessary for completing the compliance evaluations and reports required by this Agreement. However, the State has no obligation to require any individual who is not a State employee or contractor to speak with the Reviewer.

5. Provide technical assistance to the State regarding any issue related to compliance with this Agreement.

6. Attempt to resolve any dispute arising out of a Party's position with regard to the construction or implementation of this Agreement.

7. Testify in this case regarding any matter relating to the implementation, enforcement, or dissolution of the Agreement, including the Reviewer's observations, findings and recommendations in this matter. The Reviewer may not voluntarily testify as an expert witness against the State in any other administrative or civil proceeding of whatever nature brought before any federal or state court or other administrative or judicial tribunal. This limitation shall be a required term in the State's Contract with the Reviewer, which must also meet the State's Department of Administration, Division of Purchase and Contract Agency Purchasing Manual requirements, N.C. Administrative Code Title 1 Chapter 5, Title 4 Chapter 21 (ITS Home Page), and Articles 3 and 3C of Chapter 143 and Article 3D of Chapter 147 of the North Carolina General Statutes.

**F.** Throughout the pendency of this Agreement, the Reviewer will pursue a problem-solving approach so that disagreements can be minimized and resolved amicably and the energies of the Parties can be focused on the State's compliance with the provisions of the Agreement.

**G.** The Reviewer shall comply with all federal and State patient rights and confidentiality laws and regulations, including, but not limited to: N.C. Gen. Stat. § 122C-52, N.C. Gen. Stat. § 108A-80, the Adult Care Home Residents' Bill of Rights requirements contained in Chapter 131D of the North Carolina General Statutes, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Standard for Privacy of Individually Identifiable Health Information and Health Insurance Reform: Security Standards, 45 C.F.R. Part 164, alcohol and drug abuse patient records laws codified at 42 U.S.C. § 290dd-2 and 42 C.F.R. Part 2, the Health Information Technology for Economics and Clinical Health Act ("HITECH Act") adopted as part of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5).

**H.** The duties of the Reviewer shall be to observe, review, report findings, and make recommendations to the parties solely with respect to the implementation of and compliance with the Agreement. The State shall direct all agencies, employees and contractors to cooperate fully with the Reviewer. Neither Party shall interfere with the independent functions of the Reviewer. The Reviewer shall devote such time as is necessary to fulfill the purposes of the duties and responsibilities of the Reviewer pursuant to this Agreement, but within the annual budget set forth in Section IV(B).

**I.** The Reviewer and any staff/consultants will have full access to the people, places, and documents that are necessary to assess the State's compliance with and/or implementation of this Agreement, as permitted by law and in accordance with the limitations set forth in Section IV(G).

**J.** The Reviewer shall consult with the State and shall submit a written plan with regard to the methodologies to be used by the Reviewer to assess compliance with and implementation of the Agreement. The Parties shall approve the plan prior to implementation. The Reviewer's evaluations will include regular onsite inspection of individuals' residences and programs; interviews with individuals receiving services under this Agreement who consent to be interviewed and interviews with administrators, professional and direct care staff, contractors, family members, and others who serve or support individuals in the target population; detailed review of pertinent documents and records; and review and assessment of pre-admission screening documents, discharge planning and discharge plans, especially with regard to those pre-admission screenings and discharge plans where the individual's team has been unable to identify and/or effect an appropriate community placement.

**K.** The Reviewer shall conduct a baseline evaluation of the State's compliance with the terms of this Agreement and produce a written report to the Parties with regard to the State's compliance with particular provisions of the Agreement within 120 days after the Reviewer is engaged by the State. This initial baseline evaluation is intended to inform the parties and the Reviewer of the status of compliance.

**L.** Following the baseline evaluation, the Reviewer shall conduct evaluations of and issue annual written reports regarding the State's compliance. The Reviewer shall produce annual reports regarding the State's compliance with particular provisions of the Agreement to the Parties as soon as possible, but no later than February 1 of every year. The Reviewer will not file these reports with the Court without the express authorization of the Parties, unless submission to the Court is in connection with the process set forth in Sections V(F) and (G). In connection with the evaluations, the State shall establish a schedule of evaluation visits for the upcoming year, to be repeated annually thereafter.

**M.** The written report shall detail with as much specificity as possible how the State is or is not in compliance with particular provisions of the Agreement. A draft of the Reviewer's report shall be provided to the Parties for comment at least thirty days prior to issuance of the final report.

**N.** The Reviewer, including any hired staff or consultants, shall not enter into any new contract with the State or the United States while serving as the Reviewer without the written consent of the other Party.

**V.** **CONSTRUCTION AND TERMINATION**

**A.** The Parties agree to jointly file this Agreement with the Court, together with a Complaint and a joint motion to conditionally dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a). The Parties further agree that this case will remain on the Court's inactive docket, with the Court retaining jurisdiction to enforce the Agreement in the event of any disputes that may arise between the

22

Parties until the Agreement terminates, subject to the limitations set forth in Sections V(F) and (G) of this Agreement. In the event the Court declines to retain jurisdiction, this Agreement shall become null and void and the United States has the right to revive any claims otherwise barred by operation of this Agreement.

**B.**     The implementation of this Agreement shall begin immediately upon execution. The Parties anticipate that the State will have substantially complied with all provisions of this Agreement by July 1, 2020, unless the Agreement is otherwise terminated, cancelled, or extended. Substantial compliance is achieved if any violations of the Agreement are minor and occasional and are not systemic. Any Agreement deadline may be extended by mutual agreement of both Parties or pursuant to the process described in Section V(C) below in the event that the State has not achieved compliance with the Agreement on or before July 1, 2020.

**C.**     The Court shall retain jurisdiction of this action for the purposes specified in Section V(A) until July 1, 2020 unless: (1) the Parties jointly ask the Court to terminate the Agreement before July 1, 2020; or (2) the United States disputes that the State is in substantial compliance with the Agreement as of July 1, 2020. If so, the United States shall inform the Court and the State by January 1, 2020 that it disputes substantial compliance, and the Court may schedule further proceedings as appropriate. In any such proceedings, the burden shall be on the State to demonstrate substantial compliance.

**D.**     Within 60 days after the Agreement is signed, both Parties shall appoint an Agreement Coordinator to oversee compliance with this Agreement and to serve as a point of contact for the Reviewer, and shall provide notice to the Reviewer and to the other Party of the Agreement Coordinator's name, title, address, telephone number and e-mail address.

**E.**     Throughout the pendency of this Agreement, the United States and the State will coordinate and discuss areas of disagreement and attempt to resolve outstanding differences. In the event of any dispute over the language or construction of this Agreement or its requirements, the Parties agree to meet and confer in an effort to achieve a mutually agreeable resolution prior to terminating the Agreement. Overall, it is intended that the Parties will pursue a problem-solving approach so that disagreements can be minimized and resolved amicably and the energies of the Parties can be focused on the State's compliance with the provisions of this Agreement.

**F.**     With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals receiving services under this Agreement, if the United States believes the State has failed to fulfill any obligation under this Agreement, the United States shall, prior to initiating any court proceeding, notify the State in writing of any alleged non-compliance with the Agreement and request that the State take action to correct such alleged non-compliance. With the exception of conditions or practices that pose an immediate

and serious threat to the life, health, or safety of individuals receiving services under this Agreement, the State shall have 45 days from the date of such written notice to respond to the United States in writing by denying that noncompliance has occurred, or by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that the State will take, and by when, to cure the noncompliance. If the State fails to respond within 45 days or denies that noncompliance has occurred, the United States may seek an appropriate judicial remedy.

**G.**   If the State responds by proposing a curative action by a specified date, the United States may accept the State's proposal or offer a counterproposal for a different curative action or deadline. If the Parties reach an agreement that varies from the provisions of this Settlement Agreement, the new agreement shall be in writing, signed and filed with the Court. If the Parties fail to reach agreement on a plan for curative action, the United States may seek an appropriate judicial remedy, and shall have the burden of proving such alleged noncompliance, other than as described in Section V(C). The Parties will not seek to have the Court enforce implementation of this Agreement other than through the process set forth in Sections V(F) and (G).

**H.**   Any modification of this Settlement Agreement must be consented to by the Parties, shall be executed in writing by the Parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it. The Parties shall promptly notify each other of any judicial or administrative challenge to this Agreement or any portion thereof, and shall defend against any challenge to the Agreement.

**I.**   Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver.

**J.**   The State shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Independent Reviewer or the United States for inspection and copying upon request. The Independent Reviewer or the United States may require additional written reports from the State with regard to the State's compliance with the terms of this Agreement. The State will cooperate and comply with those requests.

**K.**   The State will work collaboratively with the United States to provide full access to the people, places, and documents that are necessary to assess the State's compliance with and/or implementation of this Agreement subject to applicable federal and state law.

**L.**   The Parties agree that, as of the date the court enters the order conditionally dismissing the Complaint and retaining jurisdiction, for purposes of the Parties' preservation obligations pursuant to Federal Rule of Civil Procedure 26, litigation

24

is not "reasonably foreseeable" concerning the matters described in the Findings Letter. To the extent that either Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in the Findings Letter, the Party is no longer required to maintain such a litigation hold. Nothing in this paragraph relieves either Party of any other obligations imposed by this Agreement.

**M.**    "Notice" under this Agreement shall be provided by overnight courier to the following or their successors:

> Chief of the Disability Rights Section
> United States Department of Justice
> Civil Rights Division
> 1425 New York Avenue NW
> Washington, DC 20005
>
> Attorney General
> North Carolina Department of Justice
> 9001 Mail Service Center
> Raleigh, NC 27699
>
> Secretary of DHHS
> 101 Blair Drive
> Adams Building
> Raleigh, NC 27699

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[PAGE INTENTIONALLY LEFT BLANK]**

FOR THE UNITED STATES:

_____
THOMAS G. WALKER
United States Attorney
Eastern District of North Carolina

_____
G. NORMAN ACKER III
Assistant United States Attorney
Eastern District of North Carolina

_____
THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

EVE L. HILL
Senior Counselor to the Assistant Attorney
General
Civil Rights Division

ALISON N. BARKOFF
Special Counsel for *Olmstead* Enforcement
Civil Rights Division

GREGORY B. FRIEL, Acting Chief
SHEILA M. FORAN, Special Legal Counsel
Disability Rights Section
Civil Rights Division

_____
ANNE S. RAISH
Deputy Chief
Disability Rights Section
Civil Rights Division

REGAN RUSH
JOY LEVIN WELAN
TRAVIS W. ENGLAND
REGINA KLINE
Trial Attorneys
Civil Rights Division
U.S. Department of Justice

FOR THE STATE OF NORTH CAROLINA:

_____
ALBERT A. DELIA
Acting Secretary
North Carolina Department of Health and
Human Services

27