IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:12-CV-557-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| STATE OF NORTH CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |

On August 23, 2012, the United States of America sued the State of North Carolina ("the State") over alleged violations of Title II of the Americans with Disabilities Act, 42 U.S.C.§ 12132, Title II's implementing regulations, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Section 504's implementing regulations [D.E. 1]. That same day, the parties jointly moved to dismiss the case and for the court to retain jurisdiction to enforce a settlement agreement the parties had executed [D.E. 2]. On October 5, 2012, the court granted the motion to dismiss and retained jurisdiction to enforce the settlement agreement [D.E. 13].

On January 9, 2017, the United States moved to enforce the settlement agreement [D.E. 15]. On March 1, 2017, the State responded in opposition [D.E. 23]. On March 22, 2017, the United States replied [D.E. 25]. As explained below, the court grants the United States' motion in part and denies it in part.

I.

The Americans with Disabilities Act ("ADA") prohibits public entities—such as North Carolina—from discriminating against individuals with disabilities. "[N]o qualified individual with

a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[1] Congress directed the Attorney General to issue regulations implementing this discrimination proscription. See id. § 12134(a). One of the ADA's implementing regulations, called the "integration regulation," requires public entities "to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 CFR pt. 35, app. B. The integration regulation recognizes "that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 596 (1999).

On November 17, 2010, the United States began investigating North Carolina's mental-health-service system for compliance with Title II. See [D.E. 15-3] 4. Before the investigation, the State relied heavily on adult-care homes in administering its mental-health-service system. See Compl. [D.E. 1] ¶¶ 23, 26. Adult-care homes "provide room and board, housekeeping, and personal care services for two or more unrelated adults." Id. ¶ 22. The facilities are not, however, designed to serve their residents' mental-health needs. See id. North Carolina's adult-care homes isolated residents—"a significant percentage of whom have diagnoses of mental illness"—from nondisabled

---

[1] The United States also brought a claim under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). Title II and Section 504 share the same integration requirements, and courts analyze them together. See Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013).

2

persons. Id. ¶¶ 31, 36. Several reports from North Carolina agencies acknowledged that adult-care homes fell short of integrating disabled persons into the community. See id. ¶¶ 37–38.

On July 28, 2011, the United States sent North Carolina's Attorney General Roy Cooper a letter detailing the investigation's findings. See [D.E. 15-3]. The United States concluded that North Carolina "fails to provide services to individuals with mental illness in the most integrated setting appropriate to their needs in violation of the ADA." Id. at 2. Specifically, North Carolina "plans, administers, and funds its mental health service system in a manner that unnecessarily segregates persons with mental illness in institutional adult care homes, rather than providing services to them in community-based settings." Id. at 6. As the Supreme Court has held, the "unjustified institutional isolation of persons with disabilities is a form of discrimination" prohibited under Title II. Olmstead, 527 U.S. at 600. Title II and its integration regulation requires states

> to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Id. at 607. According to the United States, North Carolina's use of adult-care homes violated the ADA and Olmstead. See [D.E. 15-3] 7.

After the State received the letter detailing the investigation's findings, the parties exchanged proposals for resolving the identified deficiencies. See Compl. ¶ 51. Ultimately, the parties executed a settlement agreement that includes certain remedial measures. See id.; [D.E. 2-2]. The measures aim "to provide adequate and appropriate public services and supports . . . in the most integrated setting appropriate to meet the needs" of individuals with serious mental illness "who are in or at risk of entry to an adult care home." [D.E. 2-2] § III(A). Two provisions concerning housing and employment are relevant here.

3

The settlement agreement requires the State to "develop and implement measures to provide individuals ... access to community-based supported housing." Id. § III(B)(1). Community-based supported housing enables residents to attain and maintain affordable housing that integrates them with the community to permit "individuals with disabilities to interact with individuals without disabilities to the fullest extent possible." Id. § III(B)(7)(c). Under the settlement agreement, by July 1, 2020, the State must increase its capacity for supported housing by "provid[ing] access to 3,000 Housing Slots." Id. § III(B)(3). "Housing Slots" are "State or federal housing vouchers and/or rental subsidies for community-based supported housing" that include "a package of tenancy support, transition support[,] and rental support." Id. § II(A). In short, supported housing slots combine permanent housing that includes tenancy rights with tenancy support services "that enable residents to attain and maintain integrated, affordable housing." Id. § III(B)(7)(b). The settlement agreement establishes annual, incremental obligations for the number of such housing slots the State must provide. See id. § III(B)(3). By July 1, 2016, the State was required to provide such housing slots "to at least 1,166 individuals." Id. § III(B)(3)(d).

The settlement agreement also requires the State to provide "Supported Employment Services" to individuals with serious mental illness "who are in or at risk of entry to an adult care home." Id. § III(D)(1). "Supported employment services" are "services that will assist individuals in preparing for, identifying, and maintaining integrated, paid, competitive employment." Id. Again, the settlement agreement establishes annual, incremental obligations dictating the pace at which the State must increase its capacity to provide supported employment services. See id. § III(D)(3). By July 1, 2016, the State was required to provide supported employment services "to a total of 1,166 individuals." Id.

4

II.

According to the United States, as of July 1, 2016, the State failed to meet its obligations under the settlement agreement. The State had provided only 650 of the required 1,166 housing slots and provided supported employment services to only 708 of the required 1,166 individuals. See [D.E. 15-19] 3, 8.

As for the events leading to the States' alleged failure, in April 2014, the State began providing monthly reports on its progress toward compliance with the settlement agreement's housing and employment-services requirements. See [D.E. 15-1] 11 n.5. In the monthly reports for April, May, June, and July of 2014, the State reported its compliance with its obligations to provide certain numbers of housing slots by counting the number of individuals "in housing with confirmed lease," i.e., by counting only occupied housing slots. See [D.E. 15-7] 2, 6 (April 2014 monthly report); [D.E. 15-6] 2, 5 (May 2014 monthly report); [D.E. 15-5] 2, 9 (June 2014 monthly report); [D.E. 15-4] 3, 6 (July 2014 monthly report). Beginning with the August 2014 monthly report, in addition to the occupied housing slots the State displayed a column labeled "total." See [D.E. 15-8] 4. According to the United States, the "total" column represented the total number of occupied and vacant housing slots, the latter being housing slots yet to be reassigned after the former tenant left. See [D.E. 15-1] 12 & n.6. Starting with the January 2015 report, the State measured compliance by referencing the combined number of occupied and vacated housing slots. See [D.E. 15-9] 3.

On March 17, 2015, the United States advised the State that the federal government disagreed with the State's interpretation of how to measure compliance with the supported-housing provisions. See [D.E. 15-10] 3–4. The United States noted the State's position as being that "[c]ompliance with the supported housing obligations should be measured against the gross number of people who have ever transitioned into supported housing under the Settlement Agreement, regardless of whether they

5

left supported housing, when they left, what services and supports they received while in supported housing, or why they left." Id. at 3. According to the United States, "[c]ompliance with the supported housing provisions of the Settlement Agreement is measured by examining the net number of people in supported housing on the given compliance dates." Id.

On June 29, 2015, the State responded. See [D.E. 15-11]. The State "disagree[d] with counting only the 'net' number of individuals in housing slots on a certain date." Id. at 3. Instead, the State contended that "[i]f the individual enters into a qualifying residence, and has tenancy support, transition support and rental support, that individual has been provided a Housing Slot, and counts towards the numeric goal," even if the individual later vacates the slot. Id. On May 27, 2016, the State reiterated this position in a letter: "[T]he State will continue to report (currently monthly) the number of individuals in the priority populations who have been provided housing slots over the course of the settlement as well as the number of individuals currently housed at the end of the time period." [D.E. 15-12] 3.

The State's interpretation of compliance with the settlement agreement's employment-service requirements also shifted over time. During the settlement agreement's first three years, the State reported compliance as the number of individuals in the target population—individuals with mental illness who are in or at risk of entry to an adult care home—receiving supported employment services on the reporting dates. See, e.g., [D.E. 15-24] 2 (2014 annual report). Although the State acknowledged that it provides employment services to individuals outside the target population, it did not count those individuals. See, e.g., [D.E. 15-25] 3 (Dec. 2014 monthly report); [D.E. 15-26] 3 (2014 Annual Report). Indeed, in June and July 2015 the State did not report compliance because the State was "assess[ing] if all individuals reported [met] the in or at risk definition for supported employment." [D.E. 15-27] 3 (July 2015 monthly report); [D.E. 15-13] 3. The October 2014 report

6

stated that "the State is conducting onsite Supported Employment reviews to make sure the people met the definition of 'in or at risk of entry to an adult care home' as laid out in the settlement." [D.E. 15-28] 3 (Oct. 2014 monthly report). The State later changed course and began measuring compliance by counting anyone receiving supported employment services, regardless of whether the person was in the target population. See [D.E. 15-12] 3–4.

III.

The United States moves to enforce the settlement agreement. According to the United States, the State misconstrues its housing and employment-services obligations by misinterpreting how to measure compliance with these obligations. The United States contends that the housing obligation requires the State to count only individuals residing in permanent supported housing as of the reporting date, and that the employment-services obligation requires the State to count only those individuals within the target population who received supported employment services.

The court has jurisdiction to enforce the settlement agreement. See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381 (1994); Columbus-Am. Discovery Grp. v. Atlantic Mut. Ins. Co., 203 F.3d 291, 299 (4th Cir. 2000). Nonetheless, the State initially argues that the court cannot resolve the United States' motion to enforce because the United States ignored the settlement agreement's dispute-resolution provisions before filing its motion.

The settlement agreement includes procedures for resolving disputes about the State's compliance. Before involving the court, if the United States thinks the State is noncompliant, the United States must notify the State in writing of the alleged noncompliance and ask the State to take corrective action. See [D.E. 2-2] § V(F). The State has 45 days to respond by denying the noncompliance or accepting the allegation and proposing corrective action. See id. If the State proposes corrective action, the United States "may accept the State's proposal or offer a

7

counterproposal for a different curative action or deadline." Id. § V(G). If the parties fail to reach an agreement, the United States "may seek an appropriate judicial remedy." Id.

The United States followed this procedure. After the parties failed to resolve the issues, on November 6, 2015, the United States formally requested a corrective-action plan under section V(F). See [D.E. 15-15]. On December 22, 2015, the State responded with a proposed corrective-action plan. See [D.E. 15-16]; [D.E. 23-5]. On March 24, 2016, the United States identified shortcomings in the State's plan and made recommendations to the State concerning effective corrective action. See [D.E. 15-17]. These steps exhausted the United States' obligations under the settlement agreement and permitted the United States to "seek an appropriate judicial remedy." Thus, the court addresses the United States' motion to enforce the settlement agreement.

IV.

"[A] motion to enforce a settlement agreement draws on standard contract principles." Hensley v. Alcon Labs., Inc., 277 F.3d 535, 540 (4th Cir. 2002). Here, federal common law supplies these principles. See Gamewell Mfg., Inc. v. HVAC Supply, Inc., 715 F.2d 112, 115–16 (4th Cir. 1983); Washington v. Hartford Life & Accident Ins. Co., No. 5:16-CV-173-BO, 2017 WL 2930579, at *1 (E.D.N.C. July 6, 2017) (unpublished). The court seeks to discern the parties' intent at the time they made the agreement. Intent is derived not from a particular contractual term but from the contract as a whole. See, e.g., Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 820 (4th Cir. 2013). The subject matter and purpose of the contract help discern the parties' intent. See id. Courts also must consider evidence of the parties' own interpretation of the contract before the controversy arose. The parties' own interpretation of the settlement agreement's terms, as demonstrated by how the parties carried out its terms after its execution, offers compelling evidence of the parties' intent. See, e.g., Mgmt. Sys. Assocs., Inc. v. McDonnell Douglas Corp., 762 F.2d

8

1161, 1171–72 (4th Cir. 1985).

This dispute concerns how the parties intended to measure the State's compliance with the settlement agreement's housing and employment-services provisions. As for housing, the United States contends that compliance requires counting only occupied housing slots as of the reporting date, while the State relies on the number of housing slots that are both currently occupied and were occupied at one point during the reporting period. As for employment services, the United States argues that the number of individuals in the target population receiving supported employment services governs, while the State claims it can count all individuals receiving those services, regardless of whether the individual was within the settlement agreement's target population.

A.

Section III(B)(3) governs the State's housing obligations. In light of the text, the purpose of the settlement agreement, and the parties' initial interpretation of the settlement agreement, the court concludes that the parties intended to measure compliance by counting only occupied housing slots as of the reporting date. Through the settlement agreement, the parties "intend[ed] that the goals of community integration and self determination will be achieved." [D.E. 2-2] § I(C). The agreement's "intended outcomes" were "increased integration, stable integrated housing, and decreased hospitalization and institutionalization." Id. § III(G)(7). To achieve these intended outcomes, section III(B)(3) obligates the State to meet provide an additional 458 or 459 housing slots each year from the second year of the agreement until its conclusion:

> 3. The State will provide access to 3,000 Housing Slots in accordance with the following schedule:
>
> a. By July 1, 2013 the State will provide Housing Slots to at least 100 and up to 300 individuals.

9

      b. By July 1, 2014 the State will provide Housing Slots to at least 150 additional individuals.

      c. By July 1, 2015 the State will provide Housing Slots to at least 708 individuals.

      d. By July 1, 2016 the State will provide Housing Slots to at least 1,166 individuals.

      e. By July 1, 2017 the State will provide Housing Slots to at least 1,624 individuals.

      f. By July 1, 2018 the State will provide Housing Slots to at least 2,082 individuals.

      g. By July 1, 2019 the State will provide Housing Slots to at least 2,541 individuals.

      h. By July 1, 2020 the State will provide Housing Slots to at least 3,000 individuals.

To achieve the settlement agreement's stated purpose of increasing community integration, this provision imposes an obligation concerning occupied housing slots as of the compliance date. Only by building its community-based housing capacity year over year can the State hope to create a system of community integration that remedies the deficiencies that the initial investigation identified.

      This reading of section III(B)(3) comports most closely with the parties' intent. Consider the implications of the State's proposed interpretation. The State reads section III(B)(3) as measuring compliance "by reference to the running, cumulative total number of individuals the State has transitioned to Housing Slots over time." [D.E. 23] 16–17. As the United States notes, "[t]aken to its logical extreme, North Carolina's position could result in a 'compliant' system in which no one resides in supported housing by the Agreement's end." [D.E. 25] 4. Indeed, under the State's reading it would not matter if every individual who received a housing slot immediately abandoned it and

moved back into an adult home care—the exact problem the parties sought to remedy. On July 1, 2020, the status quo could match that which precipitated the settlement agreement in the first place, yet the State could claim that it achieved the settlement agreement's intent. The State's position, if accepted, could eviscerate the settlement agreement. Only by measuring compliance by counting the housing slots actually occupied on the reporting date could the parties expect to achieve the systemic change needed to accomplish the settlement agreement's purpose—providing meaningful community-based alternatives to segregated adult-care homes.

The parties' course of conduct after they executed the settlement agreement confirms this interpretation of the parties' intent. In April 2014, the State began providing monthly reports. In the April, May, June, and July 2014 monthly reports, the State reported compliance by referencing the number of individuals actually in housing as of the reporting date. Even before it began filing monthly reports, the State reported compliance the same way. See [D.E. 15-22] 6 (first year summary); [D.E. 15-23] 2 (update as of Jan. 6, 2014). The Independent Reviewer also reported the State's compliance in terms of how many individuals actually occupied housing slots on the reporting date. See [D.E. 23-9] 29 (Oct. 1, 2016 report) (stating that the State's current pace would "not result in 3,000 slots in use at the time the Agreement is set to expire"); [D.E. 23-4] 10 (Oct. 14, 2015 report) ("Filling the exact number of slots as required in this Agreement or in any housing program requires refilling a substantial number of Housing Slots that are vacated over the course of eight years."). This post-agreement course of conduct confirms the parties' intent to measure compliance by counting the number of occupied housing slots, regardless of turnover.

The settlement agreement's purposes and the parties' interpretation of the settlement agreement's requirements reveal the parties' intent to measure compliance by reference to the number of housing slots actually occupied on the reporting date. As of the July 1, 2016 reporting

11

date, the State was providing housing slots to only 650 of the required 1,166 individuals—56% of the expected capacity. Thus, the State was not in substantial compliance with its July 1, 2016 obligations. See [D.E. 2-2] § V(B) ("Substantial compliance is achieved if any violations of the Agreement are minor and occasional and are not systemic.").

B.

Section III(D) governs the State's employment-services obligation. Again, in light of the text, the purpose of the settlement agreement, and the parties' initial interpretation of the settlement agreement, the court concludes that the parties intended to measure compliance with section III(D) by counting only individuals in the target population who received supported employment services. Section III(D) contains three paragraphs. The first paragraph identifies the subsection's objective: "The State will develop and implement measures to provide Supported Employment Services to individuals with SMI, who are in or at risk of entry to an adult care home, that meet their individualized needs." [D.E. 2-2] § III(D)(1). The second paragraph ensures the quality of those services: "Supported Employment Services will be provided with fidelity to an evidence-based supported employment model for supporting people in their pursuit and maintenance of integrated, paid, competitive work opportunities." Id. § III(D)(2). The third paragraph dictates the timeline for the State to provide those services: "[B]y July 1, 2016, the State will provide Supported Employment Services to a total of 1,166 individuals." Id. § III(D)(3). When read in conjunction with section III(D)(1), section III(D)(3)'s reference to "individuals" refers to "individuals with SMI, who are in or at risk of entry to an adult care home." Thus, the parties intended to measure compliance with section III(D)(3) by counting only individuals in this target population.

This reading comports with the settlement agreement's stated purpose of serving "the needs of individuals with SMI, who are in or at risk of entry to an adult care home." Id. § III(A).

12

Conversely, the State's interpretation ignores the settlement agreement's text and purpose. Under the State's reading, it could claim compliance with the employment-services provision even if it did not provide those services to a single individual in the population the settlement agreement aims to help.

As with the housing provision, the parties' post-agreement course of conduct concerning the State's employment-services obligation confirms the United States' reading. During the settlement agreement's first three years, the State reported compliance as the number of individuals with mental illness who are in or at risk of entry to an adult care home who were receiving supported employment services on the reporting dates. Several times the State chose not to report compliance because the State was "assess[ing] if all individuals reported [met] the in or at risk definition for supported employment." [D.E. 15-27] 3 (July 2015 monthly report); [D.E. 15-13] 3. In fact, the October 2014 report embraced the reading the State now disavows: "[T]he State is conducting onsite Supported Employment reviews to make sure the people met the definition of 'in or at risk of entry to an adult care home' as laid out in the settlement." [D.E. 15-28] 3 (Oct. 2014 monthly report). The Independent Reviewer also evaluated the State's compliance in terms of the target population. See [D.E. 23-9] 57 (Oct. 1, 2016 report). This post-agreement course of conduct confirms that the parties intended to measure compliance by counting only those individuals within the target population to whom the State provided supported employment services.

The settlement agreement's text and the parties' course of conduct immediately following its execution reveal the parties' intent to measure compliance with section III(D)(3) by reference to individuals within the target population. As of July 1, 2016, only 708 individuals from the target population of the required 1,166 received supported employment services—61% of the expected number. Thus, the State was not in substantial compliance with its July 1, 2016 obligations.

13

V.

As a remedy for the State's noncompliance with its July 1, 2016 obligations under sections III(B)(3) and III(D)(3) of the settlement agreement, the United States requests specific enforcement pursuant to schedule of revised monthly obligations. See [D.E. 15-1] 29–30, 32–33. In opposition, the State contends that the settlement agreement prevents the court from modifying the timeline for the State to comply with its obligations. In support, the State cites section V(H):

> Any modification of this Settlement Agreement must be consented to by the Parties, shall be executed in writing by the Parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

[D.E. 2-2] § V(H).

The court need not conclusively determine the meaning of section V(H). Instead, the court will give the parties an opportunity to negotiate in good faith and reach an agreement concerning any modified timeline in light of the court's conclusions concerning sections III(B)(3) and III(D). The parties shall file any agreed-to modifications with the court by October 27, 2017.

VI.

In sum, the court GRANTS IN PART and DENIES IN PART the United States' motion to enforce the settlement agreement [D.E. 15]. Compliance with section III(B)(3) of the settlement agreement is measured by counting the number of occupied housing slots on the relevant compliance dates. Compliance with section III(D) of the settlement agreement is measured by counting the number of individuals with serious mental illness in or at risk of entry to an adult care home who received supported employment services. Thus, North Carolina failed to substantially comply with its July 1, 2016 obligations under sections III(B)(3) and III(D). The parties shall negotiate in good faith and file any agreed-to modifications by October 27, 2017.

14

SO ORDERED. This 21 day of September 2017.

                                               JAMES C. DEVER III
                                               Chief United States District Judge