UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>v.<br><br>STATE OF NORTH CAROLINA,<br><br>            Defendant. | Case No. 5:12-cv-557-D |

## JOINT MOTION TO ENTER SIXTH MODIFICATION
## OF SETTLEMENT AGREEMENT

Plaintiff United States of America and Defendant State of North Carolina jointly move this Court to enter the Parties' proposed order modifying their Settlement Agreement and retaining jurisdiction to enforce that Agreement as modified. In support of this motion, the Parties state the following:

1. The Parties entered into a Settlement Agreement (the "Agreement") in August 2012. D.E. 2-2. The Agreement resolved claims that the United States had brought under Title II of the Americans with Disabilities Act. The United States had alleged that the State was providing services for individuals with Serious Mental Illness ("SMI") in a manner that caused these individuals to be unnecessarily segregated in settings known as "Adult Care Homes," or to be placed at risk of such segregation, even though these individuals could appropriately be served in, and did not oppose living in, the community. After signing the Agreement, the Parties jointly moved the Court to dismiss the case without prejudice while retaining jurisdiction to enforce the Agreement. The Court granted this motion. D.E. 13.

2. The Settlement Agreement includes six sets of substantive obligations. First, Section III(B) of the Agreement requires the State to provide 3,000 community-based "Housing Slots" (a service package that includes a rental subsidy, transition services, and tenancy support) to members of a "target population" of North Carolinians with SMI, with 2,000 of the slots specifically going to Adult Care Home residents, with the remainder going to individuals at risk of Adult Care Home admission. Second, Section III(C) requires the State to provide target population members with access to key community-based mental health services. Third, Section III(D) requires the State to develop and implement measures to provide Supported Employment Services to target population members to help them pursue and maintain integrated, paid, competitive work opportunities. Fourth, Section III(E) calls on the State to improve its discharge and transition processes so that Adult Care Home residents with SMI are informed of their community-based service options and can receive appropriate transition planning. Fifth, Section III(F) requires the State to screen target population members at risk of entering Adult Care Homes, and to divert them from admission where appropriate. Sixth, Section III(G) provides that the State must develop and implement a quality assurance and performance improvement system.

3. Since 2012, the Parties have modified the Agreement five times, and the Court has retained jurisdiction to enforce the Agreement each time. D.E. 30-1, 32, 36-1, 37, 39-1, 40, 41-1, 42, 45-1, 46. Notably, in the Fourth Modification, the Parties anticipated that the State would comply with some, but not all, of its obligations in the Agreement by July 1, 2021. D.E. 41-1 ¶ 2(a)–(b). The Parties thus agreed that these completed obligations would be discharged on July 1, 2021, provided that the State's performance in these areas would not materially regress during the term of the extension. *Id.* In the Fourth and Fifth Modifications, the Parties

also agreed to extend the term of the Agreement through July 1, 2025. *Id.* ¶ 2(d)–(f); D.E. 45-1 ¶ 2(b), (g)–(h). Thus, by way of example, the Parties stated in the Fourth Modification that the State, by July 1, 2021, would substantially comply with its obligation in Section III(B)(3) of the Agreement to provide 3,000 Housing Slots to Target Population members, and so, this obligation was discharged subject to the above proviso. D.E. 41-1 ¶ 2(a). The State's related obligation to provide 2,000 of these Housing Slots to Target Population members who had resided in Adult Care Homes was extended through July 1, 2025. *Id.* ¶ 2(d)–(f); D.E. 45-1 ¶ 2(b), (g)–(h).

    4.    The Parties, in consultation with the Independent Reviewer, now agree that the State has met additional substantive obligations in the Agreement. Thus, the Parties have again signed a Modification of the Agreement that discharges these obligations, subject to the approval of the Court, provided that the State's performance in these areas does not materially regress. D.E. 47-1 ¶ 2. This Sixth Modification of Settlement Agreement, D.E. 47-1, is attached to this motion. Specifically:

    a.    Section III(F) of the Agreement (titled "Pre-Admission Screening and Diversion") requires the State to take steps to prevent adults with SMI from needlessly entering Adult Care Homes. If community living is appropriate when sufficient community-based mental health services are provided, and if target population members do not oppose remaining in the community, then the State must, *inter alia*, develop and implement community integration plans for them. Over the course of the Agreement's term, the State has made significant and sustained improvements in screening and diverting adults with SMI from Adult Care Homes, effectively closing the front door to these segregated settings for North Carolinians with SMI. Portions of Section III(F) were discharged in the Fourth Modification of Settlement Agreement, and the Parties agree that the remainder of Section III(F) shall now be discharged as discussed above.

b. Section III(G) (titled "Quality Assurance and Performance Improvement") tasks the State with implementing a monitoring system to ensure that community-based placements and services are developed in accordance with the Agreement, and that individuals who receive services or Housing Slots are provided with the services they need for their health, safety, and welfare. It details numerous essential characteristics of this monitoring system, including the collection, evaluation, and reporting of data, the creation of an oversight committee, and the engagement of an External Quality Review organization. The State has made significant progress in developing and implementing a comprehensive QA/PI system, in part through its consultation and work with a nationally recognized research and consulting organization with expertise in information collection and analysis. The Parties agree that all of the obligations in Section III(G) shall now be discharged as discussed above.

c. Sections III(B)(2), III(B)(8), and III(B)(9), respectively, define which individuals have priority for receiving Housing Slots, restrict settings where Housing Slots may not be used, and require the State to ensure that individuals who choose to enter or remain in an Adult Care Home are fully informed of their right to receive services in the community instead. As previously noted, the State is providing more than 3,000 Housing Slots to Target Population members as required by Section III(B)(3). The Parties agree that the State, in providing these Housing Slots, is substantially complying with the parameters of Sections III(B)(2), III(B)(8), and III(B)(9), which therefore shall now be discharged as described above.

d. Section III(D)(3) requires the State to provide Supported Employment Services to at least 2,500 adults with SMI who live in or face a risk of placement in Adult Care Homes. Significant work remains for the State to substantially comply with its broader supported employment obligations, as required by Sections III(D)(1)–(2), but the Parties agree

that the State has substantially complied with the specific requirements of Section III(D)(3), which therefore shall now be discharged as discussed above.

        e.        Sections III(E)(9) and III(E)(14) require the State (i) to establish a state-level transition team to help local transition teams overcome barriers to community transition, and (ii) to monitor Adult Care Homes' compliance with the State's "Adult Care Home Residents' Bill of Rights" and with the requirements of 42 C.F.R. § 438.100, to ensure that Adult Care Homes do not interfere with residents' ability to explore, plan, and complete community transition. The Parties agree that the State has created a state-level "barriers team" and is monitoring Adult Care Homes' compliance with the above requirements, and that the obligations of Sections III(E)(9) and III(E)(14) shall now be discharged as discussed above.

5.        For certain other obligations in the Agreement, the Parties believe that it is possible for the State to achieve substantial compliance between now and May 16, 2025,. As such, the Parties have agreed that they will meet and confer no later than that date to determine whether substantial compliance has been achieved on those obligations. D.E. 47-1 ¶ 4.

6.        Regarding all remaining obligations in the Agreement, the Parties, in consultation with the Independent Reviewer, and subject to the approval of the Court, have agreed to extend the term of the Agreement for two years, through July 1, 2027. *Id.* ¶ 3. The Parties retain all rights under the Agreement to petition the Court for early termination if one or more Parties believes the State has substantially complied with the Agreement prior to this termination date.

7.        The Independent Reviewer has authorized the Parties to represent that she supports the Sixth Modification.

For these reasons, the Parties respectfully request that the Court enter the attached proposed order and retain jurisdiction to enforce the Settlement Agreement as modified.

This 11th day of December, 2024.                Respectfully submitted,

FOR THE UNITED STATES OF AMERICA:

            REBECCA B. BOND
            Chief
            ANNE S. RAISH
            Principal Deputy Chief
            ELIZABETH E. MCDONALD
            Deputy Chief
            Disability Rights Section
            Civil Rights Division

            /s/ Julia M. Graff
            JULIA M. GRAFF
            H. JUSTIN PARK
            Trial Attorneys
            Disability Rights Section
            Civil Rights Division
            U.S. Department of Justice
            950 Pennsylvania Avenue, N.W. (4CON)
            Washington, DC 20530
            Telephone: (202) 353-5758
            Fax: (202) 307-1197
            julia.graff@usdoj.gov

FOR THE STATE OF NORTH CAROLINA:

JOSHUA H. STEIN
Attorney General

/s/ Michael T. Wood
MICHAEL T. WOOD
Special Deputy Attorney General
North Carolina Department of Justice
State Bar No. 32427
114 West Edenton Street
P.O. Box 629
Raleigh, NC 27602-0629
Telephone (919) 716-6800
Fax (919) 716-6756
mwood@ncdoj.gov