UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>STATE OF NORTH CAROLINA,<br><br>Defendant. | Case No. 5:12-cv-557-D |

**MEMORANDUM IN SUPPORT OF JOINT MOTION TO TERMINATE SETTLEMENT AGREEMENT**

The United States of America and the State of North Carolina ("the Parties") respectfully submit this Memorandum in Support of their Joint Motion to Terminate the Settlement Agreement (D.E. 47-1), based on the terms of the Agreement, and in light of the State's demonstrated substantial compliance with the Agreement.

## INTRODUCTION

Nearly fourteen years after the Court retained jurisdiction to enforce the Parties' Agreement, the Parties now move to terminate the Agreement based upon the State's substantial compliance, and close this case. North Carolina has achieved substantial compliance with the Agreement, which focused on the institutionalization of adults with serious mental illness ("SMI") or serious and persistent mental illness ("SPMI") in Adult Care Homes ("ACHs"). The Parties move under the provision of the Agreement stating that the Court would retain jurisdiction until July 1, 2027, unless "the Parties jointly ask the Court to terminate the Agreement." D.E. 47-1 at ¶ 3 (proposed modification of VI(C)); D.E. 48 (adopting the proposed modification). In light of

North Carolina's considerable success in fulfilling the Agreement, there is no need to wait until July 1, 2027, and the Court should instead terminate the Agreement and close this case.

## STATEMENT OF FACTS

### I. Background and Procedural History

Following an investigation, the United States filed a complaint alleging North Carolina violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by institutionalizing individuals with SMI in ACHs. Complaint ¶¶ 2, 53-63, Aug. 23, 2012, D.E. 1. Contemporaneously, the Parties moved the Court to dismiss the case and retain jurisdiction to enforce the Agreement. D.E. 2; D.E. 2-2 (Proposed Settlement Agreement). On October 5, 2012, the Court conditionally dismissed the Complaint and retained jurisdiction to enforce the Agreement. D.E. 13.

The original Agreement contemplated completion in eight years to end on July 1, 2020. D.E. 2-2 at V(B). The Agreement included substantive provisions related to community-based supported housing, community-based mental health services, supported employment, discharge and transition processes, and pre-admission screening and diversion. D.E. 2-2 at III(B)-(F). The State agreed to provide access to 3,000 housing slots, 2,000 of which would be provided to individuals residing in ACHs. D.E. 2-2 at III(B)(3), (5). The State also agreed to "provide access to the array and intensity of services" necessary to allow individuals with SMI to reside in the community, and specifically to provide Assertive Community Treatment team services according to a schedule. D.E. 2-2 at III(C)(1), (9). In addition, the State was obligated to provide supported employment services to 2,500 individuals, D.E. 2-2 at III(D), and to change its procedures for discharging individuals from adult care homes and for screening individuals before admission to adult care homes. D.E. 2-2 at III(E)-(F). The Agreement also provided that an independent

reviewer ("Reviewer") would evaluate the State's progress, provide the State with technical assistance, and issue annual reports. D.E. 2-2 at IV.

The Parties modified the Agreement six times to extend deadlines and terminate obligations that the State had fulfilled. On October 27, 2017, the Parties moved to extend the agreement one year to July 1, 2021, and modify the schedule for the State to provide housing slots and supported employment services. D.E. 30-1; D.E. 32 (adopting the modifications on November 1, 2017). The Parties' second and third motions to modify the Agreement made changes to the schedule for when the United States would notify the State if it considered the State to not be in substantial compliance. D.E. 36, D.E. 39. The Court granted the second and third modifications on October 21, 2020, and March 1, 2021, respectively. D.E. 37, D.E. 40. In light of the State's "significant progress toward achieving the Agreement's goals," the Parties' fourth motion to modify asked the Court to extend the Agreement to 2023 while allowing certain provisions to expire. D.E. 41. The Court granted the motion on March 29, 2021. D.E. 42. The Parties' fifth motion similarly noted the State's "significant progress" and requested an extension to July 1, 2025, to allow the State time to substantially comply with remaining obligations. D.E. 45. The Parties also added a provision by which the State would develop an implementation plan to comply with remaining obligations. *Id.* The Court ordered the fifth modification on March 6, 2023. D.E. 46. Finally, the Parties' sixth motion to modify noted that "the State has met additional substantive obligations in the Agreement" and asked to discharge those obligations while extending the compliance date to July 1, 2027. D.E. 47. The Court granted the sixth and final modification on December 12, 2024. D.E. 48.

Under the Agreement as modified, the Court retains jurisdiction to enforce the Agreement "until July 1, 2027 unless: (1) the Parties jointly ask the Court to terminate the Agreement before

July 1, 2027 . . . ." D.E. 47-1 at ¶ 3; D.E. 48. Additionally, the Agreement provides, "If the State has substantially complied with the Agreement before July 1, 2027, the United States shall not unreasonably decline to join in the State in a motion to terminate the Agreement early." *Id.*

**II. Remaining Obligations under Current Agreement**

The Agreement, as modified, includes four sets of substantive obligations. D.E. 47 at 2, D.E. 47-1 (discussing six obligations, two of which were discharged by the sixth modification). First, Section III(B) requires the State to provide community-based housing slots to 2,000 individuals with SMI or SPMI residing in ACHs. *Id.* Second, Section III(C) obligates the State to provide access for relevant individuals to key community-based mental health services. *Id.* Third, Section III(D) mandates that the State provide Supported Employment services to relevant individuals. *Id.* Finally, Section III(E) requires the State to improve its discharge and transition processes for relevant individuals. *Id.*

The Reviewer's most recent annual report from 2025 and the Parties' filings all document the State's considerable progress toward achieving these substantive requirements. First, the State has provided community-based housing slots to 3,000 individuals since before March 1, 2023, when the State was "serving more than 3,000 target population members in permanent supported housing." D.E. 45 at 2. The State has substantially, but not completely, met the goal to provide 2,000 of these slots specifically to individuals with SMI or SPMI residing in Adult Care Homes; as of January 14, 2026, the Reviewer reported that the State was providing such slots to 1,022 individuals.[1] Fiscal Year 2025 Annual Report of the Reviewer, Exhibit A at 27. Second, the relevant mental health services are now available in the State, although, as of January 14, 2026, the Reviewer raised a question as to whether the services met certain qualitative requirements. Ex.

[1] This is a point-in-time number. Over the life of the Agreement, the State has housed 2,724 individuals exiting ACHs.

A at 42-43 (Reviewer concluding that "services are available" but did not meet certain standards at that time). Third, the State exceeded the obligation under Section III(D)(3) to provide supported employment services to 2,500 individuals—as of July 1, 2025, the State had provided these services to 2,905 individuals. Ex. A at 63 (Reviewer also noting that the State met a requirement to adopt a certain evidence-based model of services but taking issue with the scores of certain providers under that model, where the providers were still meeting fidelity); D.E. 47 at 5 (discharging this numeric requirement). Finally, the State had made considerable progress toward changing its discharge and transition processes even as of January 2026, at which time the State was planning further efforts. Ex. A at 75-82.

### III. State's Sustainability Plan

The achievement of substantial compliance is further supported by the State's ongoing and future investments in Transitions to Community Living ("TCL"), and the commitment to implementing a sustainability plan for TCL that maintains and improves on the infrastructure built through this Agreement to allow people with SMI and SPMI to live, work, and thrive in their communities.

## LEGAL STANDARD

### I. Interpretation of Settlement Agreements and Consent Decrees

Courts apply "traditional rules of contract interpretation" when interpreting a consent decree, and "the district court's authority is thus constrained by the language of the decree." *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F.3d 821, 832 n.6 (4th Cir. 2005); *Johnson v. Robinson*, 987 F.2d 1043, 1046 (4th Cir. 1993) (a district court "may not use its power of enforcing consent decrees to enlarge or diminish the duties on which the parties have agreed and which the court has approved."). "We draw those traditional rules of contract interpretation from the law of

the state in which the consent decree was entered . . .." *W. Va. Highlands Conservancy v. ERP Env't Fund, Inc.*, 99 F.4th 194, 200 (4th Cir. 2024).

In interpreting an agreement, a court's principal objective is to determine the intent of the parties at the time they made the agreement. *See Med. Mut. Ins. Co. of N.C. v. Am. Cas. Co. of Reading, Pa.*, 721 F. Supp. 2d 447, 452 (E.D.N.C. 2010). Where the language of an agreement is unambiguous, a court derives the parties' intent from the words of the contract. *See Crain v. DeBartolo,* No. 7:14-CV-29-D, 2015 WL 73961, at *2 (E.D.N.C. Jan. 6, 2015); *State v. Philip Morris USA Inc.*, 359 N.C. 763, 618 S.E.2d. 219, 225 (2005).

## ARGUMENT

The Court should grant the Parties' motion to terminate the Agreement, pursuant to the terms of the Agreement. The Agreement allows the Parties to jointly move to terminate the Agreement, and the parties now do so because of the State achieving substantial compliance with the Agreement.

### I. The Court Should Grant the Parties' Joint Motion to Terminate Based on the Agreed upon Language in the Agreement and the State's Substantial Compliance with the Agreement.

The Parties now move to terminate the Agreement under the terms of the Agreement. Under the Agreement, the Court retains jurisdiction to enforce the Agreement until July 1, 2027, unless "the Parties jointly ask the Court to terminate the Agreement before July 1, 2027 . . .." D.E. 47-1 at ¶ 3; D.E. 48. Additionally, the Agreement provides, "If the State has substantially complied with the Agreement before July 1, 2027, the United States shall not unreasonably decline to join in the State in a motion to terminate the Agreement early." *Id.* The plain meaning of this language, which the Parties contracted for and the Court approved, is that a joint motion to terminate is a sufficient basis for the Court to terminate the Agreement and no longer exercise jurisdiction over the matter. As discussed below, the Parties have stipulated and agreed that the State has reached

substantial compliance with the Agreement. Therefore, the parties ask the Court to terminate the Agreement. *E.g.*, *Thompson*, 404 F.3d at 832 n.6 (noting that "the district court's authority is thus constrained by the language of the decree.").

**II. North Carolina Has Achieved Substantial Compliance with the Agreement.**

The State has met and exceeded the Agreement's core numeric requirements. In particular, the Agreement required the State to provide housing services to 3,000 individuals, and the State has provided these services to 3,998 individuals as of June 30, 2025. Ex. A at 26. Similarly, the State was required to serve 5,000 individuals with Assertive Community Treatment ("ACT"). The State was providing ACT to 5,214 individuals by the end of Fiscal Year 2025, which is more than the Agreement required. Ex. A at 44. In addition, the State exceeded the requirement to provide supported employment services to 2,500 people by providing it to 2,905 individuals by July 1, 2025. Ex. A at 63.

To the extent the State has not perfectly complied with the Agreement, the State's noncompliance is so "minor or trivial as not substantially to defeat the object which the parties intend to accomplish." *Jeff D. v. Otter*, 643 F.3d 278, 284, 288 (9th Cir. 2011); *United States v. Brown*, 181 F.3d 92, 4 (4th Cir. 1999) (per curiam) ("If a party deviated from the terms of the contract to a substantial measure or frustrated the purpose of the contract, then the party cannot be said to be in substantial compliance."). As of the last modification, the Agreement has four remaining sets of substantive obligations. D.E. 47 at 2, D.E. 47-1. With regard to these areas, the Reviewer's Fiscal Year 2025 report asserted that the State's mental health services did not meet certain standards and that certain supported employment providers did not meet standards required by the Agreement. Ex. A at 42-43, 63. In addition, while the State has provided more housing services overall than the Agreement requires, the State has not met fully the secondary requirement to provide 2,000 of those housing slots specifically to individuals exiting ACHs. Ex. A at 27.

Achieving qualitative measures for service quality and meeting the sub-requirement of providing housing specifically to the population exiting ACHs may be worthwhile policy goals. But not having met that sub-requirement while exceeding the overall required number of housing slots and qualitative issues with a subset of available services are not so significant as to undermine the State's achievement of the Agreement's goals.

This conclusion is further supported by the State's ongoing and future investments in TCL and its commitment to implementing a sustainability plan for TCL that maintains and improves on the infrastructure built through this Agreement to allow people with SMI and SPMI to live, work, and thrive in their communities. These commitments mean the Court can terminate the Agreement with confidence that compliance with federal law will nevertheless continue.

## CONCLUSION

For these reasons, the United States and North Carolina ask the Court to grant the Parties' Joint Motion to Terminate the Agreement.

Dated: September 11, 2026

Respectfully submitted,

W. ELLIS BOYLE
United States Attorney
Eastern District of North Carolina

*/s/ Matthew L. Fesak*
MATTHEW L. FESAK
Assistant United States Attorney
Chief, Civil Division
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Telephone: (919) 856-4530
Facsimile: (919) 856-4821
Matthew.Fesak@usdoj.gov
N.C. Bar No. 35276

HARMEET K. DHILLON
Principal Deputy Assistant Attorney General

R. JONAS A. GEISSLER
Deputy Assistant Attorney General

LUIS PEREZ
Director
KEVIN KIJEWSKI
Deputy Chief

JAMES FLETCHER
Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
Telephone: (202) 598-0083
James.Fletcher@usdoj.gov

*Counsel for Plaintiff United States of America*

FOR THE STATE OF NORTH CAROLINA:

JEFFREY NEALE JACKSON
Attorney General

*/s Michael T. Wood*

Michael T. Wood
Special Deputy Attorney General
North Carolina Department of Justice
State Bar No. 32427
114 West Edenton Street
P.O. Box 629
Raleigh, NC 27602-0629
Telephone (919) 716-6800
Fax (919) 716-6756
mwood@ncdoj.gov

*Counsel for the State of North Carolina*

CERTIFICATE OF SERVICE

I do hereby certify that I have this 11th day of September, 2026, served a copy of the foregoing upon the below-listed party or parties electronically using the CM/ECF system or by placing a copy of the same in the U.S. Mail, addressed as follows:

Michael T. Wood
Email: mwood@ncdoj.gov

Brian D. Rabinovitz
Email: brabinovitz@ncdoj.gov

Josephine N. Tetteh
Email: jtetteh@ncdoj.gov

*/s/ Matthew L. Fesak*
MATTHEW L. FESAK
Assistant United States Attorney