# Exhibit A

**FY 2025 ANNUAL REPORT OF THE INDEPENDENT REVIEWER**

**In the Matter of**

**UNITED STATES OF AMERICA v. THE STATE OF NORTH CAROLINA**

**Case 5:12-cv-00557-D**

**Submitted By: Martha B. Knisley, Independent Reviewer**

**January 14, 2026**

## Table of Contents

EXECUTIVE SUMMARY .......... 3

INTRODUCTION .......... 13

METHODOLOGY .......... 16

INDIVIDUAL REVIEW FINDINGS .......... 18

I. COMMUNITY-BASED SUPPORTED HOUSING SLOTS .......... 26

II. COMMUNITY BASED MENTAL HEALTH SERVICES .......... 42

III. SUPPORTED EMPLOYMENT .......... 62

IV. DISCHARGE AND TRANSITION PROCESS .......... 75

V. PRE-ADMISSION SCREENING .......... 95

VI. QUALITY ASSURANCE AND PERFORMANCE IMPROVEMENT .......... 100

SUMMARY .......... 108

APPENDIX: STATE and LME/MCO MEAN SCORES AND RANGE OF SCORES ON SETTLEMENT AGREEMENT REQUIREMENTS .......... 110

## EXECUTIVE SUMMARY

This is the Executive Summary of the FY 2025 Final Annual Report[1] on the status of compliance with the provisions of the Settlement Agreement (SA) in United States v. North Carolina (Case 5:12-cv-000557-F) signed on August 23, 2012. The Independent Reviewer (Reviewer) submits an annual report each year of this Agreement.

The report documents North Carolina's (the State's) progress in meeting Settlement Agreement (SA) requirements including State Fiscal Year (SFY) 2025 requirements. The State is continuing to make discernable progress meeting **Section III. (E) Discharge and Transition Processes** as identified in this report. However, there is less progress and new challenges with meeting **Sections III. (B) Supported Housing** and **(D) Supported Employment. The State met (E) Pre-Screening and Diversion (F) Quality Assurance and Performance Improvement (QA/PI)** requirements and was discharged from those requirements in FY 2024. The State was discharged from the QA/PI requirements at the same time it proposed new requirements that impacts the State's ability to meet other requirements.

This summary and report highlight the steps the State has taken to meet the Settlement Agreement obligations. The report also documents the State's challenges it has meeting all the Settlement Agreement (SA) obligations as referenced in the Fourth, Fifth, and Sixth Modifications of the Settlement Agreement. The Parties filed their sixth motion to modify the Settlement Agreement with the Court on December 11, 2025, and the motion was granted by Judge Dever on December 12, 2025. The Sixth Modification extends the Settlement Agreement obligations until July 1, 2027. The Sixth Modification added a provision for the Parties to meet and confer no later than May 16, 2025, to determine whether discharge of any obligations referenced in the Sixth Modification would have been appropriate at that time. None were identified.

The Fifth Modification included language for draft and final due dates and consultation on the implementation plan with the Plaintiffs and the Reviewer. The plan included proposed steps the State needed to take to meet Settlement Agreement obligations. In the FY 2023 Annual Report, the Reviewer indicated that taking these steps may not result in the State meeting its obligations in the newly established timeframe. The FY 2025 review results, interviews, and data support this assumption.

This report references the program the State designed to comply with the obligations of the SA known as Transitions to Community Living (TCL). Individuals identified for TCL are eligible for assistance with the Discharge and Transition Process including

---

[1] The Reviewer submits annual reports for the State's fiscal year which begins on July 1 and ends on June 30 the following year.

discharge from adult care homes (ACH)s, family care homes (FCH)s, and state psychiatric hospitals (SPHs), as well as diversion from placement at ACHs. Individuals may gain TCL eligibility through a required Pre-Admission Screening process. The SA also includes obligations the State has to ensure access to and assistance with Discharge and Transition, Pre-Screening and Diversion, Supported Housing (SH), Community-Based Mental Health Services, and Supported Employment(SE). The Settlement Agreement requires the State to develop and implement a Quality Assurance and Performance Improvement system and provide community-based placements and services.

Based on the FY 2025 individual reviews, interviews and meetings with LME/MCO staff in the field, and reports from a range of state and local sources, it is clear the Settlement Agreement requirements are achievable. The State increased the number of individuals filling housing slots and a major step forward filling "target units" in Low Income Housing Tax Credit (LIHTC) properties. This will be important in FY 2026 and beyond as the state will have an increase in new LIHTC projects. The State is continuing to make progress with In-reach and Transition Processes, especially with diverting individuals from moving to ACHs as their only choice of a place to live. The State still needs to make changes that are often referred to as the drivers of results in community based mental health services and supported employment. In addition the State and the LME/MCOs must find ways to overcome challenges, listed below, that impeded progress in FY 2025.

The first major challenge was created with the reduction of the number of LME/MCOs from six to four in February 2024. Trillium's catchment area now covers 46 counties, having absorbed 18 out of the 21 counties previously served by Eastpointe and Sandhills. As forecasted based on challenges that occurred after Cardinal went out of business, reducing the number of LME/MCOs creates challenges for an extended period of time for the remaining LME/MCOs meeting Settlement requirements in terms of contracting with new providers, absorbing staff, transferring leases for individuals in Supported Housing, and quickly beginning to serve individuals transferred to their area.

The second challenge presented in the FY 2024 report referenced the State's shift in its approach to services for NC Medicaid beneficiaries who need enhanced services. The State references this shift from LME/MCO management to "Tailored Plan" management. The Tailored Plan management includes coverage and contracting for physical health services, pharmacy services, care coordination and care management, behavioral health services, and added services, such as wellness programs, across multiple qualifying populations.

Four additional challenges emerged with the transition to Tailored Plans in FY 2024 that have had impacts on the State meeting Settlement requirements. The first was that the State's guidance to the LME/MCOs on Tailored Care Managers' (TCMs) responsibilities for working

with TCL recipients did not match the Settlement requirements for LME/MCO and provider requirements. The State made some adjustments, but these did not occur until well after the fact, and these challenges for TCL recipients and staff persisted into FY 2025. MCO/LMEs appear to be making progress now on this front.

Second, TCM staff were given some new responsibilities for TCL one year after the TCM program began so FY 2023 and additional responsibilities in FY 2025 training has been trained there has not been sufficient to ensure decisions and approvals for individuals that were referred to services were made in a timely manner. The third challenge was making certain TCMs are aware of TCL requirements since most of the new staff did not have experience working with TCL-eligible individuals. The fourth, and most challenging problem, was the State's shift from covering Individual Placement and Support-Supported Employment (IPS-SE) services with the Medicaid "(b)(3)" provision to reimbursing the service instead with federal funding under the Section 1915(i) Medicaid authority, which has created delays and confusion for providers and the LME/MCOs. This move was necessitated when the State updated its 1115 Waiver in 2023. These last three challenges likely contributed to lower IPS-SE fidelity scores.

Below are summaries of FY 2025 by the Settlement Agreement major categories, requirements, and key sub-requirements. There are references to both the Fourth and Fifth Modifications to the Settlement Agreement .

**Major Settlement Agreement Requirements**

This report is informed from information yielded from 54 reviews of individuals, selected randomly, living in the community, in supported housing, or in the community but not in supported housing. In addition to this review, the Reviewer conducted a review of 10% of the individuals living in ACHs and FCHs who had been made eligible for TCL. The review is included with this report as Attachment A. The reviewer also conducted a review of nine individuals made eligible for TCL hospitalized in State Psychiatric Hospitals (SPHs). The SPH reviews included SPH and LME/MCO staff joint interviews and record reviews. This stratified review process between community and ACH/FCH reviews enables the Reviewer to conduct a thorough assessment of the State's actions and challenges assisting individuals to access supported housing and to live successfully in the community. The community and ACH/FCH reviews included an interview with the selected individuals, when possible; a review of their records; and interviews with their LME/MCO, state staff, and provider agencies. The FY 2025 review also included analysis of state and LME/MCO data and a review of draft state policies, plans, and action steps to meet these requirements. Lastly the State and LME/MCOs are making progress and need to continue on the same path to meet Discharge and Transition Process requirements.

The State took a major step in the last half of FY 2022, developing a TCL Incentive Plan (TIP), and continued that plan with minor changes in expectations in FY 2025. The State awarded LME/MCOs approximately $2.9 million meeting multiple quarterly requirements in FY 2024. The State had $2 million available for incentives and awarded $773,751 or 39% of the available funding in FY 2025. As stated above, Trillium was at a disadvantage taking on additional counties in their catchment area at the beginning of the fiscal year and was only able to meet targets for 5% of the funding available to them. The other three LME/MCOs met 55% of their target. Vaya and Alliance had the most success filling targeted units thanks to an increase in the number of new units available and the state granting them the authority and responsibility to fill those units working with property managers. They also gained access to the state's housing data system for this purpose.

Two LMEs exceeded their target for transitions and utilization of the LIHTCs targeted units and reducing separations from housing. But the four LME/MCOs collectively only met 19% of the target for net ACH transitions. The TIP, though, continued to provide funding to LME/MCOs to fund high priority projects that assist them in meeting their specific targets directly related to the Settlement Agreement.

**Section III (B) Supported Housing**

The State met **Section III. (B)(2**) at the outset of the agreement when it established the five priority populations, but it has not met the requirements and sub-requirements for **Section III. (B)(1)(5)(7)[(a)(b)(c)(d) and (f)]** in FY 2025.

The State still has challenges meeting **Section III. (B)(1)**, access to community-based supported housing. According to the State's data, only 38% of individuals with a housing slot transitioned to supported housing after receiving a housing slot in FY 2025. Meeting the **(B)(1)** requirements is dependent on the State making progress with meeting (C)(1) requirements and a number of In-reach and Transition Processes requirements as well.

The State took a major step forward in the last quarter of FY 2024, giving Vaya and the Alliance the authority to work with property managers for new LIHTC properties to fill targeted[2] set aside rental units. These two LME/MCOs doubled the number of individuals getting access to targeted units in FY 2025 from FY 2024. The State gave this authority to Trillium and Partners in the third quarter of FY 2025, although neither had new units coming on line until near the end of the fiscal year.

One issue that has affected the State meeting the **(B)(1)** (access) and (**B)(7)(b)** (tenancy support) requirements is the challenging process that LME/MCOs have been required to use

[2] A "targeted unit" is an affordable housing unit in a building financed with federal Low Income Housing Tax Credits. In exchange for the tax credits, the housing developer agrees to "set aside" a percentage of units in the building for the State to use for individuals in the Transitions to Community Living program.

to help individuals access “targeted” units in the past. That process was time-consuming and did not give the authority for placing individuals in targeted units to the LME/MCOs, even though LME/MCOs are responsible for ACH transitions and diversions and helping individuals remain in their housing.

The State made negligible progress toward transitioning 2,000 ACH and FCH eligible residents wo now live in supported housing, as required in **Section III. (B)(5).** The State increased the number of individuals living in supported housing who exited adult care homes from 957 in FY 2023 to 1,000 in FY 2024 but only increased that number by 22 individuals, to 1,022, in FY 2025. If the net gain of the last two years remains the same over the next two years, the State will only achieve a net gain of 76 individuals, far short of the **(B)(5)** requirement and far short of individuals who want and would choose to move given the opportunity to move into supported housing. This requirement is one of the main requirements, if not the main requirement, in this Settlement Agreement given that it was at the core of the investigation leading to this Agreement.

The FY 2025 review of 10% of individuals on in-reach status living in ACHs or FCHs revealed that 47 out of 205 individuals eligible and living in ACH/FCHs expressed some interest in moving into supported housing with adequate support, services, and, when applicable, guardian agreement. The review appeared to be a valid sample, meaning that 10% or 47 individuals could represent as many as 470 individuals who could and want to move. Reviewers found that another 103 individuals needed more In-reach, assessments, and opportunities to consider moving to the community. Again, since this is a 10% sample, this means that a portion of the 1,030 individuals could be included in the group of individuals choosing to move.

**Section III. (B)(7)** The challenges meeting **(B)(7)** vary widely and often range from individuals not having access to accessible units and/or accessible features, to not getting the type or level of assistance for their daily living activities that they need to live in supported housing. Some individuals experience the challenge of getting turned down for a lease due to their criminal or credit history with no follow-up to request a reasonable accommodation from the landlord for disability-related past conduct. This last impediment has improved as the result of LME/MCO agreements with Legal Aid, Pisgah Legal Services, and other attorneys.

The State has also made significant strides in partnership with HUD’s (Housing and Urban Development) Regional Housing Offices and local public housing authorities to improve access to HUD funded Housing Choice Mainstream Vouchers. Leveraging Mainstream Vouchers enables the State to stretch its funds further to expand housing capacity in the state. The NC HFA, NC DHHS, and HUD collaborative efforts have led to increasing affordable housing availability, although gaining access to safe, affordable, accessible housing in convenient locations remains a challenge in North Carolina and is a nationwide

issue. **(B)(7)(b)** includes a service intervention (tenancy supports) and often communication breakdowns occurred with the state's process for individuals getting tenancy support but LME/MCOs not being able to communicate directly with property managers in LIHTC developments. This still occurs with existing LIHTC properties. LME/MCOs have had responsibility for working with landlords and owners filling privately owned units for 13 years. Hopefully, the State will consider additional changes to this process that can help LME/MCOs meet their obligations for tenancy supports and filling housing units, new or on turnover.

**Community-Based Mental Health Services**

The FY 2025 review revealed the State's performance in meeting **Section III. (C) Community-Based Mental Health Services** did not materially improve from results in FY 2024. The State is yet to take steps necessary to meet these requirements by July 1, 2027. The State is not meeting requirements for providing access to the array, frequency, and intensity of individualized recovery-based services and supports, including crisis support, necessary to enable individuals to transition to and live in community-based settings. These findings are based on reviews that included interviews with 63 individuals living in the community, in supported housing or other locations, as well as individuals hospitalized at one of the three SPHs, and these reviews included 263 individuals in the past three years. This review also included discussions with State staff, LME/MCOs, and providers, and analysis of other documentation and data related to the provision of community based mental health services.

Community-Based Mental Health Services requirements are one of the cornerstone requirements of this agreement and essential for individuals with a serious mental illness to live in the most integrated setting possible. Without systemic change, the State will again fall short of meeting this requirement in FY 2026 and likely FY 2027. This challenge can best be met with a focused approach as started with the CST coaching, training, and mentoring with teams and agencies who volunteered for this assistance. It was expanded to include assisting providers with developing a monitoring plan and focusing on the role of agency leaders. The Institute for Best Practices at the University of North Carolina (UNC) has also identified key issues and can be a valuable partner along with the Technical Assistance Collaborative in a transformation process. At the same time, it is important that DHHS focus on state policy that better enables the LME/MCOs to carry out their responsibilities for leading the transformation with their contract agencies.

DMHDDSUS (DMH) leadership has been instrumental in promoting Peer Support services and creating opportunities for peers in shaping services going forward. The evidence and cost benefit of peers—both as team members and in providing other supports and services

corroborates this commitment. Continuing to invest in and further develop Peer Support services will be helpful in meeting multiple items in the Settlement Agreement.

**Supported Employment**

The State has not met **Section III. (D)(1)** requirements to provide Supported Employment Services with SMI, especially those individuals in TCL, to meet their individual needs. This requirement identifies Supported Employment Services as services that will assist individuals in TCL to prepare for, identifying and maintaining integrated, paid competitive employment. As stated previously, the requirement for an independent assessment is rooted in historical service systems designed for individuals with Intellectual and Developmental Disabilities—not for individuals with SMI (Serious Mental Illness). Inserting this requirement into the State's comprehensive mental health services delivery system is duplicative and burdensome for service providers making referrals to IPS-SE. It unnecessarily delays individuals with SMI from receiving Supported Employment Services.

There are two overriding issues that impact the State's ability to ensure individuals eligible for TCL gain access Supported Employment as identified **(D)(1)** and employment services provided by ACT teams **(B)(9)** that meet the Supported Employment and ACT employment requirements. The first is that individuals are not referred to these services based on their request or expressed interest in employment. In some instances, employment support is not offered. Four of the 31 or 13% of individuals interviewed in FY 2025 who expressed an interest in employment or education did not get a referral and/or did not receive either IPS-SE or services provided by an ACT team employment specialist. The percentage has not significantly changed since the review team began collecting this information as part of the annual review five years ago. The LME/MCOs report similar referral numbers as does the State's various data sources. However, there does not appear to be consistency in how the State collects and reports data. The numbers of individuals interested in employment is consistent with the national average for individuals with serious and persistent mental illness interested in employment and/or education.

The second is that individuals interested in employment and qualifying for IPS-SE do not get through the eligibility and assessment process in a timely manner, sometimes drop their request for a referral, or do not hear from staff in a timely manner to continue the referral process. This is sometimes interpreted by providers as the individuals not having genuine motivation for employment rather than recognizing that many individuals are in the pre-contemplation or contemplation stage of change and need assistance with understanding and addressing their concerns about employment to be successful. Regardless of whether this objection is subtle or not subtle, it sends a powerful and clear message to individuals that they are not capable of working. Thus, it can be seen as discrimination against individuals who have expressed a desire to seek employment and/or education and training.

The relatively new Supported Employment Specialists in the LME/MCOs have worked to correct misconceptions, promote referrals, and monitor progress. With ongoing state and agency leadership and provider support, these efforts could help the State meet supported employment requirements. The State recently introduced the DB 101 model and online tool to assist individuals to calculate the impact of earnings on benefits.

The State has met the **III. (D)(2)** IPS-SE, fidelity requirement and **(D)(3)** requirement for 2,500 individuals “in or at risk of” ACH placement to receive The State provided Supported Employment to 2,905 individuals by June 30, 2025.

Fidelity review scores over the past year indicate providers are struggling to meet **Section III. (D)(2)** which requires services to be provided with fidelity to an evidenced-based supported employment model. The lowest certification for State IPS teams, fair fidelity, needs a fidelity review score of at least 74, or an average of 2.96 on all requirements. Given that 12 items on the Fidelity Scale intersect with Settlement requirements in (D)(1), information from Fidelity also offers important information for assessing the State’s performance with (D)(1) requirements. The State’s mean score on those items was 2.88 in FY 2025.

**Discharge and Transition Processes**

The State continues to make progress meeting the discharge and transition requirements largely due to the State’s TCL team quality improvement plan that has set benchmarks, tracks progress closely and conducts reviews in the community on a continuous basis. Progress is still uneven meeting SPH discharge planning standards and ensuring individuals living in ACHs have the opportunity to visit individuals who have moved into the community from ACHs. In-reach staffing turnover also presents challenges, although LME/MCOs have been able to retain many TCL leadership staff, which benefits the State tremendously.

The Reviewer and her team, along with assistance from the State’s *Olmstead* team, conducted a 10% sample review of individuals living in ACH/FCHs to quantify to the degree possible the number of individuals who could and want to move, those who need more In-reach, and those individuals who cannot move. The State is following up on these findings and continuing their focus on monitoring transition planning.

**Pre-Admission Screening and Diversion Process**

The State met all the Pre-Admission Screening and Diversion obligations in **Section III. (F)(1-3)** in FY 2024. The State decreased ACH admissions from 56 to 24 in FY 2025 while requests for admissions decreased from 192 to 175.

**Quality Assurance and Performance Improvement**

In FY 2024, the State met the obligations for **Section III (G)(1-8)** Quality Assurance/ Performance Improvement requirements. The State has developed a QA/PI Plan over the past three years to guide systemic improvement and ensure placements and services are developed in accordance with the Settlement Agreement. As a result, the Reviewer found the State had met the Settlement QA/PI obligations. The Reviewer had not been afforded an opportunity to review new TCL requirements the State had issued to LME/MCOs before indicating the State had met the QA/PI requirements. Recommendations for implementing those requirements are included below and in the full report. However, this does not affect the State meeting the QA/PI requirements.

Given that the aim of performance improvement is to focus on continuously improving processes to achieve better outcomes, it is important DHHS consider the impact of new LME/MCO QA/PI requirements on the State's ability to meet other Settlement requirements, specifically, Supported Housing, Community-Based Mental Health Services and Supported Employment. This is important at a time the LME/MCOs need to focus on improving performance utilizing expertise of community staff and individuals with expertise in effective change and performance improvement processes. The UNC Institute for Best Practices and TAC have the experience and technical assistance skills to assist the LME/MCOs with their plans to incorporate the best methods for continuously improving practices to achieve desired outcomes as contemplated in the Settlement Agreement. Fortunately DHHS staff assigned to ensure the State meets responsible for In-reach, Transition Processes and Diversion have already developed effective, timely quality assurance and with their performance improvement strategies carried out in community settings closest to where these processes take place.

**Summary**

The State has made substantial progress meeting major requirements agreed upon in the 2012 Settlement Agreement and extended through multiple modifications, with still more challenges ahead.

The State continued to make progress with a net gain of 9% or 344 individuals living in supported housing by the end of FY 2025. Progress in meeting the housing requirement for 2,000 individuals living in ACHs to exit and occupy supported housing slots was again negligible. The State only had a net gain of 22, or 2%, for individuals exiting ACHs filling supported housing slots at the end of FY 2025. This was lower than the 4% gain in the previous year. In addition, the State fell short meeting required housing criteria for location, tenancy rights, tenancy support and assistance with choice in daily living activities **(B)(7).**

The State has again made progress filling housing slots, especially since giving LME/MCOs more ability to manage their existing responsibilities filling targeted units (in LIHTCs)and made progress with Community Inclusion, other peer led initiatives and shifting to the Milestone payment model for IPS-SE services. The State also continues to make substantial progress diverting individuals from moving to ACHs.

The State developed a new Implementation Plan in FY 2023. The focus of the Plan does not incorporate some of the key steps the State needs to take to meet the SA requirements, thus the State is not likely to meet all of the key Settlement requirements by July 1, 2026. In the FY 2023 Annual Report, the Reviewer made reference to the State needing to avoid the trap of establishing new processes, practices, and reporting requirements to improve systems on the existing culture, beliefs, and structures rather than creating a new recovery-oriented system. Unfortunately, the State seems to have followed this track with Community Mental Health Services and to some extent with Supported Housing and Supported Employment.

As stated in the FY 2024 Annual Report, many dedicated individuals across state agencies, SPHs, LME/MCOs, and service provider staff worked tirelessly again this year to break down barriers and assist individuals to move to and continue to live in their own home even considering workforce issues and staff turnover. Perhaps the most encouraging work has occurred with LME/MCOs and leaders among individuals with lived experience. Their voices, creativity, and commitment are key to the State meeting its obligations in the Settlement Agreement and the promise of a recovery-focused community-based system for individuals in the future.

## INTRODUCTION

This is the FY 2025 Annual Report on the status of North Carolina's compliance meeting requirements with the provisions of the voluntary Settlement Agreement (SA) in United States v. North Carolina (Case 5:12-cv-000557-D) signed on August 23, 2012. This report documents North Carolina's (the State's) overall progress in meeting the Settlement Agreement (SA) obligations. This report repeatedly references the title of the State's approach and programs designed to comply with the obligations of the SA, as Transitions to Community Living (TCL). Individuals are determined eligible for TCL based on three criteria: 1) they are living in an adult care home (ACH), at risk of moving into an adult care home, in or discharged from a state psychiatric hospital (SPH) or discharged from an SPH to unstable housing; 2) their diagnosis; and 3) their functional needs. The SA requires the State to provide individuals found eligible with access to in-reach, discharge and transition processes, diversion, community-based mental health services, supported housing (SH), and supported employment (SE).

This report highlights the steps the State has taken to meet the Settlement Agreement obligations. The report also documents the State's challenges it has meeting all the Settlement Agreement (SA) obligations as referenced in the Fourth, Fifth, and Sixth Modifications of the Settlement Agreement. The Parties filed their sixth motion to modify the Settlement Agreement with the Court on December 11, 2025, and the motion was granted by Judge Dever on December 12, 2025. The Sixth Modification extends the Settlement Agreement obligations until July 1, 2027. The Sixth Modification added a provision for the Parties to meet and confer no later than May 16, 2025, to determine whether discharge of any obligations referenced in the Sixth Modification would have been appropriate at that time. None were identified.

The Fifth Modification included language for draft and final due dates and consultation on the implementation plan with the Plaintiffs and the Reviewer. The plan included proposed steps the State needed to take to meet Settlement Agreement obligations. In the FY 2023 Annual Report, the Reviewer indicated that taking these steps may not result in the State meeting its obligations in the newly established timeframe. The FY 2025 review results, interviews, and data support this assumption.

The report documents the State's progress in meeting requirements. The State did not fulfill any new major obligations or specific requirements in FY 2025. There was progress on several sub-requirements in **Section III (E) Discharge and Transition Processes, (B) Supported** Ho**using, and (D) Suppo**rted Employment, while other important sub-requirements within these three major requirements showed limited or no progress. The **(F) Quality Assurance and Performance Improvement** requirements were discharged as met

in FY 2024. The State implemented a new LME/MCO QA/PI process and requirements in the last quarter of FY 2024 and this change impacts other requirements. The State did not make progress meeting **Section III. (C) Community Based Mental Health Services** requirements.

After meeting **Section III. (F) Pre-Screening and Diversion** in FY 2024, the State reduced the number of individuals not diverted from Adult Care Homes (ACHs) from 56 to 24 in FY 2025. This continuing progress signals that the State's adult mental health system is taking an important step to transform from a community based rather than institutional based system. Additional changes in the system are required for this transformation to succeed.

The State continued to make steady progress assisting 344 individuals to move into housing in FY 2025 but only increased the number of individuals exiting ACHs living in Supported Housing by 22 individuals. There were 175 individuals diverted from moving into Adult Care Homes. This number of individuals still in process accounted for most of the individuals moving into SH.

The State made improvements with new funding and new staffing dedicated to Supported Employment for each of the LME/MCOs. Several ongoing challenges remain, and new issues have emerged in FY 2025.

Over the course of the past two years the State has faced challenges to provide supported employment services with fidelity to this evidenced-based employment model. This challenge is the result of a confluence of issues. The State received approval for a new and revised 1115 waiver authority in 2023 that included approval for what is described as a "Tailored Plan" for NC Medicaid beneficiaries who need enhanced services for a mental health disorder, substance use disorder, intellectual/developmental disability (I/DD), or traumatic brain injury (TBI). This plan was launched on July 1, 2024. It includes coverage for physical health services, pharmacy services, care coordination and care management, behavioral health services, and added services, such as wellness programs.

The State shifted its Medicaid payment from a (b)(3) authority to a 1915(i) Medicaid authority for IPS-SE as part of the Tailored Plan. The 1915(i) authority requires that the State adopt an independent assessment process for this service in which the referral process is in the traditional comprehensive mental health delivery system wherein providers can more easily refer to their own IPS teams. This process delays access to IPS-SE services after referral, making it difficult to rapidly engage and assess individuals as required by the fidelity model. The number of referrals of TCL recipients remains low despite interest in employment and education as referenced in previous reports and again this year.

The reduction in the number of LME/MCOs at the beginning of FY 2025 led to staffing adjustments in the new Tailored Plans, necessitated new leases for individuals in

permanent supported housing receiving services from newly assigned LME/MCOs, and required updated provider contracts. It also required the LME/MCOs to move quickly to begin to serve individuals transferred to them during the LME/MCO changes. The LME/MCOs had related challenges contracting with new supported employment providers, accessing housing, and taking on new responsibilities with challenges in managed care requirements.

n FY 2023, the Parties agreed that the State should develop an Implementation Plan with goals, objectives, action steps, and staff responsibilities the State would take to meet SA requirements by July 1, 2025. The State began drafting this plan in late FY 2023, discussed drafts with the US DOJ and this Reviewer, and completed it by August 26, 2023. At that time, this Reviewer reported that implementation of this plan, while important, may not result in the State meeting all its obligations by July 1, 2025.

In FY 2025, the reviewer issued a Special In-Reach Report **(Attachment A).** This report included the evaluation and recommendations of a 10% sample of individuals (289 individuals) on In-reach status in ACH/FCHs. The purpose was to identify those who could and wished to move, those who needed further in-reach, and, for some individuals, additional assessments, for those who had decided not to move after repeated discussions with In-reach staff. Of that number, reviewers interviewed 151 individuals and conducted desk reviews and record reviews for individuals still residing in ACHs and collected information on those who had moved or had died but who were not yet reported to the State. In a few instances, which involved family members, other key informants, and guardians.

In addition to this special In-reach review, the Reviewer and her team conducted 54 individual reviews of randomly selected individuals living in supported housing or other locations in the community. The review team interviewed 49 of the 54 individuals selected for this review, conducted desk reviews for all 54 individuals with service providers and LME/MCO, and, in some instances, staff as well. All of the reviews included a review of provider progress notes, LME/MCO care coordination notes, person centered plans, clinical assessments, discharge summaries, care management documents where available, TCL timeline summaries, and transition materials. The LME/MCOs tried several times but could not locate two individuals and two individuals refused an interview, but the reviewer arranged for desk reviews for those individuals. One family guardian only consented to an interview with her. Nine desk reviews were conducted across three State Psychiatric Hospitals (SPH). Both SPH and LME staff were present for the reviews. The Reviewer also reviewed a number of state reports, analyzed data, and conducted additional interviews with LME/MCOs and other state staff and service providers.

There are findings and recommendations for each of the six major categories (Supported Housing, Community-Based Mental Health Services, Supported Employment, Discharge

and Transition Processes, Pre-Admission Screening and Diversion, and Quality Assurance) included in this Annual Report along with information regarding the methodology for this review and individual findings for individuals selected randomly for a review. The Appendix includes scores from individual reviews for agreed upon standards for 12 requirements in 2 major Settlement requirements (Housing and Community-Based Mental Health Services).

**METHODOLOGY**

This report includes multiple approaches to yield a assessment of the State's progress and challenges meeting the terms of the Settlement Agreement. The report includes results of field work comprised of interviews with individuals eligible for TCL benefits in each LME/MCO catchment area followed by a desk review for individuals selected for a review. A desk review includes a review of records and transition timeframes, an interview of service provider(s), of staff of the LME/MCOs and, when applicable, staff of SPHs and guardians for individuals selected for a review. This report follows the same methodology used in previous reports as referenced above with the addition of the Special In-Reach Report.

This reliable method provides qualitative and quantitative information about the individual making their own choices, getting assistance with transitions, and receiving individualized and flexible recovery-based services, supports with the frequency, duration, and intensity and assistance from natural supports and peers including assistance to deal with crises needed for success in the community. The Reviewer and her team have conducted 1,473 individual reviews over the past 10 years to gain this information. For requirements not scored or not including numeric measures, the methodology included a review of the State's policies and practices based on the measures, norms, or models in comparative evaluations and standard practices across multiple jurisdictions, as well as its demonstrated success in establishing and implementing programs that achieve outcomes consistent with those required in the Settlement Agreement. The methodology also includes a review of the of other reports, data and reviews that are specific to North Carolina. Data, reports and reviews provide, where applicable, comparable indicators of performance with the review findings.

In-person interviews are important to gauge any differences in the individual's experience and needs, especially for frequency and intensity of services based on the individual's requests and needs as documented in the individual's record. First person interviews also provide the opportunity for the Reviewer and her team to see where the individual lives as well as obstacles the location presents to the individual's access to community amenities, friends, family, and services. An individual's space reveals that individual's accessibility needs and needs for personal support. Simply said, in-person interviews are essential to determine if the State is meeting the Settlement Agreement

(SA) Supported Housing, Discharge and Transition Process, Community-Based Mental Health Services, Supported Employment, and Diversion requirements. The review team again used questionnaires to score the State's and each LME/MCO's performance in meeting specific, non-numeric requirements. In each review, the review team scored the requirements and/or sub-requirements as one of the following: fully consistent with the requirement (yielding a score of 3), partially consistent with the requirement (scoring a 1), or not consistent with the requirement (scoring a 0).

The questions reviewers asked often covered multiple sub-requirements, especially questions in the Discharge and Transition Process section[3] and Community Mental Health Services and Supported Employment sections, as those requirements tend to be overlapping in nature. Some of the numbers associated with individual reviews may be different than the numbers of the types of reviews listed above, based on questions the review team was unable to get answers for at the time of the review.

The standards the review team developed with the parties provide specificity to the SA requirements for items that did not include numeric measures in the Settlement Agreement. However, of the items included in the questionnaires, the Reviewer made qualitative and quantitative assessments to arrive at each score for most items. The review team often asked a number of questions and reviewed documents and charts to determine frequency of visits, assessments, quarterly visits, inclusion of required information in plans or follow-up, and referrals for services.

For each of these standards, the Reviewer referenced verification methods; sources of information; criteria for meeting a requirement, partially meeting a requirement, or not meeting a requirement; and applicable scores for meeting a requirement. The Parties reviewed proposed standards, recommended changes, and based on changes, accepted the standards and the methods as valid for this review.

Each member of the review team had already met the inter-rater reliability requirement and had the benefit of consultation with a subject matter expert on any question that required further review before they began reviews on their own. The Independent Reviewer case-judged each review. The review documents included descriptions for each finding for each of the requirements.

The review team assessed the State's progress in meeting the provisions of the Settlement Agreement through monthly work sessions, data analysis, review calls with State staff and review of new and existing initiatives. The Reviewer also assessed progress through discussions and roundtables with providers and community

[3] The FY 2025 Review did not include questions on Discharge and Transition Processed due to the Reviewer conducting a separate In-reach Report and transition Processes report.

stakeholders, LME/MCO reviews, and SPH and LME/MCO interviews.

In addition to the site visits for individual reviews, the Reviewer and members of her team have calls and meetings with each of the LME/MCO agency leadership and staff, including TCL teams, clinical leadership, care coordination, network management, quality management, housing, and key administrative staff. The calls and meetings covered a summary of findings from the reviews and the State's progress and challenges in meeting each of the major requirements.

The Reviewer and review team members attended provider meetings, met with peer support staff and housing stakeholders, and listened in on a number of training events (held virtually). The Reviewer and her team's focus for these discussions included, but not exclusively, access to housing and housing conditions and tenancy challenges, workforce issues, service provider performance, integration of supported employment teams with each individual's service provider, and continuing questions regarding individuals expressing concern about losing benefits if they go to work. Dr. Beth Gouse conducted three SPH reviews on-site this year. David Lynde provided consultation and analysis of services, supported employment, and quality assurance and performance improvement. Charlyne Boyette, Lyn Legere, Kim Maguire, Casey Wunsch, and the Reviewer conducted in-person and desk reviewers and subject matter consultation.

## INDIVIDUAL REVIEW FINDINGS

Individual reviews capture the most important aspects of this Agreement and answer four key questions about the State's performance to meet Settlement requirements. One, what is the individual's experience of what services and supports they are receiving, or not receiving, and how they are receiving information to help them live in the most integrated setting possible? Two, what support and assistance did the individual receive to get and keep housing and/or employment and other essential services and supports based on their expressed and apparent needs as determined from interviews and documentation? These include a review of the intensity and frequency of the assistance provided. Three, what supports did the individual receive to help them with their integration into the community, based on their expressed needs? Four, were the services and supports individuals received recovery oriented and community-based? And did those experiences and support match the actions required in the Settlement Agreement?

As widely recognized, the best source for capturing primary source data for this type of review is through individual interviews. The Reviewer and her team conducted individual interviews in the individual's home or in a residential or community setting. Secondary source interviews and document reviews are also valuable. Answering these questions enables the Reviewer to assess whether the steps the State is taking to "develop and

implement measures to prevent inappropriate institutionalization, discrimination and to provide adequate and appropriate public services and supports identified through person centered planning in the most integrated setting appropriate to meet individual needs," as required by **Section III. (A),** will enable the State to meet the Settlement requirements.

Interviews and chart reviews often provide a clearer picture than found in data in determining how well a team works together, across organizations when necessary; why a team, provider, LME/MCO, and the State are or are not making progress; and what needs to happen for the State to meet the Settlement Agreement's requirements. It was more difficult in the spring community review in FY 2025 to assess past events, precursors to potential problems, and challenges an individual faced due to issues getting documentation for this review. One provider's information system was corrupted and several individuals whose names were selected for a review had not been seen for several months or years, so information was not available. Trillium experienced challenges getting information for individuals living in the Sandhill's catchment area prior to the FY 2024 merger due to staff changes and individuals not seen regularly.

The Reviewer and review team members attended provider meetings, met with peer support staff and housing stakeholders, and listened in on a number of training events (held virtually). The Reviewer and her team's focus for these discussions included, but not exclusively, on access to housing and housing conditions, tenancy challenges, workforce issues, provider performance, integration of supported employment teams with each individual's service provider, and individuals expressing concern about losing benefits if they go to work. Dr. Beth Gouse conducted three SPH reviews on-site this year. David Lynde provided consultation and analysis of services, supported employment, and quality assurance and performance improvement. Charlyne Boyette, Lyn Legere, Kim Maguire, Casey Wunsch, and the Reviewer conducted in-person and desk reviews. Each of the reviewers provided subject matter consultation. **Figure 1** below identifies the number of individual reviews by type of review.

**Figure 1: Individuals Reviewed by Type of Case Reviews in the FY 2025 Spring Review and FY 2025 SPH Review**

| Types | Reviews |
|---|---|
| Total Reviews[1] | 63 |
| In-Person Community Interviews | 49 |
| Desk Review/ Family Interview Only | 5 |
| SPH Desk Reviews | 9 |

referenced in **Figure 2** below, in FY 2025, 25 or 47% percent of the 54 individuals in the community review sample, were men and 29, or 53%, were women. This percentage appears different than percentages in previous years but may be similar if the ACH reviews and community reviews were done at the same time. The average age of the individuals in the community based individual reviews was 50. Service needs differ for individuals in different age ranges, which has significance for what services the State needs to make available in the service array and what skills and knowledge staff have for providing services to a much younger and much older population. The age ranges may have been different if the community and ACH reviews were done at the same time. The percentages are more similar for individuals between the ages of 41 and 60. Below are five figures summarizing information from the FY 2025 Community Review labeled "C" and the FY 2025 In-Reach Review labeled "I." It is difficult to give comparisons for average age and settings where individuals live. **Figure 3** provides a clearer picture of the difference in ages of individuals living in the community and those living in ACHs. There has been a slight decrease in the number of younger individuals since the State made changes in their diversion approach.

**Figure 2: Demographics, Living Settings, Guardians, FY 20-FY 25 Reviews**

| Categories | FY 20 | FY 21 | FY 22 | FY 23 | FY 24 | FY 25-C | FY 25-I |
|---|---|---|---|---|---|---|---|
| Average age | 45 | 51 | 50 | 51 | 45 | 50 | 58 |
| Female | 31% | 45% | 41% | 31% | 35% | 53% | 40% |
| Male | 69% | 55% | 59% | 69% | 65% | 47% | 60% |
| Living in SH | 42(40%) | 28 (37%) | 31 (34%) | 20 (29%) | 30 | 33 (62%)[4] | 0 |
| Living in an ACH | 12(11%) | 33(42%) | 30 (33%) | 20 (29%) | 18 | 2 | 151[5] |
| Hospitalized in an SPH | 23(23%) | 5 (6%) | 13 (14%) | 6[6] (9%) | 8 | 9 | 0 |
| Living in another setting | 27(26%) | 12 (15%) | 17(19%) | 23 (33%) | 29 | 19 | 39[7] |
| Has a guardian | 22% | 12% | 17% | 28% | 30% | 11% | 25% |

[4] Two individuals moved as the result.

[5] Two individuals returned to an ACH at the same time their name was selected for a review.

[6] Two individuals were discharged from an SPH after the name was selected but before the actual review. One was interviewed in his Bridge Housing location.

[7] This number does not include 35 individuals the LMEs and DHHS could not locate, 23 individuals who had moved to an SNF or living in an ACH with a dementia diagnosis, 6 individuals who were deceased,

**Figure 3: Age Distribution**

| | 21-30 | 31-40 | 41-50 | 51-60 | 61-70 | Over 70 | Total |
|---|---|---|---|---|---|---|---|
| **FY 2025-C** | 3/ 5% | 11/ 20% | 8/ 15% | 17/ 31% | 14/ 26%[8] | 1/ .02% | 54 |
| **FY 2025-I** | 6/ 2% | 12/ 4% | 49/ 17% | 66/ 23% | 118/ 41% | 35/ 12% | 289 |
| **FY 2024** | 11 | 17 | 20 | 18 | 17[8] | 2 | 85 |
| **FY 2023** | 4 | 13 | 8 | 22 | 16 | 7 | 70 |
| **FY 2022** | 12 | 11 | 17 | 26 | 22 | 3 | 91 |
| **FY 2021** | 11 | 8 | 13 | 21 | 18 | 7 | 78 |
| **FY 2020** | 18 | 22 | 22 | 27 | 11 | 5 | 105 |
| **FY 2019** | 19 | 10 | 24 | 20 | 20 | 5 | 98 |

As reported in the FY 2024 Annual Report, the State Division of Social Services (DSS) and TCL staff and several LME/MCOs have followed-up on guardianship issues and continued to provide information to public guardians on the State's responsibilities in *Olmstead* and this Settlement Agreement. The State DSS has taken on more responsibility for oversight of public and agency guardianship, most importantly intervening with guardians who are not giving individuals the opportunity to consider community housing and other opportunities. Nonetheless, there are agency and public guardians who do not visit individuals on a regular basis, sometimes for over a year. Of the five individuals with public guardians in the FY 2025 review, one agency attempted to impede the review and was uncooperative during the review, an agency guardian required an individual to live in a multi-unit assisted housing (MUAH) where an individual pays higher rent, typically $800 a month or higher and the facility is typically in poor condition, and a third individual lives in a boardinghouse.

Physical Disabilities and Chronic Health Conditions: Below is a breakdown of the most common health conditions. This is not likely a complete list as records may not have full information about health conditions. Forty-one (41) individuals out of 49, or 84%, of the sample for whom information was available, had at least one serious physical disability or chronic health condition. There was insufficient information provided for five individuals to determine if they had significant health conditions or physical disabilities. This is a similar finding to the FY 2024 review sample with 77% of individuals with available information having at least one chronic health condition or physical disability. Two individuals had at least seven chronic medical conditions, one had six, four had five, and six had three. Thirty-two (32), or 65% of the individuals, had 2 or more chronic illnesses and/or physical disabilities. One individual living in the community but needing additional support had nine very serious health conditions. Eight (8) individuals, most of

[8] Two individuals in this age group were 70 years old.

them younger, did not report any chronic medical conditions and Information was unknown or could not be provided for five individuals, including one whose records were not available due to a major computer failure at one agency.

Of the 49 individuals with information on their health conditions, 11 individuals reported to have high blood pressure, chronic heart failure, or another type of heart disease or failure. A number of individuals were diagnosed with either GERD, asthma, anemia, seizure disorders, vitamin D and vitamin B deficiency, obesity, rheumatoid arthritis, neuropathy, sickle cell anemia, or a combination of any of these illnesses.

There were 14 individuals reported to have diabetes, and 6 individuals have had a stroke with one individual reporting a series of strokes. Nine individuals had high cholesterol. Seven individuals were non ambulatory, either because of a single or double amputation or other chronic illnesses. Five individuals reported to have COPD. Two individuals had a traumatic brain injury. One individual was blind in one eye and partially blind in another as the result of a tumor on his spine that has since been removed. One individual was diagnosed with Stage 3 kidney failure. One individual was diagnosed with avascular necrosis, another with Parkinson's disease. Two individuals were diagnosed with acute metabolic encephalopathy.

As in previous years, a significant number of individuals reviewed needed daily assistance, home health and/or health care management, specialty care, accessibility features or equipment, and/or a unit with easier physical access (location of the building or in the building).

Five individuals had serious physical disabilities but did not report chronic medical conditions. One person had been run over by a truck, another one had serious injuries following a car accident, and reported TBI as a result, one individual had a tumor removed from her spine with residual vision and speech impacts, and two had wrist, knee, and hip surgeries. These do not include individuals with both physical disabilities and chronic medical conditions, including three individuals who had a stroke, and now have a physical disability as a result including one individual who has had a series of strokes.

A number of individuals who were non ambulatory needed assistance with a walker or cane related to their heart condition, surgeries, arthritis, recovering from accidents, obesity and/or neuropathy. A number of individuals needed accessible features including ramps, first floor units, and or fully accessible units. While it is now standard protocol for individuals to receive a nursing and OT assessment before moving to the community, several individuals moved a number of years ago before these assessments were made available and several individuals re-housed did not get an

assessment. On the other hand, additional assessments and additional PT and OT were provided for individuals whose needs changed after moving. At the time of their review, two individuals had not yet obtained equipment and assistance, despite these needs being identified several months prior. One man was waiting on an accessible unit to become available after living in his first unit for eight years without needing assistance. One woman had moved in with her sister while waiting for surgery on her wrists. One woman needed both detox and a skilled nursing facility placement. Arrangements were made after the Reviewer reported this issue for this type of care.

Thirty-nine (39) individuals reported they had experienced or were continuing to experience trauma, sexual, physical, or verbal abuse, or a combination thereof, the sudden death of a child, or a serious car accident with life threatening injuries. This represents 93% of the individuals for whom information was available. There was insufficient information available for 15 individuals to conclusively determine if they had experienced significant trauma during their lifetime.

Records reveal a high percentage of individuals have a history and/or are currently using drugs and/or alcohol. At least 29 out of 58, or 50% of individuals with enough information available or through self-report, revealed serious substance use as a contributing factor to their hospitalizations, homelessness, and/or ACH placement. Individuals with a substance use disorder are at high risk for eviction. Three individuals indicated they were clean and sober, including one woman who reported she has been in remission for seven years from a heroin addiction . She recently received her certification as a Certified Peer Specialist.

Individuals repeatedly expressed concern about their health conditions, particularly those with physical disabilities who need regular and frequent scheduled personal assistance or support, home health, and/or care management for their physical disabilities and chronic medical problems. As stated above, the State has taken major steps to increase nursing and occupational therapy assessments. The State added funds to LME/MCOs' Medicaid payments for their Complex Care Initiative. This shows the State's clear understanding of the needs of the target population and the potential for these assessments to open up opportunities for individuals to live in the most integrated setting possible. This need extends beyond assessments as some individuals will need daily, one time or frequent OT, PT and personal support.

Living Conditions: The Review Team had access to most of the individuals' living spaces during this review and an opportunity to interview individuals inside and outside their home. One person had recently relocated to a new residence and was not available, while two people experiencing homelessness could not be located after an extended search.

In contrast to the prior three annual reviews, there was an increased number of rental units that were either in poor condition or inadequately maintained. Three individuals reported safety issues related to the location of their supported housing units. One woman, living in a boarding house, referenced that the boarding house was set up to operate a "prostitution ring." Another woman reported hearing gunshots in her neighborhood and strangers (looking to buy the home) entering her home. She reported her stairs were not safe and she was not given a copy of her lease. She is concerned because the property is for sale.

One woman was living in MUAH (multi-unit assisted housing) with services. These facilities are not licensed adult care homes or licensed assisted living facilities and are not inspected or monitored by the Division of Health Service Regulation or county departments of social services. The individual was referred to a MUAH by her community hospital treatment team with concurrence of her agency guardian. She was paying $850 a month in rent. She does not have a provider and while she has goals to move, her agency guardian believes she needs to live in this facility. Two other individuals are living in boarding houses, also paying a high rent.

This does not include concerns raised by multiple individuals with the lack of access to community amenities, place of employment, or health care providers. An individual reported difficulty accessing the bus stop for her work commute because of the distance to the bus stop and the steep incline near her home. She had been living in a residence without air conditioning or heat for over a year, despite a prior inspection. Immediately following the review, the LME assisted her in relocating to bridge housing.

One individual who has resided in his unit for eight years reported ongoing issues with his heating system and expressed interest in receiving assistance for painting and carpet shampooing as identified during a recent inspection. He requires support with both the expenses, given his fixed income, and completion of these updates. Another individual is being charged for trash collection but has not received the service consistently and has requested help from staff dealing with his landlord.

One individual was living in a cluttered, overheated mobile home with debris, roaches climbing the walls, and spoiled food. She had recently experienced two traumatic events. Her mother (her guardian and payee) and her daughter died, two weeks apart, three months earlier. She had not paid rent due to lack of access to funds. She needed urgent care for an open wound and other health issues. LME/MCO staff promptly provided food, cleaning, yard maintenance, and medical assistance after the review.

One woman waiting on funding to be approved had been without a bed for five months, sleeping in her wheelchair with her head on a table. Another woman, seen by her service

team in April, reported she had been living without furniture since she moved into her targeted unit on December 31, 2024. She received her funds just prior to the reviewer's visit. She was told the reason she did not receive her Transition Year Stability Resources (TYSR) was because she had not been approved for 1915(i) services. However, it appears her CST team linked her to a targeted unit before getting TCL approval.

Another individual reported their backyard had been sinking for at least nine months, causing her deck and air conditioning unit to collapse and malfunction. One woman was living in a one room house that resembled a storage unit. She lived in a remote setting with a deeply rooted dirt road, and she could not drive her car because she did not have funds to repair the vehicle. Another individual recently moved into a home with a faulty breaker that prevented the use of kitchen appliances. His storm door was loose and hanging, his stove had a faulty element, and he mentioned a drive-by shooting in his neighborhood.

**C. COMMUNITY BASED SUPPORTED HOUSING SLOTS**

| Major Categories[9] | Standards | Progress Meeting Requirements |
|---|---|---|
| **1. Section III. (B)(1)(2)** requires the State to develop and implement measures to provide eligible individuals with access to community-based supported housing (SH). | 1. The State has developed measures to enable individuals in all five priority groups to access SH when exiting ACHs; when discharged from an SPH, if they would otherwise become homeless or move to unstable housing; or when an individual becomes TCL eligible during or after pre-screening.<br>2. The State has implemented such measures to ensure access to SH for all five priority groups.<br>3. The State uses bridge housing to enhance the potential for "access" to permanent housing. | The State is not meeting the requirement to develop measures and take steps to fulfill requirements for timely access to SH. The FY 2025 individual reviews revealed that access for individuals choosing supported housing had been challenging or not accomplished for 24 of the 40 individuals who had indicated their interest in moving into a supported housing slot. This is a complicated issue related, in part, to challenges with transition coordinator assignments. LME/MCOs have to make decisions on assigning transition coordinators based on their capacity to adequately assist a high volume of individuals at any given time. There are also delays in new units becoming available, challenges with obtaining documents necessary for individuals to get a lease, and individuals experiencing medical complications that delayed their moving. |
| **2. Section III. (B)(3)** The State will provide housing slots to 3,000 individuals by July 1, 2021, and will retain housing slots for individuals who have housing slots on March 1, 2021, as long as they do not oppose supported housing and supported housing remains appropriate for them. | Same as requirement. | The State met this requirement in September 2021.<br>Three thousand nine hundred and ninety eight (3,998) individuals were occupying housing slots on June 30, 2025. This was an increase of 9% during FY 2025. Three hundred and twenty-two (322) individuals moving into SH were in the SA diversion category, 28 were discharged from an SPH, and the remaining 22 individuals moved from ACHs or FCHs. |

[9] This is a summary of major categories and standards for some requirements and/or not included if met in previous years (see notes in each section).

| Major Categories[9] | Standards | Progress Meeting Requirements |
|---|---|---|
| **3. Section III. (B)(4).** The State shall develop rules to establish processes and procedures for determining eligibility for SH in accordance with the requirement for priority groups set forth in **Section III (B)(2)** of the Agreement. | Same as requirement. | The State is meeting this requirement and will only have a review to the extent necessary to determine whether the State has materially regressed and, if not meeting, how it affects other continuing obligations of the Agreement. |
| **4. Section III. B. (5)** As of January 1, 2024, the State shall provide housing slots to 1,633 individuals and as of January 1, 2025, the State shall provide housing slots to 1,817 individuals as described in **Sections III(B)(2(a), (b) and (c)** of this Agreement. The State shall provide housing slots to 2,000 such individuals by July 1, 2025. | Same as requirement. | The State did not meet the Settlement requirement to provide housing slots to 2,000 individuals by July 1, 2025. The number of individuals occupying housing slots after exiting ACHs was 1,022, a net gain of 22 in FY 2025. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **5. Section III. (B)(7) (a.-g.)**<br>The State will provide housing slots for individuals to live in settings that meet these criteria:<br>a. They are permanent housing with Tenancy Rights.<br>b. They include tenancy support services that enable residents to attain and maintain integrated, affordable housing.<br>c. They enable individuals with disabilities to interact with individuals without disabilities to the fullest extent possible.<br>d. They do not limit individuals' ability to access community activities at times, frequencies, and with persons of their choosing.<br>e. They are scattered site housing.<br>f. They offer individuals choice in their daily activities such as eating, bathing, sleeping, visiting, and other typical daily activities.<br>g. The priority is for single occupancy housing. | Housing slots meet the following criteria if they:<br>a. are permanent with rights of tenancy;<br>b. enable the individual to get tenancy support to meet tenancy requirements and advocate for their rights;<br>c. the housing location makes interaction with individuals without disabilities possible;<br>d. do not limit access to community activities and with persons of their choosing;<br>e. meet the scattered site requirement;<br>f. provide a choice in living activities, accessible features and personal support; and<br>g. priority is for single occupancy. | Based on a review of provider and LME/MCO records, provider, guardian, key informant, and LME/MCO interviews, and individual visits, conducted during the spring of FY 2025, the State did not make progress meeting the requirements for **Section III. (B)(7)(a, b-d and f). Section (B)(7)(b)** also is also reviewed as part of **Section III (C) Community Based Mental Health Services**.<br><br>The State has made progress affording tenancy rights through a focus on ensuring reasonable accommodation. However, a number of individuals who may have benefitted from making such a request did not do so. The State also did not meet the specific access and location requirements **(B)(7)(c.-d.)** and the assistance with daily living requirement **(B)(7)(f),** The State continues to meet **Section III (B)(7) (e. and g.).** |
| **6. Section III. (B)(8)(9) T**hese sections describe where the State cannot use slots and the process for giving individuals the choice of housing after being informed of all available options. | Same as the requirement | The State is meeting this requirement and will only have a review to the extent necessary to determine whether the State has materially regressed. |

### *(A) Background*

The Community-Based Supported Housing (SH) slot requirements in the Settlement Agreement require a comprehensive approach to providing access to supported housing and supportive services and to maintain tenancy in integrated, community-based housing for individuals in the target population. The approach to meeting supported housing requirements necessitates that the State ensures the LME/MCOs have access to supported targeted housing units in a timely manner, that LME/MCOs are not blocked from providing in-reach, and that LME/MCOs assist individuals to move to supported housing from ACHs and FCHs in a timely manner.

Key to this success will be the State providing assistance to the LME/MCOs with attention to individuals' physical access, ensuring individuals have support for individuals' daily activities choices and needs, and having clear policies on providers' responsibilities for tenancy support, including engaging individuals before move-in, at move-in, and through the individual's tenancy. Likewise, the LME/MCOs must provide frequent and effective in-reach, with community visits, effective and timely transition processes, ensuring providers carry out their responsibilities for tenancy support, before move-in, at move-in, and thereafter.

The State began providing incentives to provide individuals access to supported housing as required in **Section III. (B)(1)** but is still working toward ensuring individuals have access in a timely manner, especially ACH qualified residents which the SA refers to as having priority for housing slots. In the FY 2025 In-reach review, 47[10] individuals interviewed and residing in ACHs or FCHs expressed an interest in moving. The 47 were part of a 10% sample of individuals residing in ACHs and FCHs identified as on In-reach status. This indicates that as many as 470 individuals may be expressing interest if asked, capable of, and not impeded from moving to supported housing. Over time, the number of individuals expressing interest may decrease with individuals moving to other locations or no longer eligible due to their medical conditions. There is also sufficient data that individuals may move to skilled nursing or die before they move. The review also indicated that and additional 750 individuals require more in-reach, based on the assumption that the sample is valid. Reviewers indicated several factors impeding individuals' moving to supported housing, including In-reach staff turnover, infrequent contacts, and staff not engaging individuals at the level necessary to learn of their interest or to help them identify their interest. There was also evidence that some guardians and ACH or FCH staff impeded the process.

There were three individuals in the FY 2025 spring review who had been referred to unlicensed Multi-unit Assisted Housing with Services (MUAH) or a boarding home. Nine individuals on TCL status were discharged from SPHs to MUAHs, and 31 were discharged to boarding homes, shelters and hotels in FY 2025. Individuals do not have tenancy rights when living in these places. The homes are not licensed, often unsafe, are crowded, with residents sleeping on mattresses on the floor, and have lice and bed bug infestation. Individuals pay as much as $850 in rent per month and in some places are required to buy some or all of their food. These numbers do not include the number of individuals who chose to move to a shelter, boarding home, or a cheap hotel or motel prior to SPH discharge or before SH becomes available.

[10] Following the In-reach review, at least 8 individuals no longer fell into this category primarily related to their health-related issues. If the 10% sample is correct, then it is possible 390 individuals could and want to move. Each of the assumptions of the numbers of individuals who can and want to move, need more in-reach or cannot or will not move may change as this data is from a point in time.

The State has exceeded the requirement in **Section III (B)(3)** that 3,000 individuals occupy housing slots but has not met the requirement in **Section III. (B)(5)** that 2,000 of the 3,000 individuals residing in supported housing on the Agreement's termination date be individuals who transitioned out of ACHs. The number of individuals on TCL status have access to a housing slot if they choose and can move. This responsibility remains even if regardless of how many individuals on this status are living in ACHs/FCHs falls below 2,000. The State has intensified this effort but there is almost no change in the numbers of individuals moving from ACHs occupying SH in this reporting period. The findings section below describes findings of the State's lack of progress toward meeting this requirement. The State met the Section **III. (B)(3)** requirement for 3,000 occupied supported housing slots in September 2021.

The State has done an excellent job making housing available through HFA actions, increased state funded rental assistance, and LME/MCO outreach to landlords. The State should also continue to incentivize LME/MCOs to assist more individuals to move into supported housing. Likewise, the LME/MCOs have shown great progress managing their housing programs, adding supports and accessible features, and assisting individuals to meet inspection requirements.

The State continues to take steps to meet obligations in the housing settings and tenancy support requirements in **Section III. (B)(7)(a.-d. and f.)** but did demonstrate improvement meeting sub-requirements **(a-d. and f.)** in FY 2025. These are important requirements as they include the steps the State must take for individuals to have tenancy rights, live in safe locations where they can interact with individuals without disabilities, and live in integrated settings that afford accessibility and choice of daily living activities. The NC Housing Finance Agency is receiving technical assistance from the Vera Institute for Justice to update the current tenant selection plan (TSP) and develop tenant screening policies that are more inclusive to people with criminal convictions. The NC Justice Center and Legal Aid NC assisted the NCHFA with the application for the technical assistance and will be supporting the HFA in the process.

Through substantial increases in Targeted Units in FY 2025, there has been greater availability of units in new federal Low Income Housing Tax Credit (LIHTC) and 4% bond properties. The early estimates predicted 915 units would be placed in service in Calendar Year 2025. This number dropped to 670 by August 2025. It is not unusual for the actual units placed in service to be lower than predicted due to slower construction schedules, challenges with access to materials, and financing. This will likely occur again in CY 2026 when early estimates predicted 721 additional targeted units (not including bond units) will be placed in service.

The NC HFA indicated there were 9,749 targeted unit vacancies reported in FY 2025, or an average of 812 reported every month, which could include the same vacancies reported over a multiple number of months.

These resources are important given that rents have increased in most North Carolina communities. This means that the contribution of state subsidies will not cover as much rent as they did when the rents were lower. This requires more state resources per unit than in earlier years. The National Low-Income Housing Coalition's recent "Housing Gap" report[11] showed that in North Carolina there are only 41 rental units per 100 households for individuals at the same income level as TCL recipients, down from 45 rental units per 100 hundred households in 2023. The numbers were lower in FY 2025 per 100 households in Charlotte (31) and Raleigh (38). The State's focused efforts to increase resources for TCL recipients could not come at a better time. HUD's 2023 Worst Case Housing Needs Report reported two in seven renter households with worse case needs included people with disabilities younger than age 62[12].

There was an increase of 86 individuals living in a targeted unit by June 30, 2025, which was greater than the FY 2024 increase of 59 individuals. The FY 2024 increase included a net gain of 55 individuals (through May 2025) who moved into units in the Alliance and Vaya pilot.

From July 1, 2024, through June 30, 2025, there were 915 targeted and bond properties "placed in service." Since January 1, 2025, 530 of these were added to the Pilot Property Pipeline. Five hundred and thirty (530) of these were made available to targeted units. During this period there were 448 TCL referrals. Since October 2022, HUD has increased its Fair Market Rental calculations as much as 40% in some jurisdictions, including Charlotte, which has enabled the State and Public Housing Authorities (PHAs) to increase subsidies.

The State initiated a "Housing Pilot" with Vaya and Alliance in FY 2024. Part of the pilot program consisted of changing which entities in the State have primary responsibility to interface with affordable housing developers who set aside units for the Transitions to Community Living program. Historically, this authority has rested with the DHHS Division of Aging and Adult Services' Regional Housing Coordinators (RHCs). The State gave this limited authority to Vaya and Alliance in the last quarter of FY 2024. The two LME/MCOs did not get access to the Vacancy and Referral (V&R) information system, which is critical to this endeavor, until FY 2025.

In states where multiple organizations have responsibility for serving individuals in housing, each of the organizations typically has identical responsibility for pre-tenancy, move-in,

[11] *The Gap Report:* A Shortage of Affordable Homes. The National Low-Income Housing Coalition: 2025.
[12] *Worst Case Housing Needs: Report to Congress.* US Department of Housing and Urban Development, Office of Policy Development and Research: 2023.

post tenancy tasks and services. One services coordinator typically manages the waiting list along with the HFA, assists when needed, and mediates disputes when issues arise with their relationships with landlords and property managers. This is important because communication with property managers is a key to successful tenancy and it is the LME/MCO and provider staff who have the responsibility to provide tenancy support services, not the Regional Housing Coordinators. It is important the State move toward enabling the LME/MCOs to have this responsibility, otherwise property managers who have worked with regional Housing Coordinators will turn to the Regional Housing staff on all tenancy related matters causing communication challenges and confusion.

Approximately 80% of individuals qualifying for this set-aside are individuals for whom the LME/MCOs have responsibility to serve. This means the LME/MCO, which also has responsibility for tenancy support, is ideally suited to take on responsibility for individuals they have responsibility for serving who are already living in a targeted unit. The State gave the LME/MCOs responsibility for tenancy support services that enable residents to attain and maintain integrated, affordable housing as defined in **Section III (B)(7) and Section III (C )**.The State also defines this responsibility before and after an individual moves into a unit in both their state contract and service definitions. This responsibility is defined in Splitting this requirement between the LME/MCOs and the RHCs has ramifications for the State to meet these requirements. The LME/MCOs have had this responsibility for individuals living in private units since 2013.

The HFA began allocating HUD 811 Project Based Rental Assistance (PRA) in FY 2025 but did not make any 811 units available to TCL recipients. The LIHTC property increases, including the 4% bond financing housing, will continue through FY 2025 and FY 2026.

The NC HFA has continued to work with developers to add units in rental properties for individuals in the target population, other individuals with disabilities, and individuals experiencing homelessness. The HFA continues to provide opportunities through the Integrated Supported Housing Program (ISHP) and Supported Housing Program (SHP), which set aside affordable units for individuals who qualify for the NC HFA permanent supported housing program.

The total supported housing units available to the TCL target population with ISHP is 243. However, even though the units have been used extensively with turnover, only 87 individuals were occupying those units at the end of June 2025. This is down from 115 individuals occupying one of those units at the end of June 2024. Prioritizing filling these vacancies would have two advantages. One, it would enable the State to use its already allocated state rental assistance that was not used in the year it was funded from the state's general fund. This was made possible with State budge language enabling the state to use

unspent funds for expanding housing opportunities. Two, these HFA resources can then be used as part of a capital allocation to a developer in return for lowering rents, making housing more affordable to individuals in TCL over a 15 year period of time and thus not subject to the state's annual budget process.

The local Public Housing Authorities (PHAs) in the state have received awards for 1,889 HUD Mainstream Vouchers since FY 2017. These rental vouchers serve households that include a non-elderly person with a disability. The upside to filling rental units by using these vouchers is two-fold. One, it means HUD is covering the cost of rent rather than the State relying solely on state rental assistance and limited HUD 811 project-based subsidies. Two, it enables the LME/MCOs to build a positive relationship with PHAs in their community, as described below. Five hundred and ninety seven (597) TCL recipients have made application for one of these vouchers but only 78 have been awarded a voucher. However, DHHS and the LMEs have worked collaboratively to build relationships and get vouchers awarded to eligible recipients.

By May 2025, 71.84 % or 1,357 individuals awarded a Mainstream Voucher had a lease for a rental unit. These vouchers are an important resource for the State, though they can be difficult to leverage. HUD has awarded these vouchers to 24 PHAs in NC. Only 10 PHAs averaged more than 80% of individuals having leased rental units using one of these vouchers. The challenge using these vouchers is two-fold. First, if individuals are already renting from a private owner, the owner must agree to meet the terms of and accept a HUD Tenant Based Voucher administered by the PHA. This is sometimes difficult to accomplish because the landlord must meet additional Section 8 requirements.

Second, HUD requires that the PHA have an agreement with a service organization to receive an award of Mainstream Vouchers. In the case of TCL recipients, this is an LME/MCO. The LME/MCO and local PHAs must establish an effective working relationship for this to occur. This last challenge has created delays in getting Mainstream Vouchers awarded to eligible recipients because PHAs have limited administrative funds with mounting requirements and view this requirement as additional work rather than additional support. Nonetheless, the LME/MCOs value this opportunity and are continuing to try to support PHAs and to pursue these relationships. These relationships can reap benefits in the future as well. In FY 2025, Hurricane Helene presented yet another challenge when PHAs faced challenges to their operations and properties were out of commission in the western part of the state.

***(B) Findings***

1. The State has not met the **Community-Based Supported Housing Slots Section III. (B)(1)** requirement to develop and implement effective measures to provide individuals

access to community housing within 90 days after individuals are issued a housing slot. (See **Figure 6** below)

The State score for supported housing access for individuals reviewed in FY 2025 was 1.55 on a 3-point scale. In FY 2024 it was 1.50, a drop from 1.7 in FY 2023. Of 32 individuals in the FY 2025 spring review, only 12 (37%) with available data received timely support to access housing in their chosen location. There are valid reasons why housing access may be delayed, i.e., waiting on a new unit to become available, individuals needing to resolve medical issues, going through a reasonable accommodation process, ensuring accessibility features are installed or complete substance use treatment, or difficulty obtaining needed documents for securing a lease. Nonetheless, these issues can be mitigated in some instances.

In FY 2025, Trillium's percentage likely dropped due to absorbing two new catchment areas at the beginning of the fiscal year. Alliance dealt with the same phenomenon after absorbing Cardinal's largest counties. Often, new staff assignments can result in delays as well as dealing with a myriad of issues that arise when another organization goes out of business. Vaya's percentage has fallen over the last three years as they also absorbed counties. Since 2018, Vaya has had the highest percentage of individuals transitioning within 90 days. Vaya also now has the lowest number of individuals residing in ACHs who are on In-reach and/or transition status.

The affordable housing crisis impacts the number of private units available but does not impact targeted units. New targeted units are steadily becoming available. If targeted units were available immediately to TCL recipients on turnover, access would also improve. There were 17 individuals who were not living in SH at the time of the review. Twenty-two (22) individuals had lost housing over a period of years.

**Figure 6: Percentage of Individuals Who First Moved to Supported Housing After Receiving a Housing Slot within 90 days**

| LME/MCO | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Alliance | 31.3% | 24.3% | 41.0% | 45.0% | 37.3% | 28.9% | 21.2% | 20.7% | 52.2% |
| Eastpointe | 80.0% | 71.0% | 67.8% | 69.7% | 62.0% | 51.8% | 49.2% | 28.4% | --- |
| Partners | 67.6% | 57.4% | 88.8% | 87.0% | 89.7% | 68.6% | 82.3% | 62.3% | 70.7% |
| Sandhills | 59.5% | 47.7% | 84.7% | 90.5% | 72.8% | 60.0% | 22.0% | 21.7% | --- |
| Trillium | 88.2% | 84.1% | 65.8% | 70.4% | 68.8% | 55.6% | 60.6% | 33.0% | 12.8% |
| Vaya | 61.1% | 90.0% | 89.3% | 86.8% | 75.2% | 52.1% | 29.4% | 34.9% | 25.8% |
| **State Total** | 61.6% | 53.6% | 63.0% | 66.1% | 58.4% | 47.4% | 38.9% | 38.8% | 37.8% |

The State met the Settlement requirement for 3,000 individuals occupying housing slots **(Section III.[B][3])** in September 2021, reaching 3,088 filled slots by June 30, 2022. The

State continually increased the number of individuals filling slots to 3,654 by June 30, 2024, and 3,998 by June 30, 2025. Unless separations increase at a greater rate than individuals occupying slots, the State will continue to meet this requirement.

2. The State has not maintained its early pace of an increase of 534 individuals living in SH or an average increase of 44 individuals living in SH per month during 2019. In FY 2025, the total increase was 344 or an average of 28 new individuals living in SH per month.

**Figure 7: NC DHHS Transitions to Community Living Initiative in FY 2025 and Retention Rate Life of the Program**

| (B)(2) Category | SH Housed and SH Occupied end of FY 23 to end of FY 24 | SH Housed/ Occupied Rate end of FY 2025 | SH Required [per III(B)(5) and (B)(3)] |
|---|---|---|---|
| a–c: ACH residents | 2347/1000 | 2539/1022 | 2,000 |
| d. SPH patients[14] | 1036/538 | 1270/642 | 1,000 |
| e: Diverted | 2424/1608 | 3462/2334 | |

3. Thirty-five (35) individuals returned to ACHs in FY 2024 and 33 individuals returned in FY 2025. Five hundred and forty-seven (547) individuals who moved to SH have returned to ACHs (or AFLs) since FY 2013. However, the number has dropped over the past two years. The average number of individuals returning to an ACH annually since 2015 is 56.

4. As depicted in **Figure 7** above and **Figures 8 and 9** below, the State is not on track to meet the requirement for 2,000 individuals occupying housing slots from Categories **Section III (B)(5) a.c. (also referred to as categories (1-3)**. The number of individuals living in supported housing after exiting ACHs at the end of FY 2025 was 1,022, a net increase of 22 since FY 2024 and a net increase of 25 from FY 2023.

**Figure 8: NC Supported Housing Increases for all Individuals Across all Categories**



5. The LME/MCOs have increasingly focused on providing housing to individuals diverted from ACHs and re-housing individuals who leave housing, either to return to ACHs after being evicted, hospitalized for medical reasons, or having left housing for other reasons. The number of individuals diverted in FY 2025 and living in SH on June 30, 2025, increased by 344 which was nearly 50% of all those diverted. Given that individuals may have gotten housing after being referred during the previous year, this percentage does not accurately represent the exact number of referrals and net gain in housing.

6. When calculating the time individuals have lived in housing, the average time increases from 54.2% after two years for an individual's first tenancy to 70% of individuals living in SH for two years overall. Twenty-two (22) individuals out of 54 selected for a review in the FY 2025 review had previously lost housing. Information from the spring review indicates that individuals generally lost housing at least once and 12 individuals had not returned to SH either by choice initially or because they failed to pay rent, had unauthorized guests, had noise violations, lacked funds to pay rent, abandoned the unit, and had to give up housing due to an injury or medical complications. Records reveal individuals losing their unit were often not seen frequently or did not get assistance with their needs for accommodations, medical issues, or were not getting their income or other type of support.

**Figure 9: Gain/Loss in Occupied Housing Slots Across Priority Populations by LME/MCO from FY 2024 to FY 2025**

| | FY 24 occupied housing slots | FY 25 Occupied housing slots | Net gain of occupied housing slots in FY 25[13] | # Increase of occupied housing slots in category a.-c. (ACH)[14] | # Increase in category d. (SPH discharges)[7] | # Increase In category e. (diversion)[7] |
|---|---|---|---|---|---|---|
| Alliance | 1119 | 1239 | 120 | 7 | 4 | 109 |
| Partners | 681 | 795 | 114 | 18 | 12 | 84 |
| Trillium | 1144 | 1212 | 68 | -12 | 14 | 66 |
| Vaya | 710 | 752 | 42 | 9 | -2 | 35 |
| **Total** | **3654** | **3998** | **344** | **22** | **28** | **294** |

7. Twenty-two percent (22%) of individuals who exited housing, returning to ACHs, skilled nursing, or who have died is down from 37% in FY 2024. LME/MCOs ranged in their success and persistence in finding ways to assist individuals to get and keep housing in

[13] These numbers include individuals transitioned from Cardinal in FY 2022. Alliance, Partners, and Vaya added most of the individuals occupying housing.
[14] These numbers include individuals transitioned from Eastpointe and Sandfills in FY 2024. Trillium added the most individuals occupying housing.

FY 2025 as depicted in Figure 9 above. The increase in individuals living in supported housing remained virtually the same between FY 2024, when the average increase was 29 individuals per month, and FY 2025, when the average increase was 26 per month. Alliance, Partners, and Vaya had gains in individuals occupying housing slots and an increase of individuals exiting ACHs occupying slots. Trillium had an overall gain but had a net loss of 12 in individuals occupying slots after exiting ACH/FCHs.

8. Sixteen (16) individuals who had access or housing stability challenges have serious medical issues and would need an accessible unit, accessibility features, and/or in-home support for their complex health conditions. This includes personal care, home health and/or other support for their accessibility needs and managing their chronic health conditions and physical health issues, including recovering from infections and wounds.

9. Other individuals had access challenges related to the approach staff took to support them with accessing housing (**Figure 10 below**). These challenges were evident in a review of 25 individuals who had moved into housing in the last three years. Three individuals reported waiting approximately three years before getting help to move. This occurred because staff lost touch, and their visits were so infrequent that staff did not take action to help an individual get a housing slot before the access process can actually begin. Another two individuals waited for five months for a transition coordinator to be assigned before beginning the process to move but both moved in approximately three months. Three individuals moved into bridge housing first, one woman waiting three months for her unit to become available, one woman waiting for eight months for a bank dispute to be resolved, and another no longer able to live in her family care home. Other moves went smoothly within the 90 day transition timeframes or took longer with infrequent visits with challenges getting arrangements made to get all through all the steps.

**Figure 10: Access Timeframes**

| **Months to move into housing by individual** | 3 years | 9 months | 8 months | 7 months | 6 months | 5 months | 4 months | 3 months or less |
|---|---|---|---|---|---|---|---|---|
| | 2 | 3 | 2 | 2 | 3 | 3 | 2 | 8 |

10. The State increased the number of individuals completing its short-term Targeted Unit Transition Program (TUTP), often referred to as a “bridge” program or “temporary housing,” by 452 in FY 2025 to a high of 1,756. The program has demonstrated success as a gateway to permanent supported housing with 80% of individuals moving into supported housing during or after they completed their TUTP planned stay. This is down

from 91% in FY 2023 and 87% in FY 2024. The greatest drop was in the new Trillium catchment area and came at a time when Trillium was absorbing programs from two other catchment areas and just meeting individuals for the first time. Bridge housing is extremely helpful as a bridge to permanent housing for individuals discharged from SPHs, especially for individuals with short stays who cannot make permanent living arrangements quickly, for individuals diverted from an ACH who are living in unstable housing, or individuals discharged from a general hospital psychiatric unit or an emergency room. Bridge housing can also be helpful for individuals who choose to leave an ACH before finalizing their living arrangements.

The State continued to commit resources for both bridge and enhanced bridge programs for two reasons. Enhanced bridge is a newer program and enables individuals to stay longer than 90 days if necessary to move into their permanent housing. This helps individuals adapt to community living and get housing in the location they choose. This also helps individuals who need more assistance with their daily living skills, decision making, and self-care management, especially related to their health condition or physical disability.

Transition Coordinators and individuals themselves can gain more confidence in the individual's ability to live with supports in the community. Secondarily, this provides more time, if needed, for individuals to get accessible features installed in their new home or made available for the individual to move.

11. There was a net gain of 22 individuals living in SH after moving from ACHs in FY 2025, but 33 individuals returned to ACHs during FY 2025. Five hundred and forty-seven (547) individuals have returned to ACHs since the State began collecting this data 10 years ago. Individuals who returned have given a number of reasons. Most individuals reported either health reasons, feeling like they could not manage on their own, were lonely, or were missing their friends. These reasons are correlated with a lack of connection to natural supports, to health care, to peers, and to family as well as challenges in getting more formal supports and assistance with daily living tasks and services on a consistent basis. Since the inception of the Settlement, 10% or 646 of the individuals who moved to Supported Housing have died. Given the health conditions and age of the individuals who have moved, this is an expected percentage and there continues to be no evidence that moving was the cause of death for most individuals. There have only been a limited number of individuals who died by accident, foul play, or negligence.

12. There were 54 individuals denied a lease based on their criminal, credit history, or landlord decision in FY 2025, an increase of 10 from FY 2024 in the State's LIHTC targeted program. Twenty-two (22) individuals appealed the decision, with 13 appeals approved;

2 individuals withdrew their appeal and 7 individuals were denied. In FY 2025, 59% of individuals who appealed were successful in overturning a denial, just slightly down from 60% the year before. While the number of individuals with successful appeals meets the national average, it is also striking that 32 individuals out of 44 individuals did not appeal the decision.

13. The State supported the LME/MCOs with incentives and other available funding to make arrangements with Legal Aid of North Carolina and external attorneys to make legal assistance available for supporting reasonable accommodation requests and appeals when necessary. Vaya also funded Pisgah Legal Services with incentive funds. These organizations can assist individuals in having allowable criminal records expunged, eliminating this barrier for individuals leasing a rental unit and for other reasons including securing employment. Lastly, it continues to be important LME/MCOs ensure staff (housing support, provider and transition coordinators) get trained and demonstrate competencies in supporting individuals to request reasonable accommodation and assist individuals to get allowable criminal records expunged. It is important that each LME/MCO monitor this process as a standard practice for everyone with a criminal record.

14. Staff report that 160 individuals withdrew their request for a housing unit in a LIHTC development in FY 2025. Of those, 73 individuals withdrew their request after contact with the property manager, suggesting that many had a negative experience, possibly a result of their experience with the property manager. The other reasons for these withdrawals vary but were often related to individuals changing their mind about applying given the location, the smoking policies, unit not becoming available, the unit not meeting the individual's needs, or individuals not giving any reason.

15. The State developed an Incentive Plan for LME/MCOS with performance targets beginning in FY 2022. In FY 2025 the State's Incentive Plan included targets for: 1) net for all supported housing transitions; 2) net ACH transitions; 3) Target/Key utilization; and 4) the quarterly housing separation rate. One LME/MCO met all four targets in the fourth quarter; one LME did not meet any of their targets in the fourth quarter. The State's proposed expenditure, if all four LME/MCOs met all their targets, was $500,000, down from FY 2024. The LME/MCOs only collectively funded 39% of the total available, down from 46% in FY 2024. The State has used unexpended funds to assist LME/MCOs with new initiatives and/or challenging issues. The State has also used funds to ensure rental assistance is available as needed to cover costs at the end of the fiscal year. The overall lowest number of quarterly target expectations met for the second year in a row was for increasing (B)(5) (a-c) housing referrals for ACH residents.

16. The State did not fully meet Section III. (B)(7)(a)(b)(d )and (f) requirements for housing that is permanent with tenancy rights, tenancy support, and a choice in daily life activities.

    Meeting the tenancy rights requirement **(B)(7)(a)** continues to be a challenge. Individuals are either not given options on where to live or are directed to live in housing that does not afford them tenancy rights such as boarding homes and MOUHs. This applied to five individuals in the spring review. Eleven (11) other individuals could not get timely responses from landlords or property managers when tenants identified housing issues or from providers or LME/MCO staff to assist with tenancy issues.

    Meeting the location requirements in **(B)(70(c.-d.)** is somewhat related to the tenancy rights issues as individuals do not have access to amenities with little or no money nor the opportunity to interact with individuals who do not have disabilities.

    This year's spring community review revealed a number of individuals do not have access to community activities at times, with frequency, and with individuals of their choosing **(B)(7)(c).** Fifteen (15) individuals reported frequent contacts with family, with their church, friends, and support groups and centers. Five of those individuals reported spending time at the "living room" in Asheville, a senior center, also in Asheville, a drop in center in Raleigh, and with support groups in Durham and Asheville. Two staff reported working on connections with a community inclusion specialist. Nonetheless, there are still challenges with affording individuals access to community activities.

***(C) Recommendations***

Recommendations below focus specifically on three requirements and four sub-requirements where the State needs to make improvements and adjustments to meet the outstanding Settlement Agreement Community-Based Supported Housing requirements. These include **Section III. (B)(1), (B)(5) and (B)(7)(a.-d. and f.)**. Each of these requirements has implications for the State meeting Discharge and Transition process requirements. These include improvements for access to housing, tenancy support including housing sustainability, choice of activities, and meeting the provision for 2,000 former ACH residents to occupy slots from **Section III. (B)(5) Categories (2)(a.-c.)**. Recommendations include:

1. Improve timely access to supported housing **Section III. (B)(1).** The State should give LME/MCOs full responsibility for tenancy support, not just before a filling a "new unit" but also after filling the unit, immediate access to turnover units, and for individuals already occupying target units, who are either in TCL or receiving services in the MH/SUD/IDD system to better meet tenancy support requirements. Ensure LME/MCOs

collaborate with each other when units are available, particularly in areas where an LME/MCO boundary connects with another LME/MCO.

2. Ensure designated LME/MCO staff and providers connect with property managers and landlords. Ensure staff strive for positive relationships with property managers and landlords and advocate for individuals if property managers and landlords to comply with tenancy rights requirements when necessary.
3. Continue to ensure transition coordinators have support to complete their tasks in a timely manner and that In-reach staff focus on frequently engaging with individuals to explore opportunities to move.
4. Continue to ensure the availability of legal assistance, including assistance with criminal record expungement challenges individuals have post-move-in, and the practice of requesting reasonable accommodations from landlords and property managers for individuals whose criminal and credit histories are related to their disability. Provide every individual who needs this assistance with information regarding these rights.
5. Continue to place priority on meeting **Section III. (B)(1) and (B)(5)** requirements. Continue the housing incentives that reinforce and place priority on these requirements. Continue to analyze possibilities for increasing ACH referrals to supported housing. Ensure nursing and occupational therapy assessments are completed for each ACH resident who has either shown interest in moving or indicated they cannot move because of their medical conditions or physical disabilities.
6. Ensure public guardians and LME/MCO staff work collaboratively to provide opportunities for individuals to move to supported housing. Ensure public guardians' concerns are specifically addressed and ensure providers and follow along LME/MCO staff work closely with public guardians to address concerns.
7. Ensure pre-tenancy, move-in, and post-tenancy arrangements are made for home health, occupational therapy, personal care services, occupational therapy, and provider-based tenancy support. Add health care professionals with specialties in serving high risk individuals through an integrated care model with a health care provider or nurses focused on individuals' medical issues and physical disabilities or add nurse practitioner.

## I. COMMUNITY BASED MENTAL HEALTH SERVICES

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **Section III. (C) (1-2)** The State shall provide access to the array and intensity of services and support to enable individuals in or at risk of entry to adult care homes to successfully transition to and live in the community. Requirements apply to individuals with a housing slot and to those not receiving a housing slot. | These two requirements specify that access to services and supports for each individual is available with services coverage under the Medicaid state plan or as part of the state funded service array. | The State did not meet this requirement in FY 2025 and is not on track to meet this requirement in FY 2026. The State has not made the necessary shift in its approach to services access, recovery based services and person centered planning, including type, array, frequency, and intensity of services, access to natural supports and supports for individuals in crisis to enable individuals to transition to and live successfully in the community. |
| **Section III. (C)(3)** The State is required to provide recovery focused and evidenced based services, flexible to meet the needs of each individual, to help individuals to increase their ability to recognize and deal with situations that could result in a crisis, and to help increase and strengthen the individual's network of community and natural supports and their use of such supports for crisis prevention/intervention. | Services and supports are to be evidence-based, recovery-focused, and community-based. Services are to be flexible, individualized, focused on community integration and building natural supports to help prevent or manage crises. | The State did not meet this requirement in FY 2025 and is not on track to meet this requirement in FY 2026. Services are not recovery-focused, community-based, flexible and individualized, to help prevent or manage crises or to help eliminate, reduce, or manage situations that may result in crises. The State is taking steps to assist individuals with their community integration with a focus on assisting individuals build natural supports. |
| **Section III. (C)(4)** requires the State to provide a specific set of community-based mental health services and other specific services included in the State's service array as set forth in **Section III (C)(1)(2)** of the Agreement. | Five services are explicitly referenced in this section. These include Assertive Community Treatment (ACT), Community Support Teams (CST), Peer Support Services, and psychosocial rehabilitation services and other services as set forth in the Agreement. | The State did not meet this requirement in FY 2025. The State is not on track to meet this requirement in FY 2026. The FY 2025 reviews revealed that while services are available, the services provided do not meet reasonable standards to satisfy the requirements of this Agreement. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **Section III.(C)(6)** Each individual has a person-centered plan (PCP). | The PCP is current, individualized, and includes the individual's own goals and steps reach those goals, for housing, services, and community integration. | The State did not meet this requirement in FY 2025 and is not on track to meet this requirement in FY 2026. PCPs focus on ensuring individuals remain compliant with provider directives rather focusing on the individual's goals. |
| **Section III. (C) (3)(7)** The State is required to hold the LME/MCOs accountable for providing access to community-based mental health services and for monitoring services and service gaps through the LME/MCOs. | These requirements identify general LME/MCO Medicaid managed care requirements. LME/MCOs are held accountable for providing access to individuals with SMI, who are in or at risk of entry to adult care homes (ACH) to transition to supported housing, and to monitor to ensure that individuals get access to services to achieve long-term success in supported housing.<br><br>The State and LME/MCOs are required to monitor service gaps and contracts to ensure the number and quality of community mental health service providers is sufficient to allow for successful transitions. | The State did not meet this requirement in FY 2025. The State is not on track to meet this requirement in FY 2026.<br><br>The State needs to transform the service system in such a manner that LME/MCOs can take action to ensure individuals get access to services to enable each individual to achieve long-term success in the community. The State must exert leadership and take steps to ensure policy and service requirements align with service requirements. The State began this support with CST coaching in FY 2024 but needs to expand this capacity along with timely TMACT reviews and other support from the UNC Center of Excellence and development of peer support options to meet the Settlement requirements.<br><br>The State has few service gaps but there are more ACT providers in some communities than needed. Workforce issues compounded by high staff turnover hinders performance and complicates network management. |
| **Section III. (C)(8)** specifies who is to receive information and training, requirements for language and accessibility to services, and the types of services required under the Medicaid State Plan. | There are requirements for LME/MCOs in this section, ranging from providing materials and information to every beneficiary consistent with 42 C.F.R. § 438.10 and to local providers, hospitals, homeless shelters, police departments, and Department of Corrections facilities. It references requirements for accessibility. | The State has not met this requirement in FY 2025. Individuals with accessibility needs are not always informed of these requirements nor receive this assistance. While this requirement was written when the State contracted for Pre-paid Health Plans (LME-MCOs) in 2012, the services referenced in this requirement have not been implemented to meet requirements and standards. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **Section III. (C)(5)(9)** The State shall provide Assertive Community Treatment (ACT) services from teams faithful to a nationally recognized fidelity model. The State has selected and has been using, in collaboration with the University of North Carolina (UNC) Institute for Best Practices in Mental Health, the Tool for Measuring ACT (TMACT) model.<br><br>By July 1, 2019, the State will have increased the number of individuals served by 50 ACT teams to 5,000 individuals at any one time; individuals receiving ACT will receive services from employment specialists on their team. | These provisions include requirements for the delivery of ACT, by a specified number of teams meeting requirements for serving a specified number of individuals.<br><br>There is a requirement for the provision of ACT by teams that meet the fidelity standards and also comply with the meet State's ACT service definition.<br><br>All the individuals who express an interest in employment and/or education will receive those services from employment specialists who work on their ACT teams. | The State has partially met this requirement. At the end of FY 2025, data reveals the State was providing 5,214 individuals with ACT services. This number fluctuates between 5,300 and 4,700 on a regular basis, based on the timing of new referrals and discharges. The State is now measuring ACT by the number of individuals receiving ACT.<br><br>The reason the State has not fully met this requirement is that only 2 out of 13 individuals who expressed interest in employment and or education received assistance from their ACT employment specialist.<br><br>The State is meeting a new challenge: post COVID, ACT teams' scores on the TMACT are trending lower. Eight teams reviewed in FY 2023 scored in the provisional range and 14 teams scored in the provisional range in FY 2024. Seventy-eight percent (78%) or 18 teams of the 23 teams reviewed in FY 2025 scored in the provisional range. There were 73.89 months or 6.12 years between TMACT reviews for the teams reviewed in FY 2025. The State has more ACT teams (87) than most states with similar populations. This makes it harder to shorten the gap between TMACTs that could boost and boost team performance. High post-COVID staff turnover, a problem facing most providers, has also been a challenge effecting performance. |
| **Section III. (C) (10) (a-c)** The State shall require that each LME/MCO develop a crisis service system, with a wide range of services and services provided in the least restrictive setting. The State will monitor crisis services and identify service gaps and take corrective action to address those gaps. | There shall be a range of crisis services delivered in a variety of locations, including at the individual's residence whenever possible, consistent with an already developed individual community-based crisis plan.<br><br>Crisis services must be accessible and delivered in a timely and responsive manner. | The State did not meet this requirement in FY 2025. Only .07% of individuals in TCL, living in SH, utilized mobile crisis and .01% of individuals utilized facility-based crisis services in the 3rd quarter of FY 2025. This data does not include information from FY 2025 that reflects ACT teams not providing crisis support as required. |

### *(A) Background*

Section III. (C) Community-Based Mental Health Services requires the State to ensure that individuals get access to evidenced-based, recovery focused and community based services. This includes providing access to the array, intensity, and frequency of services and supports necessary to enable them to successfully transition to and live in community–based settings. Services are to be flexible and individualized to meet the needs of each individual with all of the elements and components of a person-centered plan arranged for the individual in a coordinated manner. Individuals are to receive support to increase their abilities to recognize and deal with situations that otherwise may result in a crisis and to increase and strengthen their networks of community and natural supports as well as their use of these supports for crisis prevention and intervention.

The State's performance in delivering Community-Based Mental Health Services did not improve in FY 2025, as indicated by the FY 2025 reviews, TMACT reports, provider interviews, and additional data sources. This lack of improvement also affects the State's capacity to fulfill additional obligations outlined in the Settlement Agreement, including those related to Supported Employment under Section III.(D), as well as two sub-requirements within Community-Based Supported Housing Slots, Section III. (B)(1) and (7), and seven Discharge and Transition Process Section III. (E) requirements.

The State's ongoing failure to meet requirements also contributes to community and social isolation, lack of personal support, and lack of assistance from natural supports to prevent crises for people in services. Individuals institutionalized for a time or intermittently over time have difficulty overcoming their negative symptoms and restoring their functioning lost through isolation, inactivity, and negative perceptions they have of themselves and that others have of them.

This review includes nine recommendations. These recommendations are nearly identical to the reviewer's recommendations in the FY 2020-24 annual reports. Those reports recommended the State take a direct, focused approach to meeting these requirements, starting with developing a strategic plan to meet the Settlement's service requirements. The State agreed to this recommendation and developed and finalized an Implementation Plan in August 2023. The reviewer cautioned then that the steps outlined in the State's plan may not lead to compliance. The FY 2025 review results, interviews, and data support this assumption.

The State is unlikely to meet the Community Mental Health Services Settlement Agreement requirements in FY 2026 and possibly FY 2027. The second recommendation, tied closely to the first, is that the State review again how to best meet services system to meet the standards in this Settlement Agreement and deliver recovery based effective services. This

is not simply an issue of training on specific topics or requiring reports that are not likely to enable the State to meet the Settlement's services requirements. These activities may divert the attention of staff at LME/MCOs and providers from addressing existing valid local priorities and implementing necessary performance measures and monitoring in the field in real time. This is best done with engaging and empowering LME/MCOs and providers to seek innovation and clarify performance goals. Role clarity is very important as is technical assistance aimed at driving continuous innovation and improvement. Fortunately both the UNC Best Practice Institute and TAC have experience with this type of technical assistance. Assisting organizations conduct their own performance improvement strategies.

The third recommendation is updates to the State's Clinical Care Policy, the community-based mental health system support for the Settlement population may be further delayed.

The changes that are necessary will take time and a significant commitment to support the work of the LME/MCOs who have the responsibility of managing the system on a day-to-day basis. Given the State's services structure, the State must lead with effective policy, tools and access to effective technical assistance.

The plan must embody support, incentives, and more clarity on operational definitions informed by successful providers and programs and experienced individuals conducting hands-on mentoring with approaches and interventions proven effective for serving the Settlement population.

The recommendations made prior to the State developing this plan included establishing action steps, priorities, and feedback loops, and communicating proposed changes in clear concrete terms. Recommendations included intentionally sequencing the changes with the State recognizing its role and undertaking steps to develop an effective community-based and recovery focused adult mental health system for individuals with serious mental illness. Previous Reviewer recommendations also included the State examining the interconnected and multiple types of contracts, policies, practices, and reviews, including how those that are effective and those that are insufficient contradict standard practices or create redundancies.

This year's reviews also revealed evidence of service provider staff dismissing individuals' expressed needs and choices and a lack of awareness of recognizable challenges, especially regarding the effects of trauma, fear, loss of self-worth and self-confidence, and loss of functional and/or decision-making skills. There is evidence that a number of staff also seemed to rely on ACH staff and guardians for assessing people's challenges rather than spending time to understand the person fully and then developing a collaborative approach to person-centered services.

As stated previously, individuals with lived experience of mental illness, also known as

peers, have valuable knowledge and skills for assisting individuals develop WRAP plans, making informed choices and transition successfully and living in the community, managing crises, furthering their education, and seeking employment. The State is recognizing the value of individuals with life experience and is beginning to find creative ways to effectively utilize services from people with lived experience. There are other types of peer led programs the State could implement including, but not limited to, peer-led evaluation programs, support groups, and health and wellness coaches.

Four positive trends and actions expanded in FY 2025. First, Vaya's key service providers in their western counties continued to provide effective recovery-based services. Second, new DMH leadership staff are aware of the challenges with meeting the obligations of the Settlement Agreement and focused on developing more effective actions. Third, the State and LME/MCOs have committed even greater resources to peer-led organizations[15] to develop and operate crisis residences, respite programs, and community inclusion (CI) programs focused on providing individual support services. However, even with this positive trend more focus on creating peer organizations and peer-led initiatives is needed.

There are seven organizations with community inclusion programs. Three are managed by Centers for Independent Living (CILs), one by provider agency, two by organizations that provide a mix of peer and other staff led programs, and one peer led organization. Regardless of the agency committed to CIL, peers lead the process. The State reports that 19 staff across these agencies are providing CIL. Alliance is funding community inclusion at PRN in addition to the State funding the program. From January 2025 through June 2025, the CI Specialists delivered 4,128 supports to 1,457 individuals[16].

One LME/MCO, Alliance, also funded PRN for this service. PRN received endorsement from the Substance Abuse Mental Health Substance Abuse Administration (SAMHSA), which endorsed this approach as a "promising practice." Fourth, the State continues to contract with the UNC/TAC's CST coaching team. This team provides valuable insight and direct hands-on technical assistance and coaching. They have limited access and mostly work with providers who are contemplating their ability to effectively serve this population and are willing to go through the preparation, determination, and actions most associated with an effective change process. This coaching team appears to be fully aware of the type of direct intervention necessary for the State to meet the Community Based Mental Health Services requirements. They have identified opportunities and uncovered confusion and

[15] Peer led organizations are entities or programs, whose executive director, chief operating officer, or the individual responsible for the day-to-day service identifies publicly as a person with lived experience of mental health challenges. Some peer led organizations require their board to have at least 51% of its members identify as persons with lived experience.

[16] Only three agencies had begun CI at the beginning of 2025; the number of supports increased by month over the six month period.

misperceptions that undercut the effectiveness of the service teams. For example, the team recognized that while team coaching was important that some practices needed to be modified at the agency level to amplify impact. The team made an intentional shift in focus in FY 2025 to agency leadership particularly where there was staff turnover at that level. They also created a Leadership Series with a focus on helping leaders created Trauma-Informed Agencies and a CST Monitoring Tool Pilot.

***(B) Findings***

1. Individual interviews and desk reviews reveal the State is not meeting **Section III.(C)(1)(3)(6)(7)(8)(9) and (10)** requirements and standards to provide access to the array and intensity of services and supports necessary for an individual to successfully transition and live in community-based settings (**Figure 11**). A score of 2.2[17] is the primary indicator the State is meeting a requirement (standard language) or sub-requirement. The scores have fluctuated over the past four years, with slight improvement on five requirements. There has been a slight decrease on one requirement and a more significant decrease on tenancy support and person centered planning (and plans) being individualized, recovery focused, and community-based.

**Figure 11: Statewide Services Mean Scores (FY 2022-FY 2024)**

| Requirement | FY 22 | FY 23 | FY 24 | FY 25 |
|---|---|---|---|---|
| Access to Services with intensity and frequency necessary for individuals to successfully transition to and live in the community | 1.28 | 1.36 | 1.50 | 1.41 |
| Services are community-based and recovery focused | 1.07 | 1.33 | 1.45 | 1.18 |
| Services are flexible with no barriers to duration and service needs | 1.31 | 1.37 | 1.50 | 1.27 |
| Services are individualized and unique and meet individual choices/needs | 1.32 | 1.38 | 1.50 | 1.52 |
| Individuals get support to identify natural supports to avoid crises | 1.11 | 1.38 | 1.41 | 1.38 |
| Individuals are supported to increase natural support | 1.11 | 1.38 | 1.51 | 1.19 |
| Choice of supports and tenancy support is part of service provision | 1.36 | 1.61 | 1.50 | 1.11 |
| PCP is current, individualized, recovery focused, and community-based | 1.07 | 1.02 | 1.08 | .96 |

2. **Figure 12** below depicts the maximum and minimum ranges in mean scores across all LME/MCOs. In the FY 2024 review, Vaya scored above 2.2 on all but one of the services requirements. Vaya fell slightly below the standard for services on all but four items in

[17] CMS requires a composite score of 2.5 or above on their HCBS reviews and requires a plan of correction for any state scoring below 85% on their HCBS review. For purposes of this review, acceptable performance could range from 2.2-2.5 or 73% to 83%.

FY 2025. Nevertheless, their consistency and performance indicate that these standards are attainable.

**Figure 12: Range of Services Mean Scores**




3. **Figure 13** below displays the score distribution. Note how low scores impact the mean. These scores include four housing scores (access, tenancy rights, location, and choice of daily living activities) as well as the services scores.

**Figure 13: 2025 Range of Housing and Services Mean Scores**



4. **Figure 14** below shows the mean scores for supported housing and services over three years. The scores for almost all requirements increased in FY 2024 and then decreased in FY 2025.

**Figure 14: 2023-2025 Housing and Services Mean Scores**




5. This data continues to illustrate the degree to which the State's service system has not become a more recovery focused system. This typically happens when new requirements are added without changing requirements or clarifying expectations for changing practice. It indicates the need for State leadership to set the tone and policy where applicable for practice expectations. This enables LME/MCOs to set expectations, share results broadly, recognize effective practices, and implement corrective actions for improvement. It is important to remember that corrective actions are always taken after an issue arises.

6. The Settlement Agreement references relying on ACT, CST, case management, peer support, psychosocial rehabilitation, and other services to meet the needs of individuals in III (C)(4). The reviews reveal, and the State has identified, individuals' service and support needs that extend beyond the services listed above.

7. The availability or use of services, particularly peer run agencies including Greentree (Winston-Salem), Promise Resource Network (PRN) (Charlotte, Raleigh, and programs in other counties) and Sunrise (Asheville) is essential and hopefully can be expanded. Each of these organizations offer a number of opportunities ranging from peer run crisis respite, bridge extenders, peer-led supported employment, drop-in centers, and harm reduction groups for individuals with a substance use disorder, to name a few. While not technically a peer operated agency, the Asheville Buncombe Community Christian Ministry (ABCCM) provides peer lead programs as does RHA in Asheville.

8. As stated in FY 2024, DMH leadership and the LME/MCOs are taking great strides in

funding peer initiatives and seeking advice on the direction their organizations should take for enhancing the role of peers, adding new services and supports. This is a very important step for the State to meet community based services (in-reach and transition) requirements. This recognition, though, extends not just to TCL but more broadly to strengthening the adult mental health services in North Carolina.

9. Other valuable services include substance use groups such as AA and NA, as well as groups for individuals continuing to use substances but reducing their use. One ACT provider convenes a specialty harm reduction group for recipients that at least two members recently reviewed attend regularly. Another agency funds a specialty ACT team for individuals with co-occurring substance use disorders.

10. Community inclusion is an effective one-on-one support specifically tailored to assist an individual meet one of their goals or an activity they are interested in pursuing. CI availability or use varies widely, by area of the state and by awareness of the need by staff involved in an individual's service planning. The State is launching a Community Inclusion "Community of Practice" to provide a platform for staff in various agencies around the state to interact, gain new knowledge, and share best practices. Another service widely used in other states is peer crisis respite and, with advocacy from LME/MCOs and peer run organizations, four peer run respites are now available in the state. This is a start but considering their value for TCL recipients and other adults, it would be beneficial in other locations.

11. The State recently issued a new policy to strengthen the NC Certified Peer Support Service Program (NCCPSS) and provide for increased accountability and guidelines for the delivery of training and instructor expectations. The program policies provide clarity for specific issues and how we are to show up for people. In addition, the expectations of how peers are to arrive and attend training are clear along with the specificity regarding course completion options.

    The ethics section is clear and provides some concrete policies that are needed in the profession. The provision for peers to receive training and complete program requirements during incarceration is commendable and could have an impact on the expansion of forensic peer support in NC. There are also instances where guidelines are more stringent and restrictive that could deter individuals from pursuing certification.

    Individuals with lived experience are more likely to choose becoming a certified peer specialist as a vocational choice rather than other types of jobs but also turn to other employment in a short period of time because their salaries are low. As referenced

before, peer salaries should be made more competitive in order for individuals to earn a living wage.

12. Individual reviews also reveal little use of Individualized Supports, Co-Occurring Disorders (COD) services and other substance use treatment interventions, Self-Directed Care (SDC), Cognitive Behavioral Therapy (CBT), and other cognitive and trauma informed therapies. The above listed services and interventions are often key to an individual's success in community life. This is especially troubling given that 50% of those individuals reviewed in the FY 2025 spring review had a substance use disorder, including individuals with severe substance use and 85% with a history of trauma (sexual abuse, physical abuse, serious accidents, immediate family dying of gun shots and other traumatic deaths, and individuals placed in harmful settings).

    Evidence from the FY 2025 spring reviews revealed that 5 of the 19 CST teams serving individuals in TCL met services standards. CST teams in the Vaya catchment area served three of the five individuals. TMS teams met services requirements for three out of six individuals in the spring review. The three individuals receiving TMS were served by teams in the Partners area.

13. Individuals' primary services identified in the 2025 review are referenced in **Figure 15** below. There were no major changes in the type of service provided for TCL recipients in FY 2025. These do not vary significantly from the State's utilization reports for individuals living in the community in SH or other locations.

**Figure 15: Primary Services Provided to Individuals in the 2025 Review[18]**

| Primary Service/ FY 2025 Review | |
|---|---|
| Assertive Community Treatment (ACT) | 20 |
| Community Support Team (CST) | 19 |
| Tenancy Management Service (TMS) | 3 |
| Other[19] | 4 |
| Peer Support (only) | 4 |
| SUD Services[20] | 3 |
| Psychosocial Rehabilitation | 3 |
| None | 4 |

14. The State selected the TMACT fidelity model for Assertive Community Treatment (ACT)

[18] Does not include individuals hospitalized at an SPH or individuals on In-reach only not assigned to a team.
[19] Other includes two individuals getting Tailored Care Management only, one individual receiving services from the VA, and one individual only receiving support from a community inclusion specialist. These numbers do not include support individuals are receiving from Physical Therapists, and community inclusion specialist in addition to other services or drop in centers.
[20] SUD services include SUD services and support groups that individuals attend on a regular basis.

services, complying with Section III. (C)(5). The Agreement required the State to increase the number of ACT teams to 50 and serve 5,000 individuals with ACT services by July 1, 2019. (C)(9). The State has continued to increase teams, up to 86, but has not increased the number of individuals receiving ACT. Four thousand four hundred and sixty nine (4,469) individuals were reported to be receiving ACT on June 30, 2025. This number fluctuates between 5,300 and 4,700 on a regular basis based on new referrals and discharges.

15. The State is still identifying the number of individuals receiving ACT as a performance measure. This is not needed; it has been addressed and met multiple times. This requirement,(C)(9), also requires each individual on an ACT team to receive employment support. The team should explore each individual's interest and then pursue it for individuals who have an interest in employment or education.

16. Reviews revealed that only two individuals got assistance with their education and/or employment goal, two others got jobs on their own and one individual was getting help, but he was on hold until he completed substance use treatment. Of the 1,348 individuals reported to have been served at the time of their Fidelity Review in FY 2025, 134 were employed but only 35 or 2.6% of the 134 individuals received assistance with obtaining their employment, and 8 teams did not assist anyone with obtaining employment. The spring review revealed that 13 individuals, out of 20 getting ACT, demonstrated an interest in employment or education. Of those 13 individuals, only 2 had received any vocational and employment services.

17. As stated in earlier Annual Reports, fidelity reviews can play an important role in quality improvement. Low fidelity sub-scores on key items might indicate that not all staff understand and are prepared to provide services in a manner to meet Settlement terms and standard practice requirements. In FY 2025, the reviewer developed and analyzed a cross walk for 17 items from the TMACT fidelity reviews that are highly correlated with Settlement requirements (including items such as person-centered planning, frequency of contacts, and supported housing). The results show a mean score for these critical Settlement Agreement items of 3.04. This score is in the "Low Fidelity" range (2.7-3.3). **(figures 16 and 17 below)**

18. There were 20 individuals receiving ACT in the FY 2025 individual review. Five individuals' scores were at or above the standards set in the Settlement Agreement for Community Based Mental Health Services. Three individuals' scores were at the midpoint on the 3-point scale, but eight individuals' scores were below 1 on a 3-point scale.

**Figures 16 and 17: TMACT Scores in FY that Correlate with Services Settlement Agreement Requirements**

| ITEM | STATE MEAN |
|---|---|
| CP1 COMM BASED SERVICES | 4.96 |
| CP2 ASSERTIVE ENGAGMENT | 3.65 |
| CP3 INTENSITY OF SERVICES | 2.30 |
| CP4 FREQUENCY OF CONTACT | 2.35 |
| CP5 FQ CONTACT NATURAL SUPPORTS | 3.09 |
| EP3 RESP WELLNESS MANAGEMENT SVCS | 1.83 |
| EP5 SUPPORTED EMPLOY & EDUC | 3.26 |
| EP6 ENGAGE PSYCO ED NAT SUPPORTS | 2.91 |
| PP1 STRENGTHS INFORM TX PLAN | 2.26 |
| PP2 PERSON CTR PLAN | 2.91 |
| PP3 BROAD LIFE DOMAINS | 2.87 |
| PP4 SELF DETERMINATION | 3.30 |
| ST 4 EMP SPECIALIST ON TEAM | 2.52 |
| ST5 ROLE OF EMP SPEC IN SVCS | 3.06 |
| ST6 ROLE OF EMP SPEC WITHIN TEAM | 3.50 |
| ST7 PEER SPEC ON TEAM | 3.35 |
| ST8 ROLE OF PEER SPEC | 3.50 |

| | |
|---|---|
| No Certification | TMACT Rating below 3.0 |
| Provisional Certification | TMACT Rating 3.0-3.6 |
| Full Certification | TMACT Rating 3.7-4.2 |
| Exceptional Practice Certification | TMACT Rating 4.3+ |

This data and findings of the FY 2025 review continue to illustrate the degree to which the State's service system has not transformed to a recovery focused system. This typically happens when new requirements are added without clarifying expectations for changing practice. It indicates the need to develop or modify state policies that provide guidance for practice expectations. This would better enable LME/MCOs to set expectations, share results broadly, recognize effective practices, and implement corrective actions for improvement.

19. The major factors contributing to low scores were lack of engagement, blaming the individual for their problems, little or no assistance with assisting an individual to develop natural support systems, lack of assistance for SUD and dismissing SUD issues, not effectively serving individuals with significant trauma histories, lack of support and follow through for individuals' choices including supported employment, peer support, staff doing med checks only, and lack of assistance for challenging

housing situations. Two individuals' records revealed that individuals should tell any crisis services provider their problem was their diagnosis. Two individuals were told to call 911 when they went into a crisis.

**Figure 18: Number of Months since the last TMACT Review (FY 2023-2025)**




20. The State began fidelity reviews in FY 2023 following a pause during COVID. There were 41 reviews conducted and scored since the reviews resumed through the end of FY 2024 and another 23 TMACT reviews were conducted and scored in FY 2025. Eight were delayed following Hurricane Helene. Eleven (11) teams are already scheduled for TMACTs in FY 2026 and more will be scheduled. **(Figure 20. Above)**

21. The State's amended Medicaid contract with the LME/MCOs includes a new requirement for LME/MCOs to address improvements and develop plans of correction for long standing ACT and IPS providers and monitor progress on subsequent fidelity reviews. There is one unintended consequence with this requirement. This requirement does not include any requirement for collaboration between the UNC Best Practices Institute, responsible for fidelity reviews and follow-up reviews and recommendations, and the LME/MCOs with overlapping requirements. Having the UNC team and the LME/MCO staff work more collaboratively on improvements would be a positive step going forward.

22. One individual has been receiving CST while living in an ACH for four years and one other individual has received CST for two years with little or no assistance toward moving to a community setting. There was a previous reference to two individuals living in unlicensed group homes with ACT and one man living in a hotel with CST services for two years with no progress on assisting him with finding accessible safe housing. Another individual has been living in an ACH receiving ACT for four years. All of these aforementioned individuals were requesting supported housing but did not get

assistance from their service provider to initiate the process of getting housing. Moreover when records and staff interviews reveal staff are not assisting individuals to move to the community, the service cannot be considered community-based.

23. Of the 47 individuals with available data, 24 individuals were actively using substances in spring FY 2025. Three individuals were receiving treatment and support for their substance use. One young man was benefitting from his ACT team's harm reduction[21] support group and managing his rental unit despite his challenges. One man returned to addiction treatment during the time of his review, while one woman reported she was attending NA meetings and discussed switching groups with staff. One woman who needed admission to a skilled nursing facility, was addicted to opioids and using cocaine, was living in a wheelchair in a friend's house, and needed methadone before she could be admitted to a SNF. The LME and state staff pursued options for her following the review.

    Conversely, there were six individuals with significant impairments who had been provided recovery based and trauma informed and practiced support or recovered on their own over a long period of time. Two individuals in recovery proudly showed reviewers their homes where they had lived for over six years. A man expressed appreciation for the support he received at Healing Transitions in Raleigh several years ago. His experience at Healing Transitions played a significant role in his recovery, as reflected in his progress since leaving. One woman, seven years into her recovery from heroin, proudly displayed her Certified Peer Support Specialist certificate and is now looking for a peer specialist job. Two individuals reported taking cannabis for pain.

24. The UNC Institute for Best Practices had been hosting ACT Collaboratives across the state for several years, discontinued these during COVID, and recently started hosting these again along with CST Collaboratives. These are important opportunities for ACT and CST providers to exchange ideas and get new information from the Institute and the State.

25. The CST coaching team identified three themes from their work in FY 2025. They found that agencies that were more actively engaged in coaching scored higher on Agency-Centered Services on the pilot CST Monitoring Tool. Second, there was a wide variety in the quality of PCPs even within the same team. Crisis plans scored the lowest on the Pilot Monitoring Tool. Third, there was greatest variation across teams in services provision scores than in other provisions and the lowest scores were in tenancy support and appropriate therapeutic interventions. These themes are consistent with this

[21] Harm education is a public health approach to managing high-risk behaviors, including drug and alcohol addiction. It values abstinence but recognizes it is not the only approach.

Reviewer's findings

26. Housing stability is a reliable indicator of the effectiveness of services and supports, especially when measuring performance of tenancy support, individual choice, access to community activities, and flexibility. Thirty-two (32) individuals in the review sample of 67 individuals with information available to make this determination had lost housing at least once after living in SH. This includes individuals who moved before being evicted from their housing but does not include individuals who moved on their own to another safe community location, i.e., with family or to a different apartment on their own and were not at risk of losing housing. The number of individuals returning to ACHs has fluctuated over time but only 34 individuals returned to ACHs in FY 2024 and 33 in FY 2025, down slightly from 46 in FY 2021.

27. The standard for **(C)(6)** requires each individual's person-centered plan (PCP) reflect requirements **(C)(1), (C) (3) (a-d)**, as well as **(C)(6)** requirements that it be based on the individual's expressed needs, choices, and recovery goals. Each review included questions derived from the standards for these requirements.

    The Settlement Agreement requires that each individual have a Person-Centered Plan, and it is essential the plan be current, reflecting each individual's choices and their voice, particularly regarding their own views of their needs and their recovery goals. Recovery goals must include their goals for their living setting, either moving or retaining their home. Plans must be recovery-focused, evidenced-based, and community-based for individuals to move to and live in the most integrated setting in the community.

    One of the fundamental purposes of the PCP is to provide a critically important roadmap of the person's own desired recovery and their vision of the life they want to achieve in their community. The lack of focus across the state on this vital purpose denies people the opportunity to have their services built around a clear vision of their recovery. Improving this process will necessitate coaching and mentoring staff on "how" (and why) they assist an individual with their plan, not just what steps to take to go through the process.

28. Three LME/MCOs' teams had maximum PCP scores for a total of 9 out of the 43 individuals reviewed with completed or up to date PCPs. Vaya's scores were at the maximum for 70% of the individuals reviewed. As stated in the FY 2024 Annual Report, Vaya's providers appear to understand that the plan should reflect how the staff are going to assist individuals with their goals. Conversely, staff across the state continue to write PCPs for individuals to meet what providers require using the phrase "individual

shall...." signifying individuals must meet compliance requirements without referencing provider tasks.

29. The primary requirement in **Section III. (C)(7**) is for the State to implement pre-paid capitation plans and contract with LME/MCOs to operate the plan. The requirement obligates the State to monitor services and service gaps and ensure that the number and quality of community mental health service providers is sufficient to allow for successful transition and diversion of individuals from ACHs. The Settlement Agreement requires the State to enable individuals to have success in supported housing, services, and long-term stability in the community.

    As referenced in the introduction of this Report, DHHS and the Division of Health Benefits (DHB) completed their transition of LME/MCOs to Tailored Plans for beneficiaries, including individuals made eligible for TCL and other individuals with beneficiaries who require more extensive care and support than typical Medicaid participants. Also as referenced in the introduction, there has been some confusion with the role and responsibilities of newly hired and assigned Tailored Care Managers (TCMs), employed by the LME/MCOs and by providers. The State's guidance focuses on new TCM roles and responsibilities with less clarity and resulting confusion on meeting Settlement requirements. Guidance for the process for individuals attempting to access IPS-SE services was confusing and contradicted IPS-SE requirements. It was issued well after the TCM implementation. This meant that this responsibility was added on to the responsibilities they already had.

    These issues relate in part to all newly assigned TCM staff not being sufficiently familiar with their role with meeting Settlement requirements and being unfamiliar with TCL and obligations the providers have for tenancy supports, IPS-SE, and other service requirements. LME/MCOs, now Tailored Plans, are working to clarify roles and responsibilities but this will take time and cooperation internally across offices within the LME/MCOs. This is further complicated by ongoing turnover and staffing changes in the TCM positions. As referenced in the FY 2024 Annual Report, the TCMs have competing and important demands. The State underestimated the effect of the new requirement and the need for clear guidance, streamlined processes, and available TCM staff for time-sensitive tasks. Although better, the effect of this oversight remains and presents challenges to the State meeting requirements. The LME/MCOs have taken steps to circumvent these problems where they continue to exist.

30. **Section III. (C)(8)** requirements include a description of LME/MCO responsibilities to beneficiaries under 42 C.F.R. § 438.10, regarding information accessibility, as well as to hospitals, providers, police departments, homeless shelters, and Department of

Corrections facilities. It also references requirements the LME/MCOs assumed when becoming MCOs. It includes the LME/MCOs' responsibilities for meeting federal accessibility requirements.

The LME/MCOs provide publicity, materials, and training regarding crisis hotlines, services, and availability of information, although stakeholders often report that the plans are too general and reviews revealed LME/MCOs do not always provide information to help individuals make decisions, especially on moving to supported housing and on what resources are available to help individuals move to community settings.

**Section III. (C) (10) (a-c)** includes requirements for an LME/MCO to develop a crisis service system, and for the State to actively monitor and address gaps in crisis systems, and with crisis services provided in the least restrictive setting consistent with their individualized crisis plan. Crisis systems are in place and in the past monitored through a "gaps analysis" exercise. However, individuals with TCL eligibility are not receiving either facility based or mobile crisis services.

The State's data illustrates that only 0.07% of TCL recipients got mobile crisis assistance in the first quarter of FY 2024 and 0.08% of recipients got assistance in the second quarter of FY 2024. Facility based crisis services had even lower utilization for both quarters. However, LME/MCOs have utilized bridge housing for individuals experiencing housing crises, including losing their housing. Crisis plans are as equally problematic as PCPs, as they often just include phone numbers individuals can call when in crisis and information rarely retained by individuals as it is not useful to them. The one difference is that scores on the requirement for individuals to get assistance to utilize natural supports when in crisis has been higher than other services scores for the past two years.

One significant gap (and opportunity) addressed previously in this report is the lack of peer operated crisis services, including peer crisis respite programs. The efficacy of this model is widely known. Only two LME/MCOs have a mental health peer operated crisis residence.

31. Overall, crisis plans were quite detailed in FY 2025, although some plans were blank and repetition of the instructions and information contained in earlier plans even if the individual's living circumstances and potential for a crisis changed. The level of detail in the State's Crisis Plans may be useful to providers but would need to be more concise to be useful for individuals to identify steps they need to take to avoid crises. The State's data revealed that 1.7% of individuals in the target population living in the community who did not have a housing slot received mobile crisis services in the third quarter of FY 2025, up from .07 % in the third quarter of FY 2024. However, 1.7% of individuals without

a housing slot in the third quarter of FY 2025 and .07% received facility-based crisis in the third quarter of FY 2024, a very slight increase. The same percentage, .07%, of individuals received mobile crisis services in the third quarter of FY 2024 and FY 2025. The number of individuals living in supported housing who accessed facility-based crisis services in the third quarter of FY 2025, was down from .04% to .01% in third quarter of FY 2024.

***(C) Recommendations***

1. As stated in the FY 2024 Annual Report, the overriding recommendation in FY 2025 is for the State to focus on transforming the services approach from a more traditional treatment approach to a recovery-oriented approach. This requires an understanding of what strategies work best and a focus on using effective strategies to improve and transform services.
2. Focus on challenges presented by provider workforce and agency ownership and leadership changes. The UNC Institute for Best Practice has resumed ACT Collaboratives, which is an encouraging development especially in light of these identified workforce challenges and changes.
3. Take steps to align state policy through Clinical Care Policies, supporting LME/MCOs to manage their network of providers and improve services in a timely manner to ensure the State can meet its obligations in Section III (C) of the Settlement Agreement.
4. The UNC Institute for Best Practices and the TAC CST Coaches should continue to work assisting providers to improve their performance. Based on the TAC Coaches most recent report, their focus should include assisting LME/MCOs to take effective steps to monitor and provide technical assistance. This was also a need expressed by LME/MCOs. Workforce challenges referenced above present new challenges but also opportunities for LME/MCOs to adopt new strategies to improve services. Establishing pay for performance requirements is effective for clear expectations, including outcomes and data requirements. Expectations include providing services that: (1) are evidence-based and recovery focused; (2) are flexible and individualized; and (3) help individuals to increase their ability to recognize and deal with situations that may otherwise result in crises.
5. Expand the CST TCL coaching team's identification of services challenges and opportunities and continue the development and use of the tool developed by the coaching team to evaluate CST service provision.
6. Expand the coaching model, working with ACT teams in conjunction with the technical assistance provided by the UNC Institute for Best Practice. Ensure UNC has the capacity to complete TMACT fidelity reviews on a two-year cycle.

7. The Settlement community-based services requirements are consistent with best practices for adults with serious mental illness. Thus, a clearer focus on meeting each of the Settlement requirements could have a positive impact for building a competent adult mental health system. Utilize the LME/MCO subject matter experts, including their quality management, network management, and TCL leadership, to develop steps to transform the system and implement their performance improvement services strategies. As stated in this report, to increase the effectiveness of the LME/MCOs' action steps, shift the focus to the recommendations in #2 and #3 above and minimize redundancies in reporting.
8. Continue the expansion of services provided to the priority populations in the Settlement Agreement in a manner that best matches the needs of the target population, is shown to be effective, and enhances individuals' health and wellbeing and community integration. This includes placing a greater emphasis on the use of assertive engagement, evidenced based services and practices, i.e., recovery-oriented, additional peer support and the "housing first" approaches, health care management arrangements, individual supports, community inclusion, informed approaches to trauma services, and substance abuse treatment.
9. Ensure that person-centered planning training and technical assistance is tied to the needed larger services systems transformation approach as discussed above. The LME/MCOs can then take steps to tie person centered planning with their focus on improving services to be recovery focused, individualized, with the intensity, frequency and duration to best serve individuals in TCL. This also involves ensuring that person-centered planning is tailored to an individual's choices, needs, goals, well-being, healthcare, personal care, employment, and daily living in order to facilitate a fully integrated life within the community. It is critical that SPH, In-reach, transition staff, and service providers have a common understanding of these requirements and their role in using a team-based recovery focused planning approach that begins at admission to an SPH.
10. Improve the capacity and performance of service providers to reduce crises that lead to housing separations through expansion of bridge housing and the provision of crisis respite, crisis stabilization, and/or in-home crisis respite. It is a generally accepted practice that crisis teams and crisis residences, including peer run crisis respite, are helpful to enable individuals to continue to reside in or return to the most integrated setting possible, including helping people to maintain their own place to live.

## III. SUPPORTED EMPLOYMENT

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **1. Section III. (D)(1)** The State will develop and implement measures to provide Supported Employment Services (SE)[22] to individuals with a Serious Mental Illness (SMI) who are in or at risk of entry to an ACH, which meet individual needs. Services assist individuals in preparing for, identifying, and maintaining integrated, paid competitive employment. | The State has developed and is implementing measures to provide SE services to individuals who are "in or at risk of entry to an ACH" (IAR) that meet their individual needs[23]. Individuals get help to prepare for, identify, and maintain employment that meets their individualized needs including providing access to integrated employment and mental health services and access to follow-along support. | The State is not yet meeting this requirement. The State's data and reviews revealed that particularly individuals in TCL are not getting the assistance they need to prepare for and identify employment that meets their individual needs. Individuals in TCL and those in or at risk of ACH placement and receiving IPS/SE (Individual Placement and Supports/Supported Employment) rose by three individuals in 2025. This number could be higher once end of the year claims data have been submitted and validated. Information from LME/MCOs indicates 90 individuals in TCL received funding for least the first IPS-SE services payment (Milestone 1) during FY 2025, including individuals referred in FY 2024. In FY 2025, just four individuals in the FY 2025 review or 3% of those expressing interest in work or education received IPS services or support from ACT employment specialists to seek competitive jobs or education.<br><br>The LME/MCOs have taken a much more focused approach working with ACT, CST, and IPS providers and now have dedicated staff to assist the State to meet this requirement. |
| **2. Section III. (D)(2)** SE Services are provided with fidelity to an evidenced-based supported employment model for supporting people in their pursuit and maintenance of integrated, paid, competitive employment work opportunities. | 1. Services must meet fidelity to the IPS-SE model.<br>2. The State will use the established IPS-SE fidelity scale. | The State meets the requirement to adopt the IPS-SE fidelity scale. However, Fidelity scores across the teams reviewed in FY 2025 remain in the "fair" fidelity scoring range and a review of items that are comparable and intersect with (D)(1) requirements remain low. Scores have trended lower after the reviews resumed in FY 2023. Teams scored below fair on 6 of the 12 fidelity items that intersect with (D)(1) but also with (C )(1) and(C)(3); 4 teams scored above average and 2 scored in the fair range on those items. |

[22] SE services refers to IPS-SE services as referenced in #2 below.
[23] Per the Settlement Agreement, severity of an individual's disability cannot be a barrier to an individual transitioning to an integrated setting appropriate in all domains of an individual's life (including employment and education) based on the individual preference, strengths, needs, and goals.

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **3. Section III. (D)(3)** By July 1, 2021, the State will provide IPS-SE services to a total of 2,500 individuals "in or at risk of" ACH placement". | The standard is the same as the requirement | The State continues to meet this requirement. There have been 2,905 individuals served in the priority population who received some level of IPS-SE services by July 1, 2025. This is an increase from 2,796 individuals reported to have been served by July 1, 2024. The state continues to report different findings on the numbers of individuals served based on drawing data from different sources. |

***(A) Background***

The State has struggled to meet major requirements for providing Supported Employment Services as referenced below, including **Section III. (C)(1)(9),** access to IPS-SE as a service and **(D)(1). and (D)(2)** referenced below.

Access to Supported Employment remains a major challenge for individuals in the priority population who have expressed interest in an employment or education service, as required in **Section III (C)(1)**, and for individuals served by an ACT team who have expressed interest in employment support, as required in **Section III(C)(9)**. There is a reference to the (C) requirements because service providers are responsible for referring individuals to SE and because SE is a service integrated with responsibilities between an SE provider or ACT Employment Specialist and a service provider or other members of the ACT team. The State has made progress but still has challenges meeting **Section III (D)(1)** to develop and implement measures to provide individuals with SMI, who are in or at risk (IAR) of entry to an ACH, with Supported Employment (SE) services that meet their individual needs. The State is continuing to make progress developing and refining the milestone reimbursement model (NC CORE) as a method for financing Individualized Placement and Support-Supported Employment (IPS-SE) that reinforces meeting milestones (outcomes) that are consistent with Settlement requirements.

Unfortunately, two issues continue to stymie progress. One is the continuing belief that individuals do not want to work or are unable to work or pursue their educational goals. This issue is influenced by the continuing belief for some people in services that they will lose their disability benefits, relapse, or not be successful working. This is complicated by providers who do not understand these issues are common sources of ambivalence for people in the precontemplation or contemplation stages of change rather than signs of inability or a lack of motivation. Often providers at all levels give mixed messages about employment, the benefits and importance of work and education, or spending time assisting individuals to develop employment and/or education goals. Referring teams, typically CST

and TMS teams are struggling to hire qualified staff. Assertive Community Treatment (ACT) teams are struggling with hiring required vocational specialists as well as helping people receiving ACT services to achieve their employment and education related goals. This is evident in the documentation of the TMACT (Tool for Measuring Assertive Community Treatment) and IPS-SE fidelity reviews that document the challenges that teams have in finding and hiring vocational specialists who have the skills to assist individuals through these stages of change and have team members engaged in supporting employment outcomes. Two, the new IPS-SE 1915(i) referral, approval, and planning processes require timely coordination and communication among multiple organizational units that has been challenging and complicated.

The LME/MCOs now employ “Supported Employment Specialists.” Trillium hired the first specialist in FY 2024 and with State support the other three LME/MCOs hired specialists in FY 2025 and have since added staff and elevated the roles of the specialists. This change is promising. The specialists are tracking and reporting supported employment activities and utilization, including reporting challenges to the new Medicaid authority change referenced above. Beyond those responsibilities, the specialists are tracking and encouraging ACT teams to provide employment support. Their biggest challenge is with the barrage of reporting for various reasons and to multiple State staff tracking employment activity and troubleshooting referral challenges with the new 1915(i) processes. If these challenges were resolved, LME teams and providers can enable individuals to succeed in obtaining and sustaining integrated competitive employment and achieving their educational goals.

The State has met the **Section III (D)(2)** requirement to provide Supported Employment Services with fidelity to an evidenced based model. The State selected and is using the Individualized Placement and Support Supported Employment (IPS-SE) model. The State has met the **Section III (D)(3)** requirement to provide Supported Employment Services to 2,500 individuals in or at risk of ACH placement or individuals found eligible for TCL. The State met this requirement in November 2022, when the State verified 2,510 individuals in the Settlement Agreement priority populations (in or at risk of ACH placement and TCL eligible population) categories as receiving IPS-SE over the life of the Settlement. The State verified individuals as receiving IPS-SE by June 30, 2025. However, the number of individuals receiving Individualized Placement and Support (IPS-SE) services has dropped from 1,939 on March 31, 2019, to 1,114 on June 30, 2025. The June 2025 numbers show that the decrease in numbers served is leveling off and hopefully signifies that the provider capacity has stabilized.

The average number of individuals in TCL who are accessing IPS-SE has dropped annually from an average of 185 from FY 2013 through FY 2019 to 112 in FY 2025, or 40% lower than FY 2019 numbers. The lower numbers after 2019 may be a reflection of more accurate

verification by the DHHS but also partly related to challenges with fewer TCL referrals. The State's Service Rate data shows a drop from 2.3% of individuals in TCL receiving IPS-SE services to 1.3% of individuals in the third quarter of FY 2024 and a drop to .9 in the third quarter of FY 2025. A review of service rates is important. It is a good indicator of service use compared to other services with much higher rates of service. It also signifies a challenge in provider capacity that needs close attention.

As referenced in detail above, the State has shifted its IPS-SE service from a Medicaid (b)(3) service to a Section 1915(i) service, as a result of changing authorities and requirements when LME/MCOs became Tailored Plans. The reviewer reported this shift as not being a suitable fit for individuals receiving services in a comprehensive mental health services system in the FY 2023 and FY 2024 Annual Reports. Comprehensive mental health services providers more frequently refer individuals to IPS by teams also operated by the same provider. Adding an independent assessment with a referral to Tailored Care Managers to develop an individualized plan has slowed down the process significantly, especially with Tailored Care Managers becoming familiar with this requirement and balancing their overall workload. To this point, the challenges forecasted with this shift have come to fruition.

As described in the Methodology section of this report, the reviewer randomly selects individuals each year to determine the percentage of individuals getting support to reach their expressed employment and education goals. This process involves reviewing documents, including Person-Centered Plans, assessments, discharge plans, and LME/MCO and provider notes. Reviewers also ask individuals about their interest in employment and education as part of their interview.

As many as 66% of individuals with serious mental illness want to work, which is consistent with findings in TCL recipient random interviews over the past five years[24]. At least 23 randomly controlled studies demonstrate the efficacy of IPS-SE over other supported employment models[25]. It is reasonable to expect the annual reviews would reveal individuals in TCL would have that level of interest.

In the implementation of IPS-SE services, the State, to its credit, included Employment Peer Mentors as part of IPS-SE teams. In the FY 2022 report, the reviewer recommended that the State consider increasing and publicizing opportunities and augmented assistance for individuals in TCL to become Certified Peer Specialists. (See the Community-Based Mental Health Services section in reference to updating Peer Specialists' certification processes.)

---

[24] Burns EJ, Kerns SE, Pullmann MD, Hensley SW, Lutterman T, Hoagwood KE. *Research, data and evidenced based treatment in state behavioral health systems, 2001-2012. Psychiatric Serv. 2016: 67 (*5*): 496-503.*

[25] Drake RE, Bond, GR, Goldman, HH, Hogan MF, Karakus, M. *Individual Placement and Support Services Boost Employment for People with Serious Mental Illnesses, But Funding is Lacking, Health Affairs.2016:35(*6*): Abstract*.

Research[26] continues to demonstrate that Certified Peer Specialists (CPS) have greater job satisfaction and longer job tenure than Peer Specialists have in other jobs. However, as also referenced in the Community-Based Mental Health Services section of this report, they are leaving these jobs for better pay and job satisfaction.

As recommended in past reports, the State should also explore opportunities to give individuals receiving Community Inclusion (CI) the opportunity to get assistance for going to work or back to school either directly by CI specialists or recommending IPS-SE. This helps expand community integration opportunities. In FY 2025, Alliance Health and Promise Resource Network (PRN) collaborated on initiating a peer operated supported employment service which followed IPS-SE principles to a great extent but with a different staffing model more focus on engagement and less on qualifying individuals for the service. (Peer-Run Employment and Career Supports). Alliance funded this new service. The new team went through extensive orientation and training in FY 2025 and began working with SPARC, a CST agency in Charlotte, for referrals. The team began taking referrals in early CY 2025 and is now serving 16 TCL recipients. Four members have gained employment. Their success appears to be related to the fact they can increase timely access, take time to assist individuals with their decision making and choices, and assist them with additional resources and preparing for work.

The Substance Abuse Mental Health Services Administration (SAMHSA) recognized this peer-led team approach as a "promising practice." This approach was not started until FY 2025 thus it was not included in the initial Settlement Agreement as an alternative. The team's performance in FY 2025 is the first step toward becoming a "best practice" and is a positive step for the State to meet **Section III 3 (D)** Supported Employment requirements.

Over the past eight years, this reviewer's findings have identified ongoing and unresolved challenges with access and delivery of this service to assist individuals in TCL to identify and maintain employment. The FY 2025 review revealed the State has not resolved three of the previously referenced major challenges, including:

1) Ensuring supported employment is available, accessible, and offered to individuals who express an interest in employment and education in a timely manner.
2) Ensuring CST and ACT providers implement strategies for assisting individuals who could consider employment or education. The lack of referrals referenced in this and previous reports indicates that individuals are viewed as not being able to work due to how serious their illness is or their functional limitations. Often work is not valued as an important part of an individual's recovery. While less common, reports from individuals

[26] Ostrow L, Cook JA, Salzer MS, Pelt BS, Burke-Miller JK. *Employment Outcomes After certification as a Behavioral Health Peer Specialist, 2022: Psychiatric Services in Advance: 1-9.*

and staff during the spring reviews indicated that individuals cannot go to work because they will lose their benefits.

3) Integrating IPS-SE services with mental health services at both the team and individual staff level. This includes individuals who are employed receiving follow-along employment services for up to a year, or at their request, assisting them with successfully maintaining employment and meeting their employment goals. This issue is a challenge because each IPS-SE team must work with multiple providers and service providers not allocating integration time.

The State has taken steps through improvements in their Milestone payment system to stabilize IPS-SE funding. The State continues to make adjustments to this new process including sequencing the first two milestones. EIPD (Employment and Independence for People with Disabilities), formerly the Division of Vocational Rehabilitation, introduced the Disability Benefits 101 on-line tool that provides tools and information on employment, health coverage, and benefits and helped staff and providers begin using it. The State has introduced the DB 101 online tool and is providing information and technical assistance on how to use the tool. Disability Benefits 101 (DB101) is a tool and comprehensive resource to help individuals with disabilities, and their service providers, families, guardians and advocates understand the connections between work and benefits. It assists individuals in making informed decisions regarding how employment can be integrated into their life plan. This new tool, while introduced in FY 2025, will require ongoing orientation and technical assistance for some time.

"Good" fidelity supported employment services requires a significant number of staff, teams, providers, State, and LME/MCOs to integrate services to help individuals pursue their work and education goals. It also requires staff to be knowledgeable about the challenges individuals face to make employment decisions. Individuals often need time to reconsider their roles beyond being clients or patients, as well as understanding the support they need throughout this process. As seen in past reviews, and again in FY 2025, individuals quickly find jobs on their own when they move into supported housing, or even before then. Other individuals want to pursue their education or learn new skills for future employment.

Given the complexities and challenges associated with Supported Employment, the Reviewer and her team examine various sources and conduct interviews to identify individuals who may be interested in employment or education, as well as the steps required for the State to fulfill its obligations for this service. These include:

1) A review of employment services provided to individuals who expressed an interest in supported employment or continued employment and education as part of the FY 2025 review. The criteria for "interest" required at least two of the following:

a) The individual reported interest in employment and/or education during an interview with a Review Team member.
b) The individual expressed interest in employment and/or education in one or more of their own goals in their Person-Centered Plan.
c) The individual had secured employment on their own.
d) There was staff agreement to provide SE services for the individual in the Person-Centered Plan.
e) There was reference to interest in employment or education in service provider notes and/or TCL staff notes.
f) There was reference to interest in employment and/or education on the In-reach tool, in a hospital discharge plan, transition notes, or other clinical assessments.

2) Meetings with service providers (ACT, CST, TMS, and IPS-SE), LME/MCO staff, EIPD counselors, State staff, including State EIPD staff with responsibilities for serving individuals in the TCL and IAR population.
3) A review of written materials, plans, and data from TCL, EIPD, and DMH staff.
4) Follow-up reviews of IPS-SE verifications, enrollment, and follow-up of services provided for individuals based on data from paid services claims.
5) Observations of meetings (including NC CORE meetings) and subsequent follow-up discussions with Vaya, Trillium, Alliance, Partners LME/MCOs, DMH and DHB staff, the Senior Advisor to the DHHS Secretary on the ADA and *Olmstead* and her staff, and DHHS EIPD staff regarding the CORE pilot, a new business model for IPS. Vaya had piloted the model for over two years, the Alliance for one, and Trillium for a few months at the time of this annual review.
6) Reviewing recently completed IPS-SE fidelity reports and with comparable requirements in the Settlement Agreement. The Fidelity review findings further corroborated the FY 2025 IPS-SE findings.

***(B) Findings***

1. The FY 2025 individual reviews revealed that 2 of 16 individuals (12%) interviewed who expressed an interest in employment or furthering their education or training received assistance from their ACT employment specialist in FY 2025. Only one individual out of 9 individuals served by a CST team who expressed interest was getting help from their team, but that individual was not getting IPS-SE services. Two of those individuals were interested in furthering their education. One woman got a job on her own. One individual was interested in volunteering, another woman was interested in finishing her GED, and one woman was slated to start bus training which is her first and early step in obtaining employment. Five other individuals were getting TMS and one of those individuals returned to a job he did not like but felt he needed to work.

One other individual expressed an interest in employment but did not have a provider at the time of the review.

2. The State reports that by June 30, 2025, 2,905 individuals in the identified priority population have received IPS-SE services over the course of the agreement. TCL recipients accounted for 7% of the priority population. See Figure 19 below.

**Figure 19: Supported Employment January 2023-June 30, 2025[27]**




3. One consistent theme from individual reviews is that many individuals identify their interest in employment assistance both with IPS-SE and ACT providers. However, they might at the same time feel discouraged or unsure of their own capacity to obtain and maintain employment. IPS-SE and behavioral health service providers must re-examine their responsibility to effectively engage those individuals who want to work but who are concerned about their stamina, their ability to work, or the potential stress of working. A second hesitation individuals have about employment involves disability benefits. It is critical that providers help individuals to understand the myths and the facts about disability benefits and the large variety of work incentive program options for people seeking employment. It is the service providers' responsibility, along with IPS teams, to assist individuals with reasonable accommodation, OT assessments and PT as needed, benefits counseling and support using DB 101, managing their stress, and learning skills to gain and maintain their employment and meet their future employment goals.

4. The State's IPS Quarterly Outcomes Report for FY 2025 Q4 includes data reported since FY 2020 shows a downward trend of individuals receiving IPS-SE services. Figure 20 depicts this trend since the beginning of FY 2023.

[27] The increases and decreases in FY 2025 are related to changes made in the State's reporting by month during this fiscal year.

**Figure 20: IPS Quarterly Outcomes Report**




5. Eighteen (18) individuals in the FY 2025 review did not express an interest in a job, furthering their education, or getting training. There was inconclusive information for 5 other individuals, either because they were not available for an interview to confirm their interest, or they expressed ambivalence about employment. Two individuals with long work histories indicated they were "retired," and they were pursuing other interests. Again this year, two individuals indicated they would not attempt to go to work because they would lose their benefits. It is likely that others who expressed ambivalence felt the same way but did not want to discuss benefits.

6. As referenced in the FY 2024 Report, the State paused the previously discussed CORE program to consolidate the payments and milestone into one single statewide set of milestones. In addition, EIPD raised rates to match the cost of the service. This set the State on a clearer path to meet the Settlement requirements for Supported Employment. Figure 21 illustrates the number of referrals to IPS-SE and number of payments made in FY 2025 for Milestone 1.

**Figure 21: TCL Referrals and Milestone Payments in FY 2025**



7. The new 1915(i) payment process has significantly slowed down the IPS-SE referral process. Figure 21 above shows the number of individuals in TCL who were referred for IPS-SE across the state, those who decided not to continue with the referral, those who were referred and their IPS-SE provider billed the first milestone, and the number of individuals who remained in IPS-SE services after the first milestone was billed. This is a different presentation on individuals referred and receiving services from prior years' reports. The reason for the change is that this is the first year that payments made for IPS-SE were made solely using milestones rather than a fee-for-services model. Fortunately, EIPD is providing prompt assistance to providers when they have questions and challenges ensuring individuals are enrolled and receiving EIPD support.

8. The **Section III. (D)(1)** requirement also includes three standards: (1) behavioral health and IPS-SE providers provide integrated services and meet on a regular basis to support individuals to reach their employment goals; (2) individuals are provided with access to EIPD resources; and (3) employed individuals receive follow-along services for up to a year to assist them to maintain employment and meet their employment goals.

   The State has a structural imbalance between the number of CST teams, which are the most likely referral sources for IPS-SE, and the number of IPS-SE teams available to accept those referrals. There are over 100 CST teams in the state and only 27 teams provided IPS-SE[28] in FY 2025. This imbalance makes integration more difficult as one IPS team is likely working with multiple providers across multiple LME/MCOs. The IPS staff cannot possibly devote the time needed for effective integration with so many referring CST teams.

   These findings are consistent with the State and Medicaid claims data showing that only 0.9% of TCL recipients residing in SH received at least one unit of IPS-SE service in the third quarter of FY 2025. The rate for individuals living in the community but not in SH was only 0.2% in the last quarter of FY 2025, down from 0.4% in the first quarter.

9. The UNC Institute for Best Practices, under contract to DMH resumed IPS-SE fidelity reviews in September 2022, after pausing them during COVID, and has conducted 38 since then. Ten reviews conducted in FY 2025 have been reviewed and scored at this point. One team scored below the provisional fidelity score and has since discontinued IPS-SE. The State's lowest level of certification for IPS teams requires a

[28] The number of teams providing IPS-SE at the end of FY 2023 was 30, although at least one provider is dropping the service in FY 2025, and it is possible at least one more provider will do so. Perhaps additional providers will go through the start-up phase for a Fidelity review to begin the service in FY 2025.

total fidelity review score of 74, which represents a mean IPS fidelity item score of 2.96. When comparing items on the Fidelity Scale with items closely tied to SE Settlement requirement items, the State's mean score on those items was 2.88 in FY 2025. See Figure 22 below:

**Figure 22: Average IPS Fidelity Scores Correlated with SE Settlement Requirements**




10. The most promising change in FY 2025 was the LME-MCOs taking on increased responsibility for Supported Employment, both with ACT teams and IPS-SE. With LME/MCO and DHHS funding, each LME/MCO added a Supported Employment lead staff person. Trillium hired a lead staff person in FY 2023 and the other three LME/MCOs hired staff mid FY 2025. All have shown leadership working with IPS and ACT teams to increase referrals and solve problems, maximize capacity and increase performance. Based on their actions to date, their leadership will be one of the determining factors in when and how the State meets its SE obligations. In addition, The UNC IPS-SE team is providing information and assistance to the LMEs about fidelity challenges.

11. As referenced in the FY 2021-24 Annual Reports, there continues to be an underlying assumption on the part of some service providers responsible for making IPS-SE referrals, In-reach and Transition Coordinators, and other LME/MCO staff and leadership across the system that individuals in the TCL program don't want or are not capable of obtaining nor sustaining integrated competitive employment. A team member voiced this recently in a review session. Guardians and families who often make this assumption and are more verbal in their objections to an individual going to

work. Regardless of these doubts being communicated subtly or not so subtly, it continues to send an undeniable, powerful, and clear message to individuals in services that they cannot work. The State's continued attempt to provide incentives for TCL referrals in FY 2025 did not lessen the problem. At the same time there are individuals who do not want to go back to work. One individual in this year's review with a long work history voiced it clearly stating, "I'm retired." Another woman whose living situation was deplorable and as a result traumatized voiced wanting to go to work but was going to need a long period of recovery before returning to her job as a nursing assistant.

12. EIPD staff continue to be instrumental in providing timely eligibility access to EIPD services and funding support.

***(C) Recommendations***

1. Focus on action steps to improve individuals' access to and support for their identified employment and education goals. These steps include LME/MCOs working directly with provider agency leadership and staff of both ACT and CST teams to make timely referrals of individuals to employment services. At this juncture it is advised DMH, LME/MCO leadership and the UNC and TAC teams add a focus to their oversight, monitoring and technical assistance that individuals, especially those in TCL can go to work otherwise the effect of discouraging individuals and is discriminatory for individuals who want to attempt to return to work or school will linger on. This also includes State staff affirming the value of work and education for TCL services recipients and promoting employment and education for this population across referral sources, announcements to stakeholders.

2. Ensure the referral process steps do not delay individuals getting timely access to IPS-SE services.

3. Ensure the TCM assessment and individual planning processes are effective and timely.

4. As referral, continuous support and integration issues represent the main challenges to fulfilling the Settlement Agreement (SE) requirements, it is recommended that DMH leadership guide and support LME/MCOs and providers to promote a coordinated and collaborative approach to serving individuals in TCL. Continue and expand CST coaching and monitoring with a focus on CST teams making IPS referrals and assisting individuals in their employment decisions and challenges. Likewise ensure ACT teams focus on providing effective supported employment strategies.

5. Examine and reduce redundancies in employment services reporting and simplify employment service tracking and data collection.

6. Continue with the ongoing introduction and support for DB 101 to ensure each ACT and CST team is knowledgeable of and incorporating the use of DB 101 with their members.
7. Actively collaborate with LME/MCO leadership and SE Specialists in addressing each of these action steps. Enable these staff to develop their quality improvement strategy for each of their LME/MCOs and with ACT, CST and TMS teams.

## IV. DISCHARGE AND TRANSITION PROCESS

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **1. Section III. (E)(1)** The State will implement procedures to fully inform individuals with SMI in, or later admitted to, an ACH or State Psychiatric Hospitals (SPHs) or being pre-screened for admission to an ACH, about all community-based options and benefits, including the option of transitioning to SH. | 1. The State's policies and procedures[29] for Diversion, ACH, and SPH Transition Processes meet SA requirements (including eligibility policies).<br>2. SPH, LME/MCO[30], and service provider/staff know and communicate the procedures and community options.<br>3. Public guardians get information about community-based options.<br>4. The State will establish Transitions to Community Living (TCL) eligibility policies consistent with the SA. | The State has made progress toward meeting this requirement. The State updated its policies on In-reach contacts. This policy will be implemented in FY 2026.<br><br>State staff continue using their effective continuous quality assurance and monitoring approach providing practical, usable data. The State trends their data, looking for improvements and challenges and taking steps quickly when advisable. They utilize peer lead Community of Practice sessions. They follow up with in-person visits for everyone that an LME submits an Informed Decision Making Choice request for and closely track frequent engagement through chart reviews. The State team also tracks bridge housing utilization.<br><br>In FY 2025, State staff began tracking individual assessments and transition planning meetings, tracking progress, and providing technical assistance. |
| **2. Section III. (E)(2)** In-reach: Assign knowledgeable In-reach staff to: (1) provide education/ information and facilitate visits to community settings; and (2) offer opportunities to meet with other individuals with disabilities who are living, working, and receiving services and with their families and with providers. Visits are to be frequent. | 1. In-reach staff meet frequently with residents in ACHs/SPHs when individuals become eligible for TCL.<br>2. In-reach staff begin meeting with individuals being pre-screened at the point when eligibility is determined.<br>3. In-reach staff are knowledgeable about | The State is making progress with In-reach staff making face-to-face visits to see individuals living in ACHs, going from 11.3% in the second quarter of FY 2022 to 89.7% in the fourth quarter of FY 2025. There were 89 individuals, or 15% of individuals on in-reach in ACHs, not seen for their 90-day reassessment reported on 7/7/2025. Even if individuals are seen within 90 days there is not sufficient evidence that visits are frequent enough to provide the individual with an informed choice of alternatives to living in an ACH. Ninety-nine individuals discharged from SPHs did not get an assessment within 90 days. |

[29] References to State's policies and procedures also include State-LME/MCOs contract requirements and staff job requirements.

[3030] LME/MCO staff include any In-reach, Transition Coordinator, Care Coordinator, or other staff who have any job assignment associated with admission, discharge, and/or transition process and provider assignment and contracting.

| Major Categories | Standards | Progress Meeting Requirements |
| --- | --- | --- |
| **Section III. E(2) continued** | community services and supports.<br>4. In-reach staff provide information and education about the TCL process, benefits, and other information as routinely requested by individuals, their guardians, and family.<br>5. In-reach staff facilitate individuals' visits to community settings. | The State is currently not meeting the requirement for in-reach staff to facilitate visits to supported housing or to provide opportunities for individuals to interact with others living, working, and receiving services within community settings, as well as with their families and community providers. The Alliance and Promise Resource Network (PRN), a small consumer run agency in Charlotte, began an "ambassador program" in FY 2025 to provide opportunities for individuals on In-reach status to visit with peers living and working in the community. In-reach staff may not always have detailed knowledge of community supports, which can be due to factors such as high turnover or limited assistance from other staff to maintain up-to-date information. Vaya helps support a TCL group in Alamance County helping individuals living in ACH/FCHs to attend. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **3. Section III. (E)(3)** The State provides each individual with SMI in, or later admitted to, an ACH or SPH (or diverted from an ACH), with effective discharge planning and a written discharge plan. | Discharge planning from an ACH or SPH or diversion planning assists an individual to develop an effective plan to achieve outcomes that promote growth, well-being, and independence, based on their strengths, needs, goals, and preferences appropriate in all domains of their life. | The FY 2025 review did not focus on assessing this requirement in depth due to conducting the Special In-Reach described below. However, the Special In-Reach Review revealed that 47 individuals living in ACHs had an interest in transitioning but only eight individuals had plans for transitioning underway. Details of the challenges assisting individuals to transition are provided below. Likewise, the SPH reviews revealed the State is continuing to have challenges with providing effective discharge planning and discharge plans. |
| **5. Section III. (E)(5)** A transition team is responsible for the transition process. A Transition Coordinator (TC) is responsible for administering the required transition process. | 1. A transition coordinator is responsible for leading the team and administering the transition process.<br>2. There is consistency between the SA requirements and transition process.<br>3. The LME/MCO and SPH staff jointly administer the transition process.<br>4. The SPHs' and LME/MCOs' planning process enables staff to transition individuals to SH or "bridge housing" arrangements when identified as a need and choice. | The State continues to demonstrate progress with transition coordinators leading this process for individuals exiting ACHs and diverted from ACHs. There are challenges, though, with making assignments to Transition Coordinators in a timely manner and making timely decisions with steps toward transition. The State is making progress with Transition Coordinators leading the process with individuals hospitalized at SPHs although during the SPH reviews in FY 2025 there were issues with communication issues and expectations among staff at the LMEs. However the processes do not provide for effective discharge plans. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **6. Section III. (E)(6)** Each individual is given the opportunity to participate as fully as possible in his or her treatment and discharge planning. | Same as the requirement. | The State continues to monitor that individuals are given this opportunity. Chart reviews and interviews reveal that public and family guardians, in addition to making decisions for discharge planning, do not always involve individuals in these decisions or not as fully as possible. While not frequent, hospital physicians have made decisions without an individual's input. ACH and FCH owners and staff had not allowed at least three In-reach staff to visit individuals or to talk about the benefits of supported housing in FY 2025. In effect, this means that discharge planning cannot begin. PCPs do not serve as effective discharge plans and usually are not written until after an individual transitions. |
| **7. Section III. (E)(7)** Discharge Planning begins at admission (ACH or SPH), or at which point an individual is pre-screened for admission to an ACH and made eligible for TCL. It is based on the principle that with sufficient services and supports, people with SMI or Serious and Persistent Mental Illness (SPMI) can live in an integrated community setting. Discharge planning assists the individual to develop an effective written plan to live | a. The State has established the required admission point when discharge planning is to begin (admission point is within seven calendar days of admission).<br>b. The State has communicated that discharge planning is based on the principle that with sufficient services and supports, people with SMI/SPMI can live in an integrated setting.<br>c. SPHs and LME/MCOs tailor discharge<br><br>**(Standards cont.)**<br><br>planning to the individual. It is not formulaic. The SPH and the LME/MCO and provider link the discharge plan and PCP to ensure continuity and that individuals' choices are honored consistently.<br>The individual has a primary role in the development of their discharge plan, the | The State has made progress initiating community integration planning for individuals who chose to enter an ACH rather than move into supported housing or remain in the community in other settings with services. Planning often begins at admission but there is no evidence that it consistently results in individuals moving to integrated settings nor evidence that it results in an effective written plan through a discharge planning process. There are two other challenges to discharge planning. One, over time more individuals have moved from one ACH to another, often from one catchment area to another, without adequate notice to the LME/MCOs and, two, with a reduction in the number of LME/MCOs, new staff have to be assigned again, creating delays. There are reasonable delays for individuals admitted through |

| | | |
|---|---|---|
| **(Continuation of (E)(7) Major Category** independently in an integrated community setting. Discharge planning is developed through a person-centered planning (PCP) process in which<br><br>The individual has a primary role and is based on the principle of self-determination. | plan reflects their expressed needs/goals, and the plan is based on the principle of self-determination. | the court system as Incapable to Proceed (ITP) until hospital staff can determine the likelihood the individual's judicial process will keep them from being able to receive TCL services, supports, and housing in the future. It is incumbent upon the LME/MCOs to continue In-reach and transition planning after an eligible individual returns to jail. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **8. Section III. (E)(8)** A written discharge plan:<br>a. identifies the individual's strengths, preferences, needs, and desired outcomes;<br>b. identifies the specific supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes, regardless of whether the services and supports are "currently" available;<br>c. includes the providers that will provide the identified supports and services;<br>d. documents addressing barriers so the individual can move to the most integrated setting possible (barriers shall not include the individual's disability or the severity of the disability);<br>e. sets forth the transition/ discharge date, actions before, during, and after transfer and responsibilities for completing discharge/transition tasks. | Each individual being discharged from an SPH, exiting an ACH, or being diverted from an ACH has a written discharge/diversion plan that meets four criteria listed in the SA: (1) identifies strengths, preferences, needs, and desired outcomes, and specific services and supports to meet the needs, etc., listed above, regardless of whether or not they are currently available; (2) includes the providers that will provide the identified supports and services to meet the requirements listed above; (3) documents barriers to moving or living in the most integrated setting possible that do not include the individual's disability or severity of their disability; (4) identifies crises (precursors) that were factors in re-admissions (where this applies); (5) includes transition and discharge dates and action steps; (6) identifies responsibilities by staff/provider for each required pre-discharge, discharge, transfer, and community-based task and resource acquisition; and (7) includes the individual's expressed needs and goals. These include benefits restoration/initiation, resource acquisition, and SH pre-tenancy/ move-in tasks.<br>These are responsibilities split between hospital and community staff, completed in a timely manner and with participation of the recipient and any other individual they designate who may provide support (and guardian as needed). Transportation is the responsibility of the LME/MCO, and the community provider as designated by the LME/MCO. | The State has not made progress meeting this requirement. This is largely the result of two factors. One, discharge planning is often a challenge for individuals discharged from SPHs because discharges sometimes occur quickly, and plans are not yet fully in place. Two, PCP planning does not meet requirements of required discharge plans.<br><br>In-reach staff complete two tools, the In-Reach/Diversion/SPH Transition to Community Living tool and Informed Decision-Making tool, which serve as precursors to a discharge plan and first PCP. There is opportunity to streamline the planning process and redundancy in these planning documents. This is also true for a Community Integration Plan (CIP) required in **Section III. (F)(2)** which serves as the first plan for individuals diverted from ACHs. |

| Major Categories | Standards | Progress Meeting Requirements |
| --- | --- | --- |
| **10. (E)(11)** If an individual chooses to remain in an ACH or SPH, the local team documents steps to identify barriers to placement as identified by the individual or their guardian and attempts to address the barriers. The State documents steps taken to ensure this decision is an informed one and provides regular education on community options open to the individual, utilizing methods and timetables described in **Section III. (E)(2).** | Same as the requirement. | The State has committed to an Informed Decision Making (IDM) process to document that individuals have made an informed choice to remain in an ACH and to identify any barriers that exist to their moving. LME/MCOs and the State also review barriers through local and state barriers committees.<br><br>The FY 2025 Special In-Reach review revealed that a number of individuals who do not have guardians had consistently indicated they were not going to move to a community setting. The same was true for a number of family guardians who did not consent to a move for their family member. The State, with agreement of the Reviewer and the Plaintiffs, agreed to add a step in the informed choice process to discontinue check-in visits after they had made an informed choice not to transition into the community. These individuals remain in TCL and can resume contacts upon request. This process takes effect in FY 2026. Public guardians present obstacles to individuals having a choice to move to the community. |
| **12. Section III. (E)(12)** The State will reassess individuals with SPMI who remain in adult care homes or State Psychiatric Hospitals for discharge on a quarterly basis, or more frequently upon request; the State will update discharge plans as needed based on new information and/or developments. | Same as requirement. | The State has made substantial progress reassessing individuals residing in ACH and FCHs, to assess individuals every 90 days or more frequently upon request. Assessments are not conducted as frequently though for individuals discharged from SPHs.<br><br>There were situations where transitions need to go beyond 90 days. Reasons included, but were not limited to, individuals waiting until a new housing unit they selected was available in the desired location as well as individuals having challenges retrieving documentation, needing rehabilitation or treatment for medical issues, or deciding to go through substance use treatment before moving. There is no evidence discharge plans are written or updated. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **13. Section III. (E)(14)** ACH Residents Bill of Rights: The State and/or LME shall monitor ACHs for compliance with the ACH Residents' Bill of Rights requirements contained in Chapter 131D of NC Statutes and 42 C.F.R. § 438.100 (Enrollee Rights). | The State and/or the LME/MCO monitors ACH compliance with the ACH Bill of Rights and the C.F.R. § 438.100 requirements protecting the individual enrollee's rights. This includes the individual's right to privacy, to communicate privately without restrictions with individuals of their choice, to make complaints and suggestions without the fear of coercion and/or retaliation, to have flexibility to exercise choice, and to receive information on treatment options and alternatives. | The State met its obligation with the requirement for reporting violations in FY 2024. The LME/MCOs were obstructed from meeting individuals in ACHs and LME/MCO staff again reported delays in obtaining FL2 forms from ACHs to verify ACH residents' TCL eligibility and delays in getting other documents. This past year a public guardian attempted to obstruct a reviewer attempting to meet with an individual living in a MOUH and guardians also attempted to obstruct LME and reviewer's staff from meeting with individuals living in ACHs. These issues are not covered by the ACH Resident Bill of Rights but lack of access to records and meetings with TCL recipients impede In-reach staff from carrying out their responsibilities. |

***(A) Background***

Discharge and Transition Process requirements apply to individuals exiting ACHs, discharged from SPHs, and potentially diverted from ACHs. The Discharge and Transition Process requirements overlap with other similar requirements, particularly pertaining to service provision and treatment team responsibilities, access to housing, and time frame requirements for discharge planning, discharge plans, and diversion. These overlapping issues extend beyond the requirements in this section of the Agreement.

Discharge and Transition Process requirements include 13 major categories and 16 sub-categories. This review covered 12 of the 13 categories; the thirteenth category relates to steps the State was to take at the outset of the Settlement Agreement and that no longer require review. These requirements provide clear direction for the State to develop and implement effective measures to come into compliance with these provisions. Ten requirements focus on SPH discharges and ACH placements and transitions. For example, "in-reach" interventions apply to individuals living in both types of institutions. During FY 2025 reviewers assessed discharge and/or transition processes for 38 individuals diverted from ACHs and individuals living in or discharged from ACHs and SPHs if discharged or diverted in the past two years.

The State continues to take steps to break down discharge and transition barriers. The Senior Advisor and her staff assist on eligibility questions, correct misinformation, and engage multiple DHHS divisions and the NC HFA to assist with making resources available or intervening to ensure individuals can move to the most integrated settings. This has been helpful with Medicaid eligibility, county-to-county transfers which could otherwise result in disruptions to services and helping individuals qualify for Personal Care Assistance (PCA) and other in-home support.

Beginning in the third quarter of FY 2022, the State set requirements for LME/LMOs to participate in an Incentive Plan. The State has made changes in the targets each year. In FY 2025 the measures were tied to Housing and Discharge and Transition requirements and included: 1) net transitions to supported housing; 2) ACH transitions; 3) Targeted/Key utilization; and 4) quarterly separation rates.

Over the past three years, these funds have helped support or create new initiatives including peer run programs such as Peer Respite, TCL support group expansion, a Peer Ambassador Program, Meet Me at the HUB funding, Legal Aid support, enhanced bridge expansion, cleaning support, skill building, start-up funding for new IPS providers, transportation funds, SIL expansion, clean-up/ bed bug removal, OTA/COTA toolkits, DLA20 Functional Assessment Trainer Certification, home safety inspections, Qr8 Health Cognition Scale Pilot, wheelchair accessible vans, an initiative called Home Sweet Home, IPS-SE supports, Partnerships for Work and Wellness (PWW), and the Healthier at Home project.

In FY 2025, Vaya met nine targets, Partners met eight Tier 1 requirements and one Tier 2 requirement, Alliance met eight Tier 1 requirements and one Tier 2 requirement, and Trillium met one Tier 2 requirement. Alliance exceeded its Targeted/Key expectations utilizing targeted and key units for 140 individuals and exceeded their required lower separation rate target. Vaya also exceeded their separation rate, exceeded their Targeted/Key expectations filling 52 housing slots and had 49 net ACH transitions exceeding their target. Partners was just 3 shy of meeting their net transition rate with 117 transitions. Trillium struggled after taking on new counties and responsibilities but netted 87 transitions.

***(B) Findings***

The Discharge and Transition Process requirements overlap with other similar requirements, particularly pertaining to treatment team responsibilities, discharge planning process, and time frame requirements for discharge planning and for discharge plans. These overlapping issues extend beyond this section. For example, Section III. (B)(1) requires the State to develop housing access measures but performance meeting those measures often falls under requirements in the Discharge and Transition Process category.

Likewise, person-centered planning falls in Section III. (C) and in the Discharge and Planning Processes, Pre-Admission Screening and Diversion overlaps as well. Thus, it is not always a straightforward process to separate meeting Discharge and Transition Process requirements and Community-Based Mental Health Services requirements during the review process but, more importantly, in practice.

1. The numbers of individuals reported in this section as receiving assistance may be different than the overall numbers of individuals seen and reviewed, as referenced in the Individual Review section of this report. The team conducted reviews at a point where an individual may have been in the process of transitioning or discharge so reviewers could score individuals based on where they were in the process, creating slightly different numerators and denominators depending on the review and the individual's experience.

2. **Figure 23** below illustrates the number of individuals moving from ACHs in **Section III. (B)(2)(B)(a.-c.)** and occupying SH units across the state is increasing at a slower pace than necessary for the State to meet its obligation for 2,000 individuals moving from ACHs occupying SH units. This pace slowed down shortly after the pace of diversions increased in FY 2019 and before the COVID pandemic. The LME/MCOs have made a concerted effort to re-house individuals separated from SH. This has value as individuals exiting ACHs may have had challenges living in SH the first time they moved or may not have gotten the help they needed to not feel lonely, isolated, or afraid in their unit. Most individuals served by the Sandhills and Eastpointe LME/MCOs are now included in Trillium numbers. The shift of these areas presented challenges to Trillium with staff from the Sandhill and Eastpointe areas leaving or getting new assignments, staff learning to work in new areas, and Trillium staff taking over.

**Figure 23: Number of Individuals Living in Supported Housing after exiting ACH/FCHs**

| | Alliance | Eastpointe | Partners | Sandhills | Trillium | Vaya | Total |
|---|---|---|---|---|---|---|---|
| **FY 2022** | 171 | 74 | 246 | 100 | 134 | 205 | 930 |
| **FY 2023** | 178 | 80 | 259 | 95 | 135 | 210 | 942 |
| **FY 2024** | 294 | --- | 272 | --- | 295 | 239 | 1000 |
| **FY 2005** | 201(+7) | --- | 290(+18) | --- | 283(-12) | 248(+9) | 1023 |

3. One-hundred and eighteen (118) individuals living in SH died in 2025, mostly related to natural causes and 764 individuals have died after moving into supported housing during the Settlement period. It is likely that a significant number of individuals had declining health when they moved from ACHs which is also supported by reports of individuals on in-reach status dying before they moved. Thirty-three (33) individuals returned to ACHs in FY 2025, down from 34 in FY 2024 and 123 in FY 2023.

4. The State will need to increase individuals occupying SH units (net gain) by an average

of 378 per month to fully meet the Settlement Agreement requirement of 2,000 individuals moving from ACHs occupying supported housing units by July 1, 2027.

5. It is likely that the number of individuals living in SH after exiting ACHs/FCHs will remain nearly the same as the last two years, based on the information obtained following the Special In-reach review in FY 2025 without a more tailored approach to assisting individuals to move to Supported housing from ACHs and more cooperation from Public Guardians.

6. The total number of individuals living in ACHs who had been made eligible for TCL In FY 2025 was reduced by 33%, going from 2,785 on July 10, 2024, to 2,160 on July 14, 2025. On July 6, 2023, the number was 3,020. Part of this drop was related to the LME/MCOs working diligently on data clean-up to correct their numbers for individuals who had either moved to other community settings, developed dementia, moved to skilled nursing facilities, or were deemed ineligible after additional assessments and recognition that they did not have a qualifying diagnosis. The highest number of individuals no longer eligible or living in adult care homes on in-reach status in the FY 2025 in-reach review sample were individuals who moved to the community to live in other settings.

7. As depicted in **Figure 24** below, the overall number of individuals moving to supported housing or bridge housing from SPHs increased to 80 in the past year while the overall SPH discharges decreased by 3%. There was a decrease in the number of individuals moving to shelters, boarding houses, and hotels. The number of individuals discharged to ACH and Family Care Homes (FCHs) decreased by 32%. TCL recipients are an increasingly higher percentage of all SPH discharges than in past years; however, SPH discharges are down overall.

**Figure 24: SPH FY 2020-FY 2025 Discharges**

| ***Discharge Location*** | **FY 2020** | **FY 2021** | **FY 2022** | **FY 2023** | **FY 2024** | **FY 2025** |
|---|---|---|---|---|---|---|
| ***Supported and Bridge Housing[31]*** | 113 | 117 | 64 | 56 | 69 | 80 |
| ***Adult and Family Care Homes*** | 93 | 55 | 83 | 71 | 56 | 34 |
| ***Boarding Homes, Shelters, Hotels[32]*** | 80 | 32 | 38 | 34 | 37 | 29 |
| ***Group Homes*** | 145 | 81 | 71 | 54 | 61 | 67 |
| ***All/TCL SPH Discharges*** | 1452 | 1300 | 1022 | 905 | 718 | 548 |

8. Staff report that 48 individuals were discharged from SPHs to bridge housing in FY 2025, an increase of 13 from FY 2024 (35) or 28%. The number of individuals discharged directly to supported housing increased by 16 or 50%. Staff reported that a lack of availability for

[31] Bridge housing typically results in individuals moving into permanent housing.
[32] This number includes one individual discharged to a camper in December 2018.

extended bridge and bridge housing resulted in some individuals opting to move to shelters or boarding houses. This appears to be related in part to the demand for bridge and extended bridge housing for individuals being re-housed, being referred through diversion or from ACHs, in addition to individuals referred upon SPH discharge. Nonetheless, this is a notable increase and demonstrates the SPH, LME/MCO and DSHOF and TCL DHHS staff commitment to increasing their efforts to enable individuals to move to supported housing, either through bridge housing first or directly into supported housing.

9. The State is making progress meeting the in-reach requirement in **Section III (E)(2)** and made progress in FY 2024, in terms of the number of individuals assessed in 90 days. State data reveals that the number of face-to-face encounters improved significantly in FY 2025 to 84% from 65.2% in the fourth quarter of FY 2024, up from 56.8% in the fourth quarter of FY 2023 and 27.5% in the fourth quarter of FY 2022.

10. The quality of those encounters still varies as evidenced in the recent reviews. This may be the result of new staff just beginning to understand their role. It also occurs when the encounters are clearly just check-ins or when staff do not identify and/or report barriers. For individuals with long ACH stays, it is incumbent upon staff to engage and gain the trust and interest of individuals and not to just take "no, I'm not moving." This applies to encounters with guardians as well. A few staff reported guardians not returning their calls or refusing to allow in-reach staff to talk about the benefits of TCL.

    In-reach staff sometimes refer to a requirement that individuals on In-reach status get a contact every 90 days. However, the Settlement Agreement states: "the State will reassess individuals who remain in ACHs or SPHs for discharge to an integrated community setting on a quarterly basis, or more frequently upon request and updating plans as needed based on new information and/or developments." The Settlement Agreement also references that "the State will provide for frequent education efforts." It is the Reviewer's professional opinion that visits to individuals every ninety days will not result in gaining the trust of individuals so that they can live successfully in the community with supports. Nor would individuals likely feel capable of returning to the community unless seen frequently, with visits to the community, and opportunities to regain skills, explore new interests, get help with their accessibility needs, and have access to adequate health and personal care.

    For most individuals, 90 days is a long time between visits, especially if individuals want to consider a broad range of choices and decisions but do not have the opportunity to ask more questions and fully grasp opportunities. When asked during reviews, individuals have not always been able to remember who visited them or when.

Individuals do not always receive accurate information about community benefits, services, and supports, which makes the decision to move more difficult.

Staff and one reviewer reported continuing challenges with access to ACHs and FCHs. Some guardians reportedly are continuing to tell staff and reviewers not to discuss any potential for community living for individuals living in ACHs. A new issue emerged this year with public guardian turnover in at least two counties in the eastern part of the state. One individual had six public and agency guardians in seven years and another five guardians in six years. This resulted in guardians indicating to LME/MCO staff and one reviewer they could not discuss anything about the individual as they were just assigned to the individual.

11. The State has added an incentive for LME/MCOs who meet their target for transitioning individuals from ACHs to the community and supported housing. Each of the LME/MCOs had different target numbers based on their overall and ACH In-reach population. While the results show the LME/MCOs transitioned 203 individuals, the net gain of individuals exiting ACHs to live in supported housing was only 43. Below is a chart depicting the incentive expectation and results by LME/MCO. See the results in **Figure 25** below.

**Figure 25: Results of Incentive Funding Expectations for Net Transitions of Individuals from ACHs in FY 2025**

| **LME/MCO** | Alliance | Partners | Trillium | Vaya | Total |
|---|---|---|---|---|---|
| Expectation[33] | 68 | 48 | 92 | 48 | 256 |
| Result | 10 | **31** | -8 | 32 | 49 (19%) |

12. As referenced in earlier reports, the State developed a new informed decision-making tool in September 2020 and took two additional steps to improve the process in late FY 2023. This demonstrates that the LME/MCOs and the State are giving careful consideration to individuals' choice about moving to the community. The four LME/MCOs submitted 25 reviews monthly during the last quarter of FY 2024. It appears that half that number are approved monthly. The ACH In-Review underway in the fall of 2024, referenced above, will likely result in the pace of submissions and review increasing substantially.

13. One hundred and eighteen (118) individuals living in housing died and 12 moved to skilled nursing in FY 2025. Two-hundred and forty-one (241) individuals who moved to supported housing through the course of this agreement separated from supported housing in FY 2025. Of those, 49 were death related. Since FY 2017, there have been 266 total deaths. It is estimated based on current data and data from FY 2017, 20% of the

[33] Annual expectation for number of individuals transitioned from ACHs and FCHs to supported housing.

total separations of individuals who moved from ACHs during this period were death related.

14. **Section III. (E)(3)** requires the State to provide each individual with SMI in, or later admitted to, an ACH or SPH (or diverted from an ACH), with effective discharge planning and a written discharge plan. The Special In-Reach Review found that 47 ACH residents were interested in transitioning, but only 8 had active plans to do so. Out of 47 individuals, 9 public guardians opposed transitioning, 1 ACT team interfered with the move, 1 FCH wanted guardianship, another FCH insisted on PSR attendance over moving, and 1 person had waited 4 years to move. This duration was due in part to changes in staff and guardians. Subsequent discussions conducted three months later revealed that discharge planning was either in progress or completed for six individuals, while plans for several others had been revised.

15. There are interconnected requirements in **Section III. (E)(4-8).** The State is still not fully meeting **III. (E)(4)** transition team requirements and **III. (E)(5)** requirements for the transition coordinator taking responsibility as the lead contact or administering the required process as defined in the SA for SPH and ACH discharges and transition to supported housing. More detail on the transition coordinator responsibilities is listed in #23 below.

16. The State is continuing to make progress with transition teams becoming more responsible for the discharge planning process requirements in **III. (E)(7-8).** The most frequent problems have not changed from FY 2024 to FY 2025 and included, absence of discharge plans, gaps in timeframes of contacts delaying transitions, ensuring issues that might affect sustained tenancy are not addressed fully, and challenges with interference from ACHs and guardians. The result is that individuals are not always participating as fully as possible in his or her treatment and discharge planning **III. (E)(5).**

17. The State allocated funds in 2022 to LME/MCOs to improve "assertive engagement." This funding became part of the LME/MCOs' budgets going forward following this initial allocation. Assertive engagement refers to steps providers will take to begin engaging with individuals and providing supports while the individual gets enrolled in services. This means ACT, CST, Peer Support, or TMS teams can bill for time they spend seeking to engage individuals to assist with discharge planning and to assist individuals who are ambivalent about engaging in services and/or for making discharge arrangements. This mechanism was not widely used when first made available. However, providers billed $228,000 of the $250,000 available for these services in FY 2025.

    Assertive engagement is effective, essential, and critical for the State to be successful in meeting Settlement Agreement requirements and, more importantly, to assist

individuals in their recovery process. However, it is best implemented when staff who will be providing ongoing services post discharge or diversion provide the service pre-discharge, not just assigning one agency to do assertive engagement.

Peer Support Specialists are particularly effective in engaging with individuals who are contemplating change. The research and data on effectiveness of certified Peer Bridgers is positive and also cost effective. Peer support is key when individuals have lived in ACHs for a lengthy period of time, are afraid of living in the community, and have questions about a change. Peers are uniquely skilled and suited in building trust and speaking from their own experience at taking new steps in their recovery process. The State increased the availability of Peer Bridgers and Community Inclusion specialists in FY 2024 and FY 2025.

18. The State is meeting the **III.E(9)** requirement following the creation of a state-level Barriers Committee in FY 2019. The team tracks progress on eliminating barriers until they resolve the issues, often after prompting policy makers to make changes in processes and policies and to ensure local changes as well. The committee maintains a review log and updates a barriers log on a continuous basis. The team now includes one individual with lived experience.

19. The State continues to make progress identifying and resolving barriers. The State is providing consultation to and mentoring local teams. However, staff report they often try to resolve barriers on their own rather than constantly having to reply to inquiries. A review of State barriers minutes reflects ongoing pending issues.

20. However, based on both the Special In-Reach review and the spring community review in FY 2025, not all barriers are reported, or, in some instances, staff do not report or recognize barriers. There are instances where longstanding issues have either not been resolved or included in the work of the State Barriers Committee such as the continuing lack of accessible units in some communities. The same occurs with challenges with public guardians denying the opportunity for In-reach staff or Reviewer's team members to visit individuals in ACHs. Guardians sometimes deny individuals the ability to choose community living without consideration of what resources are available. As these issues persist over time, it is likely they will not be reported as barriers.

21. The State established requirements for local barriers membership, both standing and ad-hoc, including Regional Ombudsmen (monitoring ACHs) as standing members along with cross-functional LME/MCO staff. Ad-hoc members include providers, guardians, DSS, housing authorities, Centers for Independent Living (CILs), DHHS staff including VR, NAMI, and others. Other states include peers as part of this process.

The State is not meeting the **III (E)(11)** and **(12)** requirements. The reasons vary widely but fall into two broad categories. The first is that In-reach staff and Transition Coordinators

are still not meeting with individuals frequently enough to effectively address concerns. The second is that Transition Coordinators do not always have the knowledge of how to deal with a barrier or get the type and level of assistance necessary to address the barrier(s). While not a barrier per se, Staff turnover also contributes to barriers not being adequately addressed as does Transition Coordinator caseload demands.

22. There is a close connection between **Section III. (E)(11)** and **(E)(12)** requirements. They also closely match the **III (F)(3)** and (C)**(3),** requirements. The **(F)(3)** requirement is for the individual's transition team to identify barriers to placement in a more integrated setting, to describe steps to address the barriers, and attempt to address those barriers for individuals who choose to remain in an ACH or another segregated setting. The State must document those barriers and regularly educate the individual about the options open to the individual as described in **(E)(2).** The State has committed to an Informed Decision Making (IDM) process. The process requires LME/MCO In-reach staff to meet with individuals and their guardians when applicable to indicate when, after being informed of community options, not to move from an ACH. This helps confirm who could move, what barriers to placement have been identified, and how they have been addressed. This is also a requirement in the Pre-Screening and Diversion Process (F)(3). LME/MCOs had submitted 897 IDM tools by the end of June 2025 and the State had approved 394 by July 9, 2025.

23. **III (E)(12)** is the requirement for individuals remaining in an ACH or an SPH to get a re-assessment on a quarterly basis, or more frequently, upon request. The State has increased the number of individuals meeting this re-assessment requirement from 38.9% in the third quarter of FY 2023 to 87.4% of individuals living in ACHs and 53.5% of individuals discharged from SPHs and still on In-reach status in the third quarter of FY 2025. The State is giving priority to and closely monitoring the frequency of ACH visits. This includes follow up calls with LME/MCO staff on a regular basis.

24. **(E)(13.c):** The State is not meeting the requirement to complete the discharge process for transition to SH provided that a housing slot is available within 90 days of assignment to a transition team. Transition Coordinators are required to continue to work with individuals to transition to SH until a housing slot is available. This is an important requirement, as not meeting this requirement for individuals for individuals residing in ACHs, individuals being discharged from SPHs, and individuals diverted from ACHs) seriously impedes the State's ability to meet access to housing requirements in Section III (B)(1) and (B)(5).

25. At least 5 issues make it more difficult for the State to meet the 90 day requirement. First, the longer it takes for an individual to get a transition coordinator assigned at each of the LMEs and it varies based on current caseloads in any geographic area. For example, if in one month 15 people say they want to move in a given geographic area and the transition

coordinators are already helping another 15, it may take longer. This is the case not just for assignment but for taking all the required steps to assist someone to move and if there were only five new individuals wanting to move the process may go more smoothly. It is not always easy to assign another coordinator working in a different area. Second, more time may be needed for individuals not yet discharged from a treatment center or hospital for substance use, medical, or psychiatric treatment. Third, many individuals have chronic medical conditions and physical disabilities, may need time in bridge housing, or may not have access to vital documents required to get a lease or find an accessible unit; getting all the needed equipment or vital documents takes time.

Fourth, individuals may need to repair their credit or go through a reasonable accommodation request which again takes time. Fifth, individuals may be waiting for an apartment unit to become available in a new LIHTC property. This has always been an issue but with more availability now to new LITC units, individuals may need to wait. With the exception of waiting on staff to assist, there are advantages to longer transition periods in some instances.

The State changed its method for providing data on length of time (in days) to fill a unit after a housing slot to the percentage of individuals moving into SH within 90 days, broken down into quarters. This makes it more difficult to assess the State's progress meeting this requirement and the median length of time individuals moved in each of the catchment areas. In FY 2025, circumstances changed based on the availability of housing, with Alliance having more units available in the first quarter (73.5%) and second quarter (72.9%), down to 50% in the fourth quarter. **(Figure 26)** Vaya was dealing with housing challenges post hurricane Helene and Trillium took over greater responsibility following the aforementioned mergers. On the other hand, Partners stayed steady at 58% in the first quarter to 60% in the fourth quarter with slight variations above 60% in between.

**Figure 26: 4th quarter Percentage of units filled in 90 days after Transition Coordinator Assignment**

| Alliance | Partners | Trillium | Vaya |
|---|---|---|---|
| 50% | 60% | 13.50% | 37.50 |

26. The State met the requirement for identifying and reporting potential violations of the ACH Residents Bill of Rights requirement with reporting potential violations **(Section III E)(14)** in FY 2024**.** This requirement only pertains to staff reporting alleged violations.

    Investigative findings by the Division of Health Service Regulation (DHSR) often come back unsubstantiated, which LME/MCO staff report as concerning given their personal knowledge of the alleged violation(s). It is imperative that the State continue to monitor reports of potential violations of this requirement given the history of ACH Residents Bill of Rights violations.

The LME/MCOs and reviewers were again obstructed from meeting some individuals in ACHs. LME/MCO staff again reported delays in obtaining FL2 forms from ACHs to verify ACH residents' TCL eligibility and delays in getting other documents. In FY 2025, a public guardian attempted to obstruct a reviewer attempting to meet with an individual living in a MOUH and guardians also attempted to obstruct LME and reviewer's staff from meeting with individuals living in ACHs. These issues are not covered by the ACH Resident Bill of Rights but lack of access to records and meetings with TCL recipients impede In-reach staff from carrying out their responsibilities.

27. Individuals voiced their frustration with not being able to move and below are represented samples of their concerns. One woman, legally blind, state her guardian would never let her move and her agency guardian refuse to allow the In-reach worker to discuss housing as an option. She said she wanted an accessible unit and "if they don't trust me with a stove, I'll use a microwave." Her ACH is providing Peer Support, but she does not get any other help. Her reviewer recommended she get an OT assessment. One woman indicated she did not feel supported enough to move.

    Another man is getting ACT services while living in an ACH for years and has not been receiving frequent In-reach visits. Our team has visited another man twice in the past two years. He was voicing his interest in moving during the first. His move was being delayed because his surgeon wanted him to lose weight. He needs some knee repairs but not a replacement. He has had three providers over the past three years but was not assigned to Transition Coordinator at the time of the move. Having a Transition Coordinator could help with arrangements as he prepares for the move. The reviewer requested a pharmacy review and as a result his meds were decreased by half. The reviewer raised other issues as well.

***(C) Recommendations***

1. The State should continue their approach to meet the Discharge and Transition Processes requirements. The State's *Olmstead* staff managing the state's actions and policies includes rigorous quality improvement data management, smart goals, attention to timelines and trends. The team provides peer-led opportunities and is planning additional activities in FY 2025. The team ensures training is effective so barriers are reported and resolved, including ensuring individuals can get their needed health care to make the transition safe and successful. However the team's reports reveal this level of attention should continue.
2. Ensure In-Reach includes facilitated visits to supported housing for individuals living in ACH/FCHs that also includes opportunities for individuals to meet with other individuals with disabilities who are living, working and receiving services in integrated settings, with their families and with community providers.
3. The LME/MCOs are very supportive of the accelerated review to ensure individuals

living in ACHs have informed choice about moving to the community or remaining in an ACH. Once this process commences, the LMEs/MCOs and the State should take immediate action to remove transition barriers for the individuals who are exercising choice and moving to the community. To be successful, transition and community support systems will need to be strengthened with more timely access to housing.

4. Ensure individuals with public or agency guardians have choice to move to the community as appropriate and with LME/MCOs and providers arranging for and putting adequate services in place. This includes the State ensuring additional supports are in place if not already available.
5. Ensure Transition Coordinators are assigned at the time a housing slot is issued, that steps are taken concurrently not sequentially to assist an individual with their choices, needed assessments, collecting necessary documentation and making community visits with In-reach or other staff.
6. Ensure the transition team meets and communicates regularly and effectively. Ensure the TCM is actively engaged in the transition process and carries out their responsibilities in a timely fashion. Where possible, include an individual's identified natural supports, community inclusion specialist and peer support staff in transition planning.
7. Ensure Discharge Plans are current, express the individual's choices and are updated regularly as the individual's issues with discharge may change frequently.
8. Assign a new provider, or if an individual already has a provider, include them in every aspect of transition planning. An individual's discharge plan can serve as a precursor to an individual's PCP. If an individual does not have an assigned provider, utilize assertive engagement for the provider payment while the individual is made eligible.

**V. PRE-ADMISSION SCREENING AND DIVERSION**

| Major Categories | Standards | Progress Meeting Requirements |
| --- | --- | --- |
| **1. Section III. (F)(1)** The State will refine and implement tools and training to ensure that when any individual is considered for admission to an Adult Care Home (ACH) the State shall arrange for a determination, by an independent screener, of whether the individual has SMI or not. | 1. The State has developed tools and training directly and through the LME/MCOs to evaluate individuals for admission to an ACH for Serious Mental Illness (SMI).<br>2. The State makes this determination when considering the individual for admission, not after they move into an ACH. | The State met this requirement previously and continues to meet this requirement. |
| **2. Section III. (F)(2)** The State shall screen and connect any individual with SMI to the appropriate LME/MCO for a prompt determination of eligibility for mental health services. | The State screens and connects eligible individuals to an LME/MCO. The LME/MCO responds promptly to requests for determination of eligibility for mental health services required prior to admission of an individual to an ACH. | The State met this requirement previously and continues to meet this requirement.<br>The number of referrals "in process" was 550 at the end of FY 2025, which was 183 more individuals than those "in process" at the end of FY 2024. Since this metric is a point-in-time count, that number may fluctuate widely over time based on the pace of referrals. The number of individuals diverted increased by 9% (17) in FY 2025 and only 24 individuals were not diverted in FY 2025. |
| **3. Section III. (F)(2)** Once determined eligible for mental health services the State and/or the LME/MCO will work with the individual to develop and implement a community integration plan. The individual shall get the opportunity to participate in this process. | 1. Once eligibility for mental health services is determined, individuals considered for an ACH admission get assistance to develop and implement a community integration plan.<br><br>2. The individual fully participates in the process. | The State continues to meet this sub-requirement. There were 23 individuals reviewed from the diversion category during FY 2025. Twenty-two were living in the community in supported housing or another location. One individual had returned to a family care home at the time of the review.<br><br>The DHHS post-referral case reviews in June 2025 revealed that 60 out of 64 individuals received one diversion contact. Of that number, 49 individuals indicated interest in supported housing and 37 had already had a transition coordinator assigned. State staff worked closely with LME RSVP/Diversion staff to track the outcomes for these individuals. |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **4. Section III. (F)(2)** The development and implementation of the community integration plan shall be consistent with the discharge planning provisions in Section III (E) of this Agreement. | The development and implementation of the community integration plan is consistent with provisions in **Section III (E)** of this Agreement. | The State is meeting requirements in the sub-section of **Section III. (F)(2).** The planning process is consistent with the discharge planning provisions in **Section III. (E).**<br><br>See the review of **Section III. (E)** for a review of the State's performance meeting the discharge and transition process requirements. |
| **5. Section III (F)(3)** The State will set forth and implement individualized strategies to address concerns and objections to placement in an integrated setting, will monitor individuals choosing to reside in an adult care home, and continue to provide in-reach and transition planning. | 1. The State has developed and implemented strategies for each individual who objects to placement in an integrated setting to address concerns and objections to such a placement.<br><br>2. The State is monitoring each individual choosing to reside in an ACH and continues to provide In-reach and transition planning. | The State is meeting requirements for **Section III. (F)(3).** The State monitors individuals choosing to reside in an ACH from both Priority Groups d. and e. identified in Section II.(B). The State conducts periodic reviews of LME/MCO In-reach for individuals in Priority Group e. (Cat 5) following RSVP referrals.<br><br>The State began providing the details and circumstances for each person's SPH discharge in FY 2024 and has begun following up with each individual and their guardian (as applicable) to address In-reach concerns and objections to placement in an integrated setting and develop individualized strategies to address those concerns when possible. |

***(A) Background***

The State has continued to make substantial progress improving and administering the Pre-Admission Screening and Diversion, **Section III. (F)(1-3)** process**,** which began with a new process initiated over the past four and a half years. In November 2018, the State initiated a new online Pre-Admission Screening process, titled the Referral Screening Verification Process (RSVP), connecting individuals at risk of ACH admission to the appropriate LME/MCO for a TCL eligibility determination. This is an online system wherein a referring entity (health or behavioral health state or private hospital discharge planner, departments of social services, guardians, healthcare and mental health service provider, homeless services provider or other community agencies, family member, or individuals themselves) can make a request that goes straight to an LME/MCO. The LME/MCO determines eligibility, often having to request additional information, including a clinical assessment. If additional information is necessary for eligibility determination, staff flag the request as pending. The LME/MCO tracks the time an application is pending and in process.

The LME/MCOs complete the RSVP process and refer the individual to the appropriate staff person for in-reach and transition planning. After staff apprise the individual of their options, if the individual chooses to move to an ACH, the State must show this was an informed decision, as required by **Section III. (F)(3).** This requirement also obliges the State to provide in-reach and implement individualized strategies to address concerns and objections to living in an integrated setting. If the individual changes their mind and wants to move back to the community, the LME/MCO arranges for that to happen.

Since initiating RSVP, the State and the LME/MCOs have better defined the process, taking action to correct problems and providing guidance to organizations that routinely refer individuals for Pre-Admission Screening. LME/MCOs took much needed action collaborating with providers, stakeholders, and referring organizations. As a result, the process is improved, and the State is continuing to analyze data and troubleshoot problems as they occur rather than months after the fact.

The FY 2021 Annual Report first discussed the TCL eligibility determination problem of individuals referred through RSVP despite not appearing to be at risk of ACH placement. This is often the result of frustration on the part of the referring entity that safe, affordable housing is not available to individuals who have a disabling condition, but who are not at risk of placement in an ACH. There were 223 individuals referred in FY 2025 not found eligible. This includes some duplications but also shows the demand for housing.

The most significant change the State has made since entering into the Settlement Agreement is the shift from the number of individuals "not diverted" to a greater number of individuals "diverted" and the significant reduction in requests for ACH placements (reviewed in the findings below).

***(B) Findings***

1. As shown in Figure 27 below, the State reported there were 47,370[34] individual referrals to LME/MCOs for an adult care home placement eligibility determination between November 1, 2018, and June 30, 2025. According to DHHS, after November 1, 2018, there were 6,407 individuals found eligible and added to the Transitions to Community Living Database (TCLD)[35].

   To demonstrate the stark contrast in performance switching to RSVP, there were 6,087 individuals not diverted between November 2013 and November 2018, only 1656 individuals not diverted between November 2018 and June 2025, 656 between FY 2020 and FY 2021, and only 148 individuals not diverted over the last three years. This includes individuals not diverted from ACH placement who were living in the community or other

[34] Some referrals may be duplicates. SPH referrals not included as Category 4 referrals.
[35] This is the database that includes names and key information regarding the target population.

facility. These numbers do not include those not diverted upon discharge from an SPH. Those individuals fall into Category 4. Figure 27 also displays the number of eligibility determinations, those in process of determination, and disposition. The high number of individuals found ineligible reflects the demand for safe, affordable housing for individuals with low incomes and mental health challenges or other issues, but it also includes duplicates and individuals already in the TCLD database.

**Figure 27: RSVP Referrals and Progress in Processing (November 2018-June 30, 2025)[36]**

| | 11/2018-6/30/25 RSVP Referrals | 11/1/18-7/1/25 Individuals Determined TCL Eligible | FY 2025 Total Diversion Attempts | In Process 6/30/22 | In Process 6/30/23 | In Process 6/30/24 | In Process 6/30/25 |
|---|---|---|---|---|---|---|---|
| Alliance | 10,107 | 1930 | 269 | 212 | 42 | 127 | 317 |
| Cardinal | 4042 | --- | --- | --- | --- | --- | --- |
| Eastpointe | 2100 | --- | --- | 9 | 18 | --- | --- |
| Partners | 8718 | 979 | 124 | 65 | 69 | 74 | 62 |
| Sandhills | 2971 | --- | --- | 30 | 38 | --- | --- |
| Trillium | 10,986 | 1721 | 114 | 73 | 37 | 94 | 81 |
| Vaya[37] | 9430 | 1777 | 115 | 94 | 70 | 81 | 90 |
| **Total** | 47,370 | 6407 | 699 | 483 | 274 | 376 | 550 |

2. In Process determination numbers have declined since FY 2021[38], demonstrating the LME/MCOs' increased capacity to manage diversion as well as to provide education and consultation on requirements with referring organizations. It also reflects the State's actions to "clean-up" duplicates, count, and code. This number increased in FY 2024 by 28% but remained lower than FY 2021 and FY 2022. At the same time, referrals increased by 25%, indicating the LME/MCOs continue to manage referrals effectively.

   There were 23 individuals diverted and selected for a review in the FY 2025 random pull. Most were at immediate risk of ACH placement. It is likely that all of the individuals would have remained in unstable housing, remained homeless, or either remained or were at risk for life threatening medical conditions or uncontrolled substance use. This included seven individuals under the age of 40. Drug and alcohol use was both very high and very serious. Eleven (11) individuals had significant substance use issues. Twenty-one (21) individuals had experienced traumatic events, including physical and/or sexual abuse, loss of a child, or serious accidents often resulting in a traumatic brain injury. Nine individuals had been living on the street, in a hotel (not bridge), or in an unsafe location,

---

[36] Totals reflect the number of screenings not the number of individuals screened.
[37] Vaya's Care Coordination manages the pre-screening process.
[38] 420 individuals were still "in process" at the end of FY 2021

often living with persons using drugs and taking their money. Two individuals had been discharged from a private psychiatric inpatient facility to a shelter. One individual had been falsely accused of a crime.

**Figure 28: LME/MCO Diversions FY 2019-FY 2025**

| | Admissions[39] to ACHs in | Diversions FY 2019 | Not Diverted FY 2020 | Diverted FY 2020 | Not Diverted FY 2021 | Diverted FY 2021 | Not Diverted FY 2022 | Diverted FY 2022 | Not Diverted FY | Diverted FY 2023 | Not Diverted FY 2024 | Diverted FY 2024 | Not diverted FY 2025 | Diverted FY 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alliance | 50 | 36 | 50 | 5 | 21 | 10 | 8 | 34 | 14 | 4 | 10 | 22 | 8 | 36 |
| Cardinal | 198 | 27 | 196 | 17 | 51 | 45 | --- | --- | --- | --- | --- | --- | --- | --- |
| Eastpointe | 75 | 44 | 28 | 46 | 4 | 35 | 0 | 25 | 1 | 27 | --- | --- | --- | --- |
| Partners | 155 | 17 | 52 | 14 | 15 | 16 | 13 | 12 | 18 | 39 | 20 | 70 | 4 | 71 |
| Sandhills | 57 | 58 | 65 | 15 | 9 | 58 | 5 | 23 | 3 | 14 | --- | --- | --- | --- |
| Trillium | 118 | 88 | 92 | 48 | 11 | 7 | 7 | 30 | 9 | 20 | 13 | 13 | 4 | 45 |
| Vaya[40] | 199 | 84 | 128 | 57 | 12 | 40 | 18 | 42 | 23 | 36 | 13 | 13 | 8 | 23 |
| **Total** | **852** | **354** | **611** | **202** | **123** | **211** | **45** | **166** | **68** | **140** | **56** | **192** | **24** | **175** |

3. **Section III (F)(3)** includes two requirements. One, the State shows the decision an individual makes to move to an ACH is an informed one. Two, the State has set forth strategies to address concerns and objectives to placement in an integrated setting and will monitor individuals choosing to reside in an ACH and continue to provide in-reach and transition planning.

   As stated above, the State tested out a new Individualized Decision Making (IDM) process in the fall of FY 2020 and LME/MCOs began using it before the FY 2021 reviews began. Unfortunately, there was an indication early in the review process that there were challenges with the implementation of the policy and implementation of the IDM. The State suspended the implementation of the tool and followed this decision with additional technical assistance. The State issued further guidance and began re-using the tool in March 2023. The State and LME/MCOs are now using this process more methodically to help confirm fully the individual's decision to move to an ACH at the point they are making a diversion decision. LME/MCOs had only submitted 856 completed tools and the DHHS approved 403 through the July 15, 2025, report. However, this represents a 63% increase in submissions and 68% increase in approval rates from FY 2024.

[39] Sometimes referenced as "not diverted."
[40] Vaya's Care Coordination team manages the pre-screening process.

4. The DHHS *Olmstead* team closely monitors open diversion attempts to ensure LME staff make contact with individuals in a timely manner. The team also closely monitors the LME action steps to assist individuals who chose to move to an ACH but then indicated an interest in moving to the community to supported housing with services. A June 2025 review of 64 records revealed at least 60 individuals had one outreach contact and that 49 out of the 64 individuals had indicated an interest in moving to the community and were assigned a transition coordinator. This is consistent with information from the spring review.

***(C) Recommendations***

The following recommendations focus on the sustainability of the gains the State has made meeting the **Section III (F)(1-3) Pre-Screening and Diversion** requirements:

1. Continue to improve the timeliness of the diversion process.
2. Continue to focus on removing obstacles and barriers to individuals moving to community settings before or after moving to an ACH, if that is their choice.
3. Continue to make gains in making supported housing accessible and available, including bridge housing and enhanced bridge housing.
4. Maximize assertive engagement and the individual's immediate access to effective services and supports,
5. Ensure that the individual and guardian receive adequate education and information about these services and supports.
6. Continue progress made with RSVP, including conducting periodic quality reviews of Pre-Admission Screening approvals as well as providing education to RSVP staff making eligibility determinations and to referring organizations on the eligibility criteria.

The State has made remarkable progress in diverting individuals who chose community living with TCL resources rather than moving to an ACH. The State has not slowed down their efforts to maintain a high performing pre-screening and diversion process since meeting the Settlement obligations in FY 2024. This continues to be a positive sign that the State is shifting from an institutional based to a community based mental health service system for adults with serious mental illness. The State meets the Settlement Agreement obligations for **Section III.(F)(1-3) Pre-admission Screening and Diversion.**

**VI. QUALITY ASSURANCE AND PERFORMANCE IMPROVEMENT**

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **Section III. (G)(1)(3)(4)** The State will develop and implement a Quality Assurance and Performance Improvement (QA/PI) monitoring system to ensure community-based placements and services are made in accordance with this Agreement. As part of the quality assurance system, the State shall complete an annual PHIP and/or LME EQR process by which an External Quality Review (EQR) Organization will review policies and processes for the State's mental health service system. | This requirement specifies that the State develop and implement a QA/PI system. The system's goal is to ensure that all the State's services are of good quality and sufficient to help individuals to achieve increased independence, gain greater integration into the community, obtain and maintain stable housing, avoid harms, and decrease the incidence of hospital contacts and institutionalization. The requirement specifies the State collect, aggregate, and analyze data on seven items and seven sub-items in III (G)(3) (g) related to in-reach, person-centered discharge, and community placement, including identifying barriers to placement. This requirement includes the State reviewing this information on a semi-annual basis to develop and implement measures to overcome barriers. The External Quality Review (EQR) includes a review of internal TCL policies and practices. | The State met **Section III. (G)(1)(3) and (4)** in FY 2024. As stated in the FY 2024 Annual Report, while the State has identified measures, there are remaining and new challenges to address to meet the terms of the Settlement. Also as stated in the FY 2024 Annual Report, the State is advised to narrow its focus on the most critical Settlement Agreement areas that require improvements to meet the Settlement Agreement. The State would be well served to reach out to reliable sources of information and ideas from across the state to help the State meet unmet obligations in the Settlement Agreement. The Annual Report identifies key issues the State must address to meet the Settlement Agreement obligations. |
| **Section III. (G)(2)** A Transition Oversight Committee (TOC) will monitor monthly progress of implementing this Agreement. This includes the LME/MCOs reporting monthly progress on discharge related measures as listed in the SA | The Transition Oversight Committee chair is the DHHS designee (Deputy Secretary). Membership includes three divisions, the state hospital CEOs, the state hospital team lead, the Money Follows the Person Program, and LME/MCOs. The SA requires the committee to report on implementation progress. This includes the LME/MCOs for reporting monthly progress on discharge related measures. | The State is meeting **Section III. (G)(2).** The Transition Oversight Committee's charge is to review progress and challenges on critical issues and get direct feedback from the LME/MCOs on specific measures. The committee mostly focuses on discharge issues, which are important, but does not focus on monitoring the monthly progress on other Settlement Agreement requirements. |
| **Section III. (G)(5)** The State will implement three quality of life surveys to be completed by individuals with SMI. | The State implements three quality of life surveys at specific intervals: (1) prior to an individual transitioning out of a facility; (2) 11 months after transitioning; and (3) 24 months after transitioning. | The State is meeting **Section III. (G)(5).** The State has made a commitment to develop reliable methods of measuring quality of life (QOL). |

| Major Categories | Standards | Progress Meeting Requirements |
|---|---|---|
| **Section III. (G)(6)** The State shall complete an annual LME/MCO External Quality Review (EQR) process. | The State meets specific EQR requirements in 10 areas. An external EQR organization completes this review annually. | The State met **Section III. (G)(6)** in FY 2024. Given the extent of the changes in the State's EQR process, will review the new requirements again in FY 2026. |
| **Section III. (G)(7)** Each year the State will aggregate and analyze the data collected by the State, LME/MCOs, and the EQR organization on the outcomes of this Agreement. If data collected shows the Agreement's intended outcomes of increased integration, stable integrated housing, and decreased hospitalization and institutionalization are not occurring, the State will evaluate why the goals are not being met and assess whether action is needed to better meet those goals. | The State aggregates and analyzes data collected by the State, LME/MCOs, and the EQR organization on the outcomes of this Agreement. If this data shows that the intended outcomes of increased integration, stable integrated housing, and decreased institutionalization/ hospitalization are not occurring, the Agreement specifies that the State evaluate why they are not meeting their goals and if there is a need for additional action to better meet those goals. | The State previously met **Section III. (G)(7).** The State is providing usable information for most of the outcomes listed in this agreement. The State collects, aggregates, and analyzes data but not on all the outcomes listed in this section of the Agreement. The State aggregates and tracks data on the number of individuals accessing integrated supported housing by the housing priority categories in the Agreement and by measuring stability for individuals living in the community. This requirement will be reviewed again in FY 2026 to ensure the integrity of the data in the recently developed dashboard and other reports. |
| **Section III. (G)(8)** the State will publish, on the DHHS website, an annual report identifying the number of people served in each type of setting and service described in this Agreement. The State will detail the quality of services and supports provided by the State and community providers using data collected through quality assurance and performance improvement system, the contracting process, the EQRs, and outcome data. | The DHHS publishes an annual report of the number of individuals served by type of setting and services described in this Agreement. The annual report includes details on the quality of services and supports provided by the State, LME/MCOs, and providers collected through the QA/PI system, the contracting process, the EQRs, and the outcome data described above in the QA/PI requirements. | The State is meeting **Section III. (G)(8).** The State published its FY 2023 Annual Report on its website. The State has improved the content and presentation of this report over the past two years. Due to the timing of data submission, the report is submitted to the Reviewer for review after the Reviewer's Annual Report is submitted. |

***(A) Background***

QA/PI requirements reference quality assurance and performance improvement system tasks, action steps, and processes essential to ensure the development of community-based placements in accordance with this Agreement. This provision includes reporting on progress toward establishing goals for individuals to achieve greater independence, live a life more integrated in their community, obtain and maintain stable housing, avoid harm, and decrease institutional use. The Settlement Agreement requires the State measure and monitor the State's performance and individuals' outcomes on meeting these goals.

To be in full compliance with **Section III.G(1),** which is the overarching obligation to create a QA/PI system, the State must identify accountable performance improvement requirements and hold itself (DHHS Divisions, the SPHs, and the NC HFA) and the LMEs/MCOs accountable for all the specific requirements in the Settlement Agreement. The Agreement contemplates that QA/PI is a system, not just a disparate set of ad hoc charts and reports. It is a system with a coherent and integrated set of action steps, benchmarks for requiring corrective actions, and, most importantly, well-developed Plan Do Check Act (PDCA) data driven loop built in to reduce barriers and improve performance.

The DHHS has primary responsibility for developing this system with input and support from DHHS Divisions, the NC HFA, and LME/MCOs. Beginning in early 2019, the Reviewer requested the State submit a Quality Assurance Plan for review and continuously requested a time to review the plan. At the time, State staff reported challenges with reporting "output" data and that metrics used to measure performance were not sufficient nor accurate to make the required improvements. The State hired the Mathematica consulting organization to help them address this problem and provide consultation.

In FY 2024, the State and Mathematica took steps to finalize the State's QA/PI Plan. The team identified data sources, data marts, and member monthly analytics files to produce a data dashboard. The State established first step frames of TCL monitoring and improvement including: 1) contract monitoring, reporting, and creating quality (and outcome) measures; 2) monitoring ad hoc issues and barriers analysis; and 3) measuring TCL compliance through recipient outcomes and performance improvement.

A review of the FY 2025 third quarter dashboard revealed differences in the dashboard measures with other state reports as well as redundancies with other reports. Some reports revealed the State's Subject Matter Experts (SMEs) may not be fully aware of what requirements have been met already. Staff appear to not fully understand what information is needed to assess the State and LME/MCO performance and how to use the information to further that goal. Other issues persist, for example, one measure was of a sub-

requirement that had been met in monthly reports dating back to 2015. One of LME/MCOs was cited as not meeting that requirement even though the measure was no longer relevant.

The second step identified earlier was to identify SMEs across all six TCL domains, and to establish and convene a TCL Quality Assurance Committee (QAC) that will "own" the TCL QA/PI system.

A challenge documented in the FY 2023 report was that the State needed to remedy the problem of the QA/PI processes being the responsibility of six separate DHHS divisions, the HFA, LME/MCOs, and service providers. It appeared then that staff saw these interactions, transitions, and decisions as being separate and, at times, divisions did not address requirements within their purview, assuming it was another division's responsibility. The State continued to attempt to remedy this problem with their Implementation Plan. In retrospect, the Implementation Plan action steps were sometimes more burdensome than helpful, and the issues addressed in FY 2023 have not been resolved. Reporting has taken up more time than focusing on staff becoming aware of major challenges and the ability to make headway on yet to be resolved issues.

The State uses four targeted performance methods that are helpful to meet Settlement Agreement requirements. The first two were developed by the DHHS TCL team, the third as a recommendation of the State's TCL Team Director and the Housing Plan consultant following the introduction of the new CST service in 2019, and the fourth method is to review TMACT and IPS-SE Fidelity Reviews that are required in the Settlement.

The first is the State's TCL team quality, data collection, monitoring and performance improvement approaches for discharge, transition, pre-screening, and diversion. This approach began six years ago and has been refined and updated as needed. Second, in FY 2022, the State's TCL team, with assistance from DMH Quality Management, created a LME/MCO-specific TCL Incentive Plan (TIP). The State TCL team has continued to utilize this approach and LME/MCOs and recipients have benefitted from both the funds they have received and the straightforward focus on key discharge and housing requirements.

The TIP has two components aimed at assisting LME/MCOs in accomplishing performance measures/goals in accordance with defined outcomes to meet specific SA requirements: (1) one-time startup funds (when available) to meet initial requirements and (2) subsequent quarterly payments if the LME/MCO meets quarterly performance measures and goals.

The third is the approach the CST coaches are utilizing to not just provide training, coaching, and mentoring but to also make recommendations for improving CST overall (and by extension other services). The team began working closely with LME/MCOs to develop a monitoring instrument for LME/MCOs to use as part of their improvement strategies.

Fourth is closely related to the third approach. The UNC Institute for Best Practice conducts TMACT and IPS Fidelity reports that closely match Settlement requirements. The Reviewer and her team crosswalk these requirements and analyze them to help identify common providers' challenges and strengths. The NC Best Practices Institute staff also participate in the CST coaching work to the extent possible.

***(B) Findings***

1. The State met the **Section III. (G) Quality Assurance and Performance Improvement** requirements In FY 2024, the Reviewer found the State met the required quality assurance and performance monitoring system requirements as referenced in **(G)(1)** and concomitant requirements in **(G3), (G4), and (G7).** As with all requirements, QA/PI will always be an evolving process as new or recurring issues emerge. The success of QA/PI is always related to improved performance and meeting other requirements.
2. The State introduced new requirements for LMEs to report their quality assurance actions across a broad set of TCL requirements in FY 2024; these steps are important to the State meeting **(G)(1), (G)(4) and (G)(7).** The State met with the LME/MCO staff in February 2025 to discuss what actions the LMEs were taking across this broad set of issues. Following submission of those steps and additional discussions, the State issued new reporting requirements in July. Each LME/MCO was then required to report on the steps they were taking, including steps to meet the State's requirements quarterly. The LME/MCOs received feedback from the State on what was missing with their approach. The Reviewer was not made aware of these steps and requirements until April 2025.
3. The Reviewer also found State met the Transition Oversight Committee (TOC) requirements in **(G)(2)**, with one caveat. The TOC requirements are explicit about LME requirements primarily related to transition measures. However, the TOC requirement also references that the TOC is to monitor progress of the implementation of the Agreement in addition to the specific reference to discharge and transition planning. Meeting minutes from the last quarter of FY 2025 do not address monthly progress on requirements aside from transitions. It is important for attendees to be aware of the overall progress meeting Settlement Agreement requirements and where the key challenges lie now.
4. According to the FY 2022 TCL Annual Report, the State met the **(G)(5)** requirement for the Quality of Life (QOL) Surveys in FY 2022. The State and Mathematica collaborated on a survey to determine if there were better methods to capture the experiences of TCL recipients. The team issued its findings and recommendations in the first quarter of FY

2025. The Reviewer and her team are reviewing these findings and will provide feedback and report on outcomes in the FY 2026 Annual Report.

5. The Reviewer found the State met its EQR requirements **(G)(6)** earlier. However, the State has updated its approach to EQR and contracted with a new firm to conduct EQR reviews. These began in late FY 2025. The Reviewer will review the State meeting this obligation using different methods in FY 2026.
6. The CST coaching team recognized that in addition to examining individual requirements, it would be critical and potentially lead to significant improvements in outcomes if providers could improve their overall focus to delivering effective services. Their findings and approach provide useful information for the State's overall QA/PI approach for making similar improvements with tenancy support, services, and supported employment. The UNC Institute for Best Practices also presents reports quarterly that can be helpful in shaping state level QA/PI direction. This is especially important as the State has not met the Supported Housing, Community-Based Mental Health Services and Supported Employment requirements.
7. The Reviewer has reported on state level challenges that merit a focused state level review to ensure that State policy and action steps will yield desired results and help to improve the State's overall performance. The State successfully did this with changes made in Pre-screening and Diversion, making changes in personal care services and adding complex care teams, changes in CST requirements, and paying for IPS-SE services based on milestones instead of using a fee-for-service model. There are additional issues at the State level that need continued review, such as housing policies, service provision approaches, and strategies for increasing support for TCL members to gain access to IPS-SE. It is important, though, that making changes and TCL adding requirements needs to be fully vetted to ensure their focus on outstanding issues.
8. Further, LME/MCOs have a history of identifying critical performance issues, conducting Performance Improvement Projects, and changing their internal operations and contract expectations to improve performance. They report and address barriers, and deal with ongoing and emerging challenges including providing information on how they are helping people in TCL transition and live successfully in the community. Adding new steps and processes without fully analyzing these challenges and what steps the LME/MCOs have taken to overcome these challenges may inadvertently undercut the LME/MCOs' strategies to improve services and supports. Reviewing these provides context for how LME/MCOs can make improvements in their performance in the future and what steps the State must also take. As stated previously, the TCL team focused in Discharge, Transition, and Pre-Screening and Diversion does this on an ongoing basis.

9. The State has been collecting and reporting information on key Settlement Agreement requirements since 2013 on a monthly basis. This Reviewer has consistently utilized these reports to analyze the State's progress meeting requirements. The Reviewer has also relied on TMACT and IPS-SE Fidelity reports where applicable, LME/MCO generated reports on individuals receiving IPS-SE services, and, more recently, State Barriers and Transition Oversight Committee minutes and the DHHS TCL team bi-weekly quality utilization and monitoring reports.

10. The State published an Annual Report for FY 2024 on the DHHS website as required in **(G)(8)** after the Reviewer issued her draft Annual Report to the parties. The State completes the Annual Report as soon after the end of a fiscal year as possible to provide the Parties with information to make decisions and for the State to consider what additional steps they need to take to come into substantial compliance with this Settlement Agreement. The State has challenges producing its report with service data and other information that is not available until after the end of the fiscal year. This occurs after year end service claims adjudication and approval. This results in the Reviewer only being able to report on the completeness and quality of the State's Annual Report for the previous fiscal year. The State's Annual Report has improved over time and is available on the State's website.

11. The State has improved its Annual Report both in its detail and data collection to provide a clearer picture of systems improvement and challenges. The report references personal outcomes related to participant health, safety and welfare, independence, community integration, housing stability, harm avoidance, and reduced incidence of hospital contacts and institutionalization.

***(C) Recommendations***

1. Review expectations for LME/MCO QA/PI expectations and required reporting to ensure key performance issues are the focus of the state's expectations with housing, community based services and supported employment requirements. Elicit data and experiential information from both the CST Coaching and Monitoring team, and the UNC Institute for Best Practices to assist DMH and LME/MCOs in the identification of key services areas that are in need of focused performance improvement activities. This includes reviewing supported housing, services and supported employment requirements as a whole rather than narrowly focusing on one requirement at a time. This also includes DMH exploring options and opportunities for individuals in TCL to get assistance with supported employment as required in **(D)(1).**

2. Utilize the Discharge, Transition Process, Pre-screening bi-monthly report as the reporting and guiding document for the State's quality improvement process for these

requirements. Utilize the TCL team's current approach in assisting LME/MCOs with meeting these requirements.

3. Analyze and, where necessary, include dashboard measures that are specifically focused on the outstanding Settlement Agreement issues.

## SUMMARY

This report outlines the progress the State has made, meeting major requirements agreed upon in the 2012 Settlement Agreement and extended through multiple modifications. The report also outlines the State's challenges in fulfilling the Settlement Agreement in FY 2025. The Parties filed their sixth motion to modify the Settlement Agreement with the Court on December 11, 2025, and the motion was granted by Judge Dever on December 12, 2025. The Sixth Modification extends the Settlement Agreement obligations until July 1, 2027.

The State met its obligations for Pre-Screening and Diversion and Quality Assurance and Performance Improvement in FY 2024. The Sixth Modification added a provision for the Parties to meet and confer no later than May 16, 2025, to determine whether discharge of any obligations referenced in the Sixth Modification would have been appropriate at that time. None were identified then and none by the end of FY 2025.

The State continued to make progress with 344 individuals living in supported housing, an increase of 8%, by the end of FY 2025. The State only made negligible progress meeting major housing requirements for 2,000 individuals exiting ACHs living in supported housing with a net gain of 22, or 3%, in FY 2025, down from a net gain of 43 individuals in FY 2024

The State began to show progress in FY 2021 through FY 2024, ensuring individuals get permanent housing with tenancy rights, in a location they choose and ensuring individuals get a choice in their daily living activities. The State did not meet access requirements, affording individuals of their rights in a location with access to community activities and enabling the opportunity to interact with individuals without disabilities. The State is continuing their incentive plan and expanding their efforts to identify and reduce barriers, expand bridge housing programs, and add a limited number of new staff at the State level and with LME/MC0s. The State made progress with 59% of applicants who requested reasonable accommodation securing a rental lease in FY 2025, although not all eligible individuals applied.

The rate of individuals in TCL receiving IPS-SE services or support from their ACT employment specialist did not increase substantially, with only 11% of individuals interviewed in the Reviewer's FY 2025 review who indicated an interest in supported employment getting assistance. Staff in local EIPD offices have made timely eligibility decisions and EIPD rolled out the new DB 101 tool. A number of obstacles remain, principally individuals in TCL not getting an IPS-SE referral or staff not following through to assist individuals with their choices for seeking employment or education.

The State did not make progress meeting Community-Based Mental Health Services and is not on track to meet these requirements in FY 2026. The State developed a new

Implementation Plan in early FY 2024 but the level of system transformation this SA requires to make progress remains incomplete, adding to the possibility the State cannot make the necessary progress to meet all of the key requirements by July 1, 2026. In the FY 2023 Annual Report, the reviewer made reference to the State needing to avoid the trap of establishing new processes and practices to improve systems on the existing culture, beliefs, and structures rather than creating a new recovery-oriented system. Unfortunately, the State seems to have followed the same track with community mental health services and, to some degree, with supported housing requirements. The State increased their support to the UNC Center of Excellence and the TAC CST coaching team in FY 2025. This support is crucial for the State to move forward.

The State continues to make progress meeting the discharge and transition requirements largely due to the State's TCL team quality improvement plan that has set benchmarks, tracks progress closely and conducts reviews in the community on a continuous basis. Progress is still uneven meeting SPH discharge planning standards and ensuring individuals living in ACHs have the opportunity to visit individuals who have moved into the community from ACHs. In-reach staffing turnover also presents challenges, although LME/MCOs have been able to retain many TCL leadership staff, which benefits the State tremendously.

The Reviewer and her team, along with assistance from the State's *Olmstead* team, conducted a review of a 10% sample of individuals living in ACH/FCHs to quantify to the degree possible the number of individuals who could and want to move, those who need more In-reach, and those individuals who cannot move. The State is following up on these findings and continuing their focus on monitoring transition planning. The State continues to make progress diverting individuals from admission to ACHs and providing other community services and supports. In FY 2019, 852 individuals were not diverted from ACHs. In FY 2025, the number of individuals not diverted dropped to 24 with 175 individuals diverted from ACHs.

Many dedicated individuals across state agencies, state psychiatric hospitals, LME/MCOs, and service provider staff worked tirelessly again this year to break down barriers and assist individuals to move to and continue to live in their own home, even considering workforce issues and staff turnover. Perhaps the most encouraging work occurred with LME/MCO and staff and leaders among individuals with lived experience. Their voices, creativity, and commitment are key to the State meeting its obligations in the Settlement Agreement and the promise of a recovery focused community-based system for individuals in the future.

# APPENDIX

## STATE AND LME/MCO MEAN SCORES
## AND RANGE OF SCORES IN FY 2025
## ON TWELVE SETTLEMENT AGREEMENT REQUIREMENTS AND STANDARDS IN:
## SUPPORTED HOUSING AND COMMUNITY-BASED MENTAL HEALTH SERVICES

**TABLE 1: STATE SCORES BY SETTLEMENT REQUIREMENT CATEGORY AND STANDARDS COMPARISON BETWEEN FY 2024 AND FY 2025**

| | STATE MEAN | MINIMUM LME MEAN | MAXIMUM LME MEAN |
|---|---|---|---|
| **Access to Hsg. B.1.** | **1.67/1.55** | **0.82/1.20** | **2.30/1.55** |
| **Hsg. Rights of ten 5 a-b** | **2.53 1.67** | **1.86/1.13** | **3.00/2.57** |
| **Location 5 c-d** | **2.54/1.50** | **1.91/.086** | **3.00/2.25** |
| **Choice in Act. 5.e.** | **2.16/1.62** | **1.74/1.43** | **2.58/2.14** |
| **Access to services, frequency, intensity 1.1-2.** | **1.50/1.41** | **0.53/0.93** | **2.55/2.50** |
| **Comm Based-Rec/Recovery 3.1.3** | **1.45/1.18** | **0.73/0.69** | **2.42/2.00** |
| **Flex, int. Asser Engagement 3.4** | **1.50/1.27** | **0.80/0.71** | **2.63/1.89** |
| **Individualized with choice 3.5** | **1.50/1.52** | **0.33/1.28** | **2.68/2.33** |
| **Comm natural support 3.6** | **1.41/1.38** | **0.47/0.93** | **2.28/2.28** |
| **Sup net for crisis 3.7** | **1.51/1.19** | **0.53/0.57** | **2.74/1.89** |
| **list of services, engaged 4.2.3.** | **1.50/1.11** | **0.27/0.33** | **2.78/2.00** |
| **PCP 6.1** | **1.10/0.96** | **0.33/0.36** | **1.94/2.22** |

**GRAPH 1: FY 2025 STATE MAXIMUM-MEAN-MINIMUM COMPARISON SCORES**




**GRAPH 2: FY 2023-FY2025 STATE MEAN COMPARISON SCORES**




Red Line at 2.20 is the Settlement Agreement Standard

**GRAPH 3: STATE AND LME/MCO SUPPORTED HOUSING AND COMMUNITY BASED MENTAL SERVICES SCORES**




**GRAPH 4: FY 2024-FY 2025 ALLIANCE SUPPORTED HOUSING AND COMMUNITY BASED MENTAL SERVICES MEAN SCORES**



**GRAPH 5: FY 2024-FY 2025 PARTNERS SUPPORTED HOUSING AND COMMUNITY BASED MENTAL SERVICES MEAN SCORES**




**GRAPH 5: FY 2024-FY 2025 TRILLIUM SUPPORTED HOUSING AND COMMUNITY BASED MENTAL SERVICES MEAN SCORES**



**GRAPH 5: FY 2024-FY 2025 VAYA SUPPORTED HOUSING AND COMMUNITY BASED MENTAL SERVICES MEAN SCORES**

